**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| COOPER SCHULZE, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>HALLMARK FINANCIAL SERVICES, INC., NAVEEN ANAND, and JEFFREY R. PASSMORE,<br><br>                              Defendants. | Case No. 3:20-cv-1130<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cooper Schulze ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Hallmark Financial Services, Inc. ("Hallmark Financial" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Hallmark Financial; and (c) review of other publicly available information concerning Hallmark Financial.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Hallmark Financial securities between March 5, 2019 and March 17, 2020, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Hallmark Financial is a diversified property/casualty insurance group. The Company's Specialty Commercial Segment includes Commercial Auto, E&S Casualty, E&S Property, Professional Liability, and Aerospace & Programs. The Standard Commercial Segment includes Commercial Accounts and the run-off from the Company's former Workers Compensation operating unit. The Personal Segment consists solely of its Specialty Personal Lines business unit.

3.      On March 2, 2020, Hallmark Financial announced that it had decided to exit from its Binding Primary Commercial Auto business, and reported a $63.8 million loss development for prior underwriting years.

4.      On this news, the Company's share price fell $2.10, or more than 14%, to close at $12.23 per share on March 3, 2020, on unusually heavy trading volume.

5.      On March 11, 2020, Hallmark Financial disclosed that it had dismissed its independent auditor, BDO USA, LLP ("BDO") due to a disagreement regarding estimates for

reserves for unpaid losses, among other things.

6.      On this news, the Company's share price fell $2.39, or over 29%, to close at $5.71 per share on March 12, 2020, on unusually heavy trading volume.

7.      On March 17, 2020, Hallmark Financial filed with the SEC a letter from BDO in which BDO stated "BDO expanded significantly the scope of its audit on January 31, 2020, with respect to which a substantial portion of the requests had not been received and/or tested prior to our termination."

8.      On this news, the Company's share price fell $0.08 per share, or 2.5%, to close at $3.12 per share on March 18, 2020.

9.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company lacked effective internal controls over accounting and financial reporting related to reserves for unpaid losses; (2) that the Company improperly accounted for reserve for unpaid losses and loss adjustment expenses related to its Binding Primary Commercial Auto business; (3) that, as a result, Hallmark Financial would be forced to report a $63.8 million loss development for prior underwriting years; (4) that, as a result, Hallmark Financial would exit from its Binding Primary Commercial Auto business; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.     Plaintiff Cooper Schulze, as set forth in the accompanying certification, incorporated by reference herein, purchased Hallmark Financial securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Hallmark Financial is incorporated under the laws of Nevada with its principal executive offices located in Dallas, Texas. Hallmark Financial's common stock trades on the NASDAQ exchange under the symbol "HALL."

17.     Defendant Naveen Anand ("Anand") was the Company's Chief Executive Officer ("CEO") at all relevant times.

18.     Defendant Jeffrey R. Passmore ("Passmore") was the Company's Chief Financial Officer ("CFO") at all relevant times.

19.     Defendants Anand and Passmore (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities

analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.    Hallmark Financial is a diversified property/casualty insurance group.   The Company's Specialty Commercial Segment includes Commercial Auto, E&S Casualty, E&S Property, Professional Liability, and Aerospace & Programs. The Standard Commercial Segment includes Commercial Accounts and the run-off from the Company's former Workers Compensation operating unit. The Personal Segment consists solely of its Specialty Personal Lines business unit.

### Materially False and Misleading
### Statements Issued During the Class Period

21.    The Class Period begins on March 5, 2019. On that day, Hallmark Financial announced its fourth quarter and full year 2018 financial results in a press release, stating in relevant part:

**Year End 2018 Highlights (all comparisons to prior year):**
- Gross premiums written of $663.0 million represented an increase of 10%
- Net premiums written of $363.8 million were slightly lower than 2017 of $365.6 million
- Net combined ratio of 97.1% compared to 107.9%
- Net income of $10.3 million, or $0.57 per diluted share, compared to net loss of $11.6 million, or $0.63 per diluted share
- Operating earnings of $18.4 million, or $1.01 per diluted share, compared

to Operating loss of $11.4 million, or $0.62 per diluted share
- Net investment losses of $10.2 million included $1.8 million in net realized gains from the sale of investment securities and a $9.3 million loss from a reduction in the amount of net unrealized capital gains that existed in our equity investments. The income statement recognition of changes in unrealized gains and losses of equity securities is related to the adoption in 2018 of new accounting rules and does not impact operating earnings.

22.     On March 14, 2019, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2018, affirming the previously reported financial results. Therein, under "Reserves for Losses and Loss Adjustment Expenses," Hallmark Financial stated, in relevant part:

> The $6.0 million unfavorable net development and $40.1 million unfavorable net development in prior accident years recognized in 2018 and 2017, respectively, represent changes in our loss reserve estimates. In 2018 and 2017, the aggregate loss reserve estimates for prior years were increased to reflect unfavorable loss development when the available information indicated a reasonable likelihood that the ultimate losses would be more than the previous estimates. The unfavorable prior year reserve development during the twelve months ended December 31, 2018 was primarily driven by the continued emergence of increased frequency and severity trends in our primary commercial auto lines of business within our Contract Binding operating unit, which was representative of industry trends, partially offset by net favorable development in our general liability lines within our Contract Binding and Standard Commercial P&C operating units. Generally, changes in reserves are caused by variations between actual experience and previous expectations and by reduced emphasis on the Bornhuetter-Ferguson method due to the aging of the accident years.

> ***Year ended December 31, 2018:***

> - ***Specialty Commercial Segment.*** Our Contract Binding operating unit experienced net unfavorable development in the 2016 and prior accident years primarily in the commercial auto liability line of business, partially offset by favorable development primarily in the commercial auto and general liability lines of business in the 2017 accident year. Our Specialty Commercial operating unit experienced net unfavorable development in general aviation, commercial excess liability, satellite launch insurance products, primary/excess commercial property, professional liability and specialty risk programs lines of business.

* * *

*Year ended December 31, 2017:*

- ***Specialty Commercial Segment.*** Our Contract Binding operating unit experienced net unfavorable development in the 2016 and prior accident years primarily driven by the continued emergence of increased frequency and severity trends in the commercial auto lines of business. Our Specialty Commercial operating unit experienced net unfavorable development in general aviation primarily in the 2016, 2013 and 2011 and prior accident years, commercial excess liability primarily in the 2013 accident year and specialty risk programs primarily in the 2015 and prior accident years, partially offset by net favorable development in the medical professional liability and primary/excess commercial property lines of business primarily in the 2016 accident years.

\* \* \*

In the opinion of management, our reserves represent the best estimate of our ultimate liabilities, based on currently known facts, current law, current technology and assumptions considered reasonable where facts are not known. Due to the significant uncertainties and related management judgments, there can be no assurance that future favorable or unfavorable loss development, which may be material, will not occur.

23.     On May 8, 2019, Hallmark Financial reported its first quarter 2019 financial results in a press release that stated, in relevant part:

**First Quarter 2019 Highlights (all comparisons to same prior year period):**

- Gross premiums written increased 22% to $187.3 million
- Net premiums written increased 28% to $117.4 million
- Net combined ratio improved to 96.5% compared to 97.4%
- Net income of $15.0 million, or $0.83 per diluted share, compared to $0.6 million, or $0.04 per diluted share
- Operating earnings of $5.6 million, or $0.31 per diluted share, compared to $4.5 million, or $0.24 per diluted share (see "Non-GAAP Financial Measures" below)
- Net investment gains of $11.9 million, including $4.1 million in net realized gains and a $7.8 million increase in net unrealized capital gains, compared to net investment losses of $4.8 million

24.     The same day, Hallmark Financial filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019, affirming the previously reported financial results. Therein, the Company reported that its consolidated reserve for unpaid losses and loss adjustment expenses was $530.23 million. Regarding the primary factors affecting each

segment's prior accident year reserve development, the report stated, in relevant part:

> ***Specialty Commercial Segment.*** Our Commercial Auto business unit experienced net unfavorable development in the 2017 and prior accident years primarily in the primary commercial auto liability line of business, partially offset by favorable development in the primary commercial auto line of business in the 2018 accident year. Our E&S Casualty business unit experienced net unfavorable development primarily in our E&S package insurance products in the 2017 and prior accident years, partially offset by favorable development in the 2018 accident year. We experienced net unfavorable development in our E&S Property and Aerospace & Programs business units, partially offset by favorable development in our Professional liability business unit.
>
> * * *
>
> Our Specialty Commercial Segment reported a $1.6 million decrease in losses and LAE which consisted of (a) a $10.0 million decrease in losses and LAE in our Commercial Auto Business unit due largely to lower net earned premiums, as well as $0.3 million of favorable prior year net loss reserve development recognized during the three months ended March 31, 2019 as compared to $3.5 million of unfavorable prior year net loss reserve development during the same period of 2018, partially offset by increased net current accident year loss trends, . . .

25.    On August 7, 2019, Hallmark Financial reported its second quarter 2019 financial results in a press release that stated, in relevant part:

> **Second Quarter 2019 Highlights (all comparisons to same prior year period):**
>
> - Gross premiums written increased 26% to $218.2 million
> - Net premiums written increased 38% to $123.8 million
> - Net combined ratio improved to 94.5% compared to 97.0%
> - Net income of $13.0 million, or $0.71 per diluted share, compared to $5.1 million, or $0.28 per diluted share
> - Operating earnings of $7.6 million, or $0.42 per diluted share, compared to $4.7 million, or $0.26 per diluted share (see "Non-GAAP Financial Measures" below)
> - Net investment gains of $6.8 million, including $0.1 million in net realized gains and a $6.7 million increase in net unrealized gains, compared to net investment gains of $0.5 million

26.    On August 9, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019, affirming the previously reported financial results. Therein, the Company reported that its consolidated reserve for unpaid losses and loss adjustment expenses was $551.54 million. Regarding the primary factors affecting each

segment's prior accident year reserve development, the report stated, in relevant part:

> ***Specialty Commercial Segment.*** Our Commercial Auto business unit experienced net unfavorable development in the 2017 and prior accident years primarily in the primary commercial auto liability line of business, partially offset by net favorable development in the primary commercial auto line of business in the 2018 accident year. Our E&S Casualty business unit experienced net unfavorable development primarily in our E&S package insurance products in the 2017 and prior accident years, partially offset by net favorable development in the 2018 accident year. We experienced net favorable development in our E&S Property and Professional Liability business units, partially offset by net unfavorable development in our Aerospace & Programs business unit.
>
> * * *
>
> Our Specialty Commercial Segment reported stable losses and LAE as the combined result of (a) a $8.0 million decrease in losses and LAE in our Commercial Auto business unit due largely to lower net earned premiums, as well as $2.8 million of unfavorable prior year net loss reserve development recognized during the three months ended June 30, 2019 as compared to $5.9 million of unfavorable prior year net loss reserve development during the same period of 2018, . . .

27.     On November 7, 2019, Hallmark Financial announced its third quarter 2019 financial results in a press release that stated, in relevant part:

> **Third Quarter 2019 Highlights (all comparisons to same prior year period):**
> - Gross premiums written increased 33% to $224.2 million
> - Net premiums written increased 45% to $127.8 million
> - Net combined ratio improved to 95.8% compared to 98.1%
> - Net income of $5.3 million, or $0.29 per diluted share, compared to $9.7 million, or $0.53 per diluted share
> - Operating earnings of $6.3 million, or $0.35 per diluted share, compared to $4.2 million, or $0.23 per diluted share (see "Non-GAAP Financial Measures" below)
> - Net investment losses of $1.3 million, including $0.2 million in net realized gains and a $1.5 million decrease in net unrealized gains, compared to net investment gains of $7.0 million

28.     The same day, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019, affirming the previously reported financial results. Therein, the Company reported that its consolidated reserve for unpaid losses and loss adjustment expenses was $565.29 million. Regarding the primary factors affecting each segment's prior accident year reserve development, the report stated, in relevant part:

*Specialty Commercial Segment*. Our Commercial Auto business unit experienced net unfavorable development in the 2017 and prior accident years primarily in the primary commercial auto liability line of business, partially offset by net favorable development in the primary commercial auto line of business in the 2018 accident year. Our E&S Casualty business unit experienced net unfavorable development primarily in our E&S package insurance products in the 2017 and prior accident years, partially offset by net favorable development in the 2018 accident year. We experienced net favorable development in our E&S Property and Professional Liability business units, partially offset by net unfavorable development in our Aerospace & Programs business unit.

\* \* \*

Our Specialty Commercial Segment reported lower losses and LAE as the combined result of (a) a $5.9 million decrease in losses and LAE in our Commercial Auto business unit due largely to $5.1 million of unfavorable prior year net loss reserve development recognized during the three months ended September 30, 2019 as compared to $8.1 million of unfavorable prior year net loss reserve development during the same period of 2018 . . .

29.     The above statements identified in ¶¶ 21-28 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) the Company lacked effective internal controls over accounting and financial reporting related to reserves for unpaid losses; (2) that the Company improperly accounted for reserve for unpaid losses and loss adjustment expenses related to its Binding Primary Commercial Auto business; (3) that, as a result, Hallmark Financial would be forced to report a $63.8 million loss development for prior underwriting years; (4) that, as a result, Hallmark Financial would exit from its Binding Primary Commercial Auto business; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

30.     On March 2, 2020, Hallmark Financial announced that it had exited from its Binding Primary Commercial Auto business and reported a $63.8 million loss development for prior underwriting years. In a press release, the Company stated, in relevant part:

Hallmark Financial Services, Inc. ("Hallmark Financial" or the "Company")

(NASDAQ: HALL), a specialty property and casualty insurance company, *announced last month to its brokers and agents that the Company had made the strategic decision to exit its Binding Primary Auto business*. Despite several years of implementing proactive rate actions and policy changes, the Company has continued to experience increasing claim severity from prior accident years. As a result, Hallmark Financial has made the decision that its in-force policies will be placed into run-off and non-renewed in accordance with applicable state requirements.

\* \* \*

The Company also announced that it will file its annual insurance statutory reports today, which will include pre-tax adverse prior year loss development of $63.8 million, net of reinsurance, for fiscal 2019, as provided in Schedule P, of which $56.1 million was recorded in the fourth quarter of 2019. These losses are primarily related to the Binding Primary Auto business for the 2016 and 2017 underwriting years, with a smaller remainder largely attributable to general liability. These amounts are unaudited and based on statutory requirements rather than generally accepted accounting principles.

Current Operations

At year-end 2019, the Binding Primary Auto business operated in only four states: Texas, Oklahoma, Arkansas and Missouri, having previously exited Louisiana and Mississippi in 2016. With its profile limited to only four states, and heavy concentration (87%) in Texas, the performance of the Binding Primary Auto book is highly influenced by the legal and regulatory environments of these states.

Despite achieving significant rate increases in this portfolio and improving the overall risk profile of the book, the performance of this business continued to be volatile. Over the past five years, the Binding Primary Auto business was responsible for over 100% of the Company's aggregate adverse reserve development.

The Company worked to transform this book, bringing in new underwriting leadership, exiting states and segments of business, increasing analytical pricing support, developing predictive models and filing new rate structures. Despite these efforts, based on the increasing claim severity trends impacting this line of business, and the limitations of this customer base to absorb meaningful rate increases viewed as necessary to profitably write this business, the Company made the decision to exit this segment of the commercial auto market.

31.     On this news, the Company's share price fell $2.10, or over 14%, to close at $12.23 per share on March 3, 2020, on unusually heavy trading volume.

32.     On March 11, 2020, after the market closed, Hallmark Financial disclosed that it had dismissed its independent auditor due to a disagreement regarding estimates for reserves for

unpaid losses, among other things. In a Form 8-K filed with the SEC after the market closed, the

Company stated, in relevant part:

> On March 5, 2020, Hallmark Financial Services, Inc. (the "Company") dismissed BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm, effective immediately. BDO's audit reports on the Company's consolidated financial statements as of and for the years ended December 31, 2017 and 2018, did not contain any adverse opinion or disclaimer of opinion, and were not qualified or modified as to uncertainty, audit scope or accounting principles. The decision to change accountants was approved by the Audit Committee of the Company's board of directors (the "Audit Committee").

> During the two fiscal years ended December 31, 2018, and the subsequent interim periods through the filing of the Company's Form 10-Q for the quarter ended September 30, 2019, there were no disagreements (as defined in Item 3.04 of Regulation S-K) between the Company and BDO. ***Subsequently, a disagreement arose regarding certain matters related to (a) the Company's processes for estimating reserves for unpaid losses and loss adjustment expenses, (b) the resulting potential impact on the Company's assessment of the associated internal controls over financial reporting, and (c) the resulting potential impact on recorded amounts of those reserves, all as of the quarter ended September 30, 2019, and the year ended December 31, 2019.*** The Audit Committee has discussed the subject matter of the disagreement with BDO and has authorized BDO to respond fully to the inquiries of any successor independent registered public accounting firm concerning the subject matter of such disagreement.

(Emphasis added.)

33.     On this news, the Company's share price fell $2.39, or over 29%, to close at $5.71

per share on March 12, 2020, on unusually heavy trading volume.

34.     On March 17, 2020, Hallmark Financial filed with the SEC a letter from BDO.

Therein, BDO stated:

> We have been furnished with a copy of the response to Item 4.01 of Form 8-K for the event that occurred on March 11, 2020, to be filed by our former client, Hallmark Financial Services, Inc. (the "Company"). We agree with the statements made in response to that Item insofar as they relate to our Firm. In addition, with respect to the matters of disagreement, BDO expanded significantly the scope of its audit on January 31, 2020, with respect to which a substantial portion of the requests had not been received and/or tested prior to our termination.

35.     On this news, the Company's share price fell $0.08 per share, or 2.5%, to close at

$3.12 per share on March 18, 2020.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Hallmark Financial securities between March 5, 2019 and March 17, 2020, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hallmark Financial's common shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Hallmark Financial common stock were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Hallmark Financial or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Hallmark Financial; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

41.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

42.      The market for Hallmark Financial's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Hallmark Financial's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Hallmark Financial's securities relying upon the integrity of the market price of the Company's securities and market information relating to Hallmark Financial, and have been damaged thereby.

43.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Hallmark Financial's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Hallmark Financial's business, operations, and prospects as alleged herein.

44.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hallmark Financial's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.     During the Class Period, Plaintiff and the Class purchased Hallmark Financial's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

47.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by

virtue of their receipt of information reflecting the true facts regarding Hallmark Financial, their control over, and/or receipt and/or modification of Hallmark Financial's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hallmark Financial, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

48.     The market for Hallmark Financial's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Hallmark Financial's securities traded at artificially inflated prices during the Class Period.  On October 22, 2019, the Company's share price closed at a Class Period high of $19.88 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Hallmark Financial's securities and market information relating to Hallmark Financial, and have been damaged thereby.

49.     During the Class Period, the artificial inflation of Hallmark Financial's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hallmark Financial's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Hallmark Financial and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

50.     At all relevant times, the market for Hallmark Financial's securities was an efficient market for the following reasons, among others:

(a)     Hallmark Financial shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Hallmark Financial filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Hallmark Financial regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Hallmark Financial was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for Hallmark Financial's securities promptly digested current information regarding Hallmark Financial from all publicly available sources and reflected such information in Hallmark Financial's share price. Under these circumstances, all purchasers of Hallmark Financial's securities during the Class Period suffered similar injury through their purchase of Hallmark Financial's securities at artificially inflated prices and a presumption of reliance applies.

52.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose

material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

53.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Hallmark Financial who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

54.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Hallmark Financial's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

56.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Hallmark Financial's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Hallmark Financial's financial well-being and prospects, as specified herein.

58.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hallmark Financial's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hallmark Financial and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

59.     Each of the Individual Defendants' primary liability and controlling person

liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

60.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Hallmark Financial's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Hallmark Financial's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the

integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Hallmark Financial's securities during the Class Period at artificially high prices and were damaged thereby.

62.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Hallmark Financial was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Hallmark Financial securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

63.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

65.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66.    Individual Defendants acted as controlling persons of Hallmark Financial within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-

making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

68. As set forth above, Hallmark Financial and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

      Plaintiff hereby demands a trial by jury.


Dated: May 5, 2020

By: *s/ Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
Email: jkendall@kendalllawgroup.com

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060

*Attorneys for Plaintiff Cooper Schulze*