## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| COOPER SCHULZE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HALLMARK FINANCIAL SERVICES, INC., NAVEEN ANAND, and JEFFREY R. PASSMORE,<br><br>Defendants. | Civil Action No. 3:20-cv-1130-X<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

010936-11/1354806 V1

## <u>TABLE OF CONTENTS</u>

I.     NATURE OF THE ACTION ....................................................................2

II.    JURISDICTION AND VENUE ..............................................................5

III.   PARTIES AND RELEVANT NON-PARTIES .......................................5

    A.     Lead Plaintiff Yalamanchili...........................................................5

    B.     Corporate Defendant Hallmark......................................................6

    C.     Executive Defendants Anand and Passmore...................................6

    D.     Relevant Non-Parties .....................................................................7

IV.    BACKGROUND INFORMATION .........................................................7

    A.     Hallmark's Reported Loss Reserves. ..............................................7

    B.     Hallmark's Disclosed Procedures for Determining Loss Reserves. .......................8

    C.     The Level of Hallmark's Reported Loss Reserves Was Vital
        Information for Investors. ..............................................................9

    D.     Hallmark Deliberately Understated its Reserves During the Class
        Period. ..........................................................................................11

        1.     Hallmark's actual procedures for estimating loss reserves
            (the "reserve project") were contrary to its publicly
            disclosed procedures. ............................................................12

        2.     Hallmark's fraudulent claims reserve process resulted in
            materially understated reserves. ............................................14

        3.     Hallmark attempted to "paper the files" by employing a
            new process for estimating loss reserves after firing
            accounting firm BDO...............................................................16

        4.     Stauber's and Milch's abuse of the loss reserves estimation
            process reveals Hallmark's lack of internal accounting
            controls....................................................................................16

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................17

VI.    THE TRUTH EMERGES.........................................................................28

VII.    HALLMARK'S FINANCIAL STATEMENTS VIOLATED GAAP BY
        MATERIALLY MISREPRESENTING HALLMARK'S REPORTED
        LOSS RESERVES ............................................................................................33

VIII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ...............................35

IX.     LOSS CAUSATION...........................................................................................37

        A.      Corrective Disclosures. ...........................................................................37

        B.      Materialization of Risks. .........................................................................39

X.      NO SAFE HARBOR .........................................................................................40

XI.     THE PRESUMPTION OF RELIANCE ................................................................41

XII.    CLASS ALLEGATIONS ...................................................................................42

XIII.   CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(A)
        OF THE EXCHANGE ACT................................................................................44

XIV.    PRAYER FOR RELIEF ....................................................................................48

XV.     DEMAND FOR JURY TRIAL ..........................................................................48

Lead Plaintiff Rajeev Yalamanchili ("Lead Plaintiff" or "Mr. Yalamanchili") brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of himself and a Class of all other persons or entities who purchased or otherwise acquired the publicly-traded common stock of Hallmark Financial Services, Inc. ("Hallmark" or the "Company") during the period from March 5, 2019, through March 17, 2020, inclusive (the "Class Period").  The Defendants are Hallmark and Executive Defendants Naveen Anand (Hallmark's Chief Executive Officer, or "CEO") and Jeffrey R. Passmore (Hallmark's Chief Financial Officer, or "CFO").  The Executive Defendants and Hallmark are collectively referred to herein as the "Defendants."

Lead Plaintiff alleges the following based upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief are based on the ongoing independent investigation of its undersigned counsel.  This investigation included, but was not limited to, review and analysis of: (i) public filings with the United States Securities and Exchange Commission ("SEC") made by Hallmark; (ii) transcripts of Hallmark's conference calls with analysts and investors; (iii) publicly available presentations by Hallmark; (iv) Hallmark's press releases and media reports; (v) research reports by securities and financial analysts; (vi) news and media reports concerning the Company; (vi) Hallmark's securities pricing data; (vii) information provided by former Hallmark employees; (viii) consultations with relevant experts and consultants; and (ix) other publicly available material and data identified herein.  Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that substantial additional evidentiary support for the allegations set forth herein will be uncovered after a reasonable opportunity for further investigation or discovery.

# I.   NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Hallmark securities between March 5, 2019, and March 17, 2020, inclusive (the "Class Period").  Lead Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Hallmark is a diversified property/casualty insurance group selling various types of property and casualty insurance to its customers.  When Hallmark sells an insurance policy, it receives the premiums up-front, and may have to pay related claims years into the future.  To properly "match" these claims expenses with the premium revenues, Hallmark (like other insurance companies) are required by relevant accounting rules to estimate the future amounts it will have to pay to settle claims that have been made against the policy, recognizing these amounts as a current-period expense and as a "loss reserve" liability on its balance sheet.  Accordingly, loss reserves recognized by the Company will lower the Company's reported net income in the same amount.

3.      Throughout the Class Period, Hallmark and the Executive Defendants certified that Hallmark's loss reserve amount was adequate, appropriately calculated, effectively managed, and properly maintained to account for unpaid losses associated with Hallmark's insurance claim files.  Defendants further certified throughout the Class Period that Hallmark's claims management process included aggressively closing out new and existing insurance claims under a "fast track" process so that loss reserves could be controlled and adequately maintained.

4.      Defendants further certified throughout the Class Period that Hallmark employed a specialized, experienced, and competent claims management team that effectively evaluated and estimated loss reserves.

5.     However, despite Defendants' ongoing positive representations during the Class Period that Hallmark's loss reserve process was sufficient and accurate, Hallmark: (i) deliberately and systematically manipulated and understated loss reserves in order to overstate its reported net income during the Class Period; and (ii) lacked effective internal accounting controls to prevent such manipulation.

6.     Defendants knowingly concealed from investors and the public that Hallmark's loss reserving practices were unsound.  In addition to the above, Hallmark personnel were actively engaged in poor loss reserving practices and arbitrarily and deliberately reduced the amount of projected claim file exposures in order to manipulate and lower the amount of Hallmark's reportable loss reserves.

7.     On March 2, 2020, the truth of Hallmark's unsound claims management and loss reserve practices began to emerge after Hallmark announced that it would be required to increase its loss reserves *a staggering $63.8 million* related to insurance policies that it had sold during 2016 and 2017.  The Company also announced its intention to exit its Binding Primary Commercial Auto business, which had appeared to be profitable prior to taking this massive charge against earnings.  On this news, the Company's share price fell $2.10, or more than 14%, to close at $12.23 per share on March 3, 2020, on unusually heavy trading volume.

8.     The Binding Primary Commercial Auto business had appeared to be profitable because of Defendants' undisclosed improper manipulation of Hallmark's loss reserves.  Because the Company lacked sufficient internal accounting controls, Hallmark was able to perpetrate this fraud until its independent auditor, BDO USA, LLP ("BDO") finally became suspicious and required additional documentation and evidence regarding the appropriateness of the loss reserves in connection with its audit of Hallmark's 2019 financial statements.

9.      Rather than produce the incriminating evidence to its auditor, Hallmark instead fired BDO, as Hallmark disclosed on March 11, 2020.  In response to this shocking disclosure, the Company's share price fell from a close of $8.10 per share on March 11, 2020 to close trading at $5.71 on March 12, 2020, a loss of $2.39 per share (29.5%), on unusually heavy trading volume.

10.     On March 17, 2020, following the close of the market, Hallmark filed with the SEC an amendment of its March 11, 2017 Current Report, in which it attached as Exhibit 16.1 a letter from BDO dated March 13, 2020.  In this letter, BDO disclosed that its termination resulted from Defendants' refusal to comply with auditing procedures established by BDO:

> BDO expanded significantly the scope of its audit on January 31, 2020,  with respect to which a substantial portion of the requests had not been received and/or tested prior to our termination.

11.     Thus, instead of allowing BDO to perform an audit of Hallmark's loss reserve calculations, the Company decided to terminate BDO's work, knowing that certain negative market reaction would inevitably follow (and in fact, did follow) from the dismissal of an auditor in the midst of an accounting scandal.

12.     On the news of Hallmark's refusal to comply with BDO's audit procedures, the Company's share price fell from a close of $3.20 per share on March 17, 2020 to close  at $3.12 per share on March 18, 2020, a decline of $0.08 per share (2.5%).

13.     In total, between March 2, 2020 (when the truth regarding Hallmark's false loss reserves began to be revealed) through March 17, 2020 (when BDO disclosed it was fired because Hallmark refused to comply with its audit procedures), Hallmark's share price plummeted more than 78%.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members  have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act.

17.    Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Hallmark has its headquarters in this District, and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

18.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

19.    All Defendants are subject to personal jurisdiction in the State of Texas, as they reside in Texas, committed the acts complained of herein in Texas, or are otherwise subject to the Texas Long-Arm Statute.

## III.    PARTIES AND RELEVANT NON-PARTIES

**A.    Lead Plaintiff Yalamanchili.**

20.    Lead Plaintiff Rajeev Yalamanchili is an individual who resides in Houston, Texas. Mr. Yalamanchili purchased Hallmark common stock during the Class Period and was damaged thereby, as set forth in the Certification filed by Mr. Yalamanchili in connection with his motion requesting appointment as Lead Plaintiff in this matter.

**B.       Corporate Defendant Hallmark.**

21.     Defendant Hallmark is incorporated under the laws of Nevada with its principal executive offices located at 5420 Lyndon B. Johnson Freeway, Suite 1100, Dallas, Texas.  During the Class Period, the Company's common stock traded on the NASDAQ exchange, which is an efficient market, under the ticker symbol "HALL."  As of March 17, 2020, the end of the Class Period, Hallmark had over 18.4 million shares of common stock outstanding.

**C.       Executive Defendants Anand and Passmore.**

22.     Defendant Naveen Anand ("Anand") has served as the Company's President and Chief Executive Officer ("CEO") since September 2014.  During the Class Period, Defendant Anand reviewed, approved, and signed Hallmark's materially false and misleading SEC filings and certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications").  Specifically, Defendant Anand signed: (i) the Company's Forms 10-Q for the first three quarters of 2019; and (ii) the Company's 2018 Form 10-K.

23.     Defendant Jeffrey R. Passmore ("Passmore") was the Company's Chief Financial Officer ("CFO") at all relevant times during the Class Period.  Defendant Passmore made materially false and misleading statements on the Company's earnings conference calls held on August 8, 2019, and November 8, 2019.  Defendant Passmore left his employment with the Company effective September 30, 2020.

24.     Defendants Anand and Passmore (collectively the "Executive Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Executive Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Executive Defendants are liable for the false statements pleaded herein.

**D.     Relevant Non-Parties**

25.     Although not defendants in this action, the following Hallmark Financial employees are relevant to the misconduct alleged herein:

a)     Chuck Stauber ("Stauber") was the Senior Vice President and Chief Claims Officer of Hallmark, and reported directly to Defendant Anand; and

b)     Stefanie Milch ("Milch") was the Vice President of Claims Litigation of Hallmark, and reported directly to Stauber.

**IV.     BACKGROUND INFORMATION**

26.     Hallmark Financial is a diversified property/casualty insurance group.  The Company's Specialty Commercial Segment includes Commercial Auto, E&S Casualty, E&S Property, Professional Liability, and Aerospace & Programs.  The Standard Commercial Segment includes Commercial Accounts and the run-off from the Company's former Workers Compensation operating unit.

**A.     Hallmark's Reported Loss Reserves.**

27.     An insurance policy is a contract between an "insured" and an insurance company (such as Hallmark), whereby the insured pays an up-front amount of cash ("premiums") in order to protect itself from specified adverse consequences that may impact the insured during a defined future time period.   The insurance company "pools" these risks and pays "claims" when the

specified adverse consequences impact any of its insureds.  The insurance company's profits are the difference between the premiums it receives and: (i) the amounts that it pays out in claims; and (ii) its overhead and other expenses.

28.     Because the insurance company receives its revenues (the premiums) up-front and before it will ultimately pay any claims related to the insurance policies, the "matching principle" and relevant accounting standards require an insurance company to estimate the amount of claims that it will ultimately pay related to the policies it issues in a given time period, and recognize these estimates as an expense in the same time period in which it recognizes the premiums as revenue. These estimates are known as "Reserves," and are an insurance company's best estimate of the eventual cost of the claim to the company, including both the cost of indemnifying the insured and the cost of adjusting the claim.

29.     Accordingly, Hallmark's reported financial statements purport to recognize these estimated future claims as an expense in the period in which the premiums were recognized as revenues, and as a liability on its balance sheet until the claims are actually paid.

**B.     Hallmark's Disclosed Procedures for Determining Loss Reserves.**

30.     Although there are subjective elements to estimating loss reserves, Hallmark assured the market that its loss reserves were "adequate" and were calculated as objectively as possible "using individual case-basis valuations and statistical analyses," and that the estimates were "continually reviewed and adjusted as experience develops or new information becomes known."[1]  Further, Defendants promised that their calculation of Hallmark's reserves represented

---

[1] Hallmark Financial Services, Inc., 2018 Annual Report (Form 10-K), filed March 14, 2019 (the "2018 Form 10-K"), pp. 15, F-12.

"the best estimate of our ultimate liabilities, based on currently known facts, current law, current technology and assumptions considered reasonable where facts are not known."[2]

31.     Hallmark set out the procedures pursuant to which loss reserves would be estimated.  Specifically, Defendants promised that loss reserves would be estimated "using case-basis evaluations and statistical projections, which include inferences from both losses paid and losses incurred."[3]  Hallmark further elaborated that these case-by-case evaluations would be performed by claim supervisors and managers, and touted the experience and expertise of these employees.[4]

32.     Although the case-by-case evaluations would be performed by the experienced claims supervisors and managers, Hallmark explained that "[l]arge loss exposures are: i) reviewed at least quarterly with senior management of the operating unit; and ii) monitored by Hallmark senior management.[5]

33.     In addition to following these procedures, Hallmark also committed to "regularly review the estimates and adjust them as claims experience develops and new information becomes known."[6]

## C.     The Level of Hallmark's Reported Loss Reserves Was Vital Information for Investors.

34.     Because the loss reserves directly impact Hallmark's reported financial statements, including its reported expenses, net income, liabilities and net assets, the amount of loss reserves

---

[2] *Id.* at F-25.

[3] *Id.* at 15.

[4] *Id.* at 14 ("As of December 31, 2018, we had a total of 92 claims managers, supervisors and adjusters with an average experience of approximately 16 years.").

[5] *Id.*

[6] *Id.* at 15.

is of central importance to investors in analyzing the Company's financial condition.

35.    Accurate loss reserves were also vital to the calculation of certain financial ratios that the Company disclosed were "traditionally" used to measure an insurance company's financial performance:

> An insurance company's underwriting performance is traditionally measured by its statutory loss and loss adjustment expense ratio, its statutory expense ratio and its statutory combined ratio.    The statutory loss and loss adjustment expense ratio, which is calculated as the ratio of net losses and loss adjustment expenses ("LAE") incurred to net premiums earned, helps to assess the adequacy of the insurer's rates, the propriety of its underwriting guidelines and the performance of its claims department.  The statutory expense ratio, which is calculated as the ratio of underwriting and operating expenses to net premiums written, assists in measuring the insurer's cost of processing and managing the business.   The statutory combined ratio, which is the sum of the statutory loss and LAE ratio and the statutory expense ratio, is indicative of the overall profitability of an insurer's underwriting activities, with a combined ratio of less than 100% indicating profitable underwriting results.[7]

36.    Likewise, industry analysts closely monitored Hallmark's loss reserves in order to assess the Company's value.

37.    Given the importance of Hallmark's loss reserve developments to industry analysts, Hallmark's profitability, and Hallmark's overall insurance business model, Defendants deceptively touted Hallmark's allegedly methodical and sophisticated claims management process as an effective way to mitigate against anticipated increases in loss reserves due to claims liability exposure.  Defendants consistently and falsely represented that Hallmark's claims management process would close claims faster and reduce exposure to increasing loss reserve costs, thereby improving Hallmark's financial position.

---

[7] *Id*. at 13-14.

**D.      Hallmark Deliberately Understated its Reserves During the Class Period.**

38.      Hallmark deliberately and materially understated its loss reserves during the Class Period, as confirmed by the following two confidential witnesses:

a)      <u>Confidential Witness #1</u>.  CW-1 served as a Claims Program Manager at Hallmark from late 2017 to early 2020.  Prior to working at Hallmark, CW-1 worked for various large insurance companies for approximately 12 years.  As a result of these positions, CW-1 had experience resolving and reserving losses for publicly traded companies.  CW-1 worked in the Binding Primary Commercial Auto line at Hallmark's main office in Dallas.  As a Claims Program Manager, CW-1 oversaw the day-to-day operations of claims, loss reserve requests, the training of adjusters, audits of claims files, and the reporting of results to upper management.  CW-1 would also project claims payments for adjusters' cases when adjusters resigned or were fired.  CW-1's direct supervisor was Vice President of Claims Litigation Stefanie Milch, with whom CW-1 had daily interactions.  Milch reported directly to Chief Claims Officer Chuck Stauber, who in turn reported directly to CEO Defendant Naveen Anand.

b)      <u>Confidential Witness #2</u>.  CW-2 served as a former Senior Liability Adjuster at Hallmark from mid-2015 to late 2020. CW-2 worked as an adjuster in Hallmark's Primary Commercial Auto Insurance business line and reported to Hallmark's former Vice President and Director of Claims (who was later replaced by Stefanie Milch). CW-2 was responsible for evaluating Hallmark's liability exposure on claims and lawsuits in the Primary Commercial Auto Insurance business line.  This involved determining payout amounts for case settlement resolution, determining the level of loss reserves, and completing loss reports.  All of this information would be documented in a draft report, which was sent to Milch and Chuck Stauber for their approvals.  CW-2 stated that a claim

would not be paid until given final approval by Stauber.  CW-2 became aware of these practices in late 2018, and ultimately resigned in late 2020 after he realized that Hallmark's ongoing practices would not improve.

39.    The accounts of these confidential witnesses, as recounted below, are corroborated by each other, as well as by Hallmark's refusal to allow BDO to properly audit its loss reserves calculation, and by Hallmark's dramatic $63.8 million increase in loss reserves.[8]

**1.    Hallmark's actual procedures for estimating loss reserves (the "reserve project") were contrary to its publicly disclosed procedures.**

40.    CW-1 personally participated in quarterly claims review meetings with Milch, Stauber, and several other claims managers referred to as the "reserve project" by Milch and Stauber.  CW-1 stated that these meetings would often take place in Milch's office, and sometimes in Defendant Anand's office with Anand participating.

41.    Contrary to its publicly disclosed procedures for estimating loss reserves as described above in Section IV(B), Hallmark employed procedures described by CW-1 as "unsound" and providing no "checks and balances in place on financials."  Instead of the procedures publicly disclosed by Defendants whereby case-by-case evaluations would be performed by claim supervisors and managers and "reviewed" by senior management, CW-1 described that Hallmark's actual claims management and loss reserve adjustment process disregarded the judgment of the experienced claim supervisors and managers previously touted by

---

[8] "Confidential source statements are a permissible basis on which to make an inference of scienter."  *Central Laborers' Pension Fund v. Integrated Elec. Services Inc.*, 497 F.3d 546, 552 (5th Cir. 2007); *accord Kohut v. KBR, Inc.*, 2015 WL 11995250, at *12 (S.D. Tex. Sept. 3, 2015); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 457 (S.D. Tex. 2016) ("In cases under the PSLRA, plaintiffs may rely on confidential witnesses provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") (Citation omitted).

the Company would be summarily disregarded in order to manipulate Hallmark's reported financial results.

42.    Specifically, CW-1 described the actual procedure whereby: (i) CW-1 would collect adjusters' claims reports; (ii) CW-1 would provide these reports to Milch; (iii) Milch would then provide the adjusters' claims reports to Stauber; and (iv) Stauber would arbitrarily reduce the claim amounts *without any rationale for changing the adjusters' reserve/claims recommendations*. Stauber's rationale for reducing the claims amounts were never documented or placed in claim files, and only Stauber's final loss and reserve figures were documented.  CW-2 confirmed that Hallmark's loss reserves were frequently drastically and arbitrarily reduced from recommended claims payouts.  For example, CW-2 stated as an example that if a recommended claims payout was $500,000, the loss reserves would be arbitrarily reduced by Milch and Stauber to as low as $5,000 to $10,000 without any explanation of the rationale for doing so.

43.    CW-1 stated that there were no "checks and balances" and no consistent, formal process with compliance personnel involved during Stauber's decisions to reduce a claim's predicted value (and thus lowering loss reserves and increasing reported net income).  CW-1 stated that during these meetings, Stauber would review all claims, and Stauber would almost always reduce the amount of claim values and lower loss reserves arbitrarily and without valid reasons for doing.  CW-2 said that Hallmark's systemic decrease in loss reserves "did not sit well" with him as a claim adjuster and that reductions were appearing to be done "arbitrarily" without any documentation in claims files or explanation to claims adjusters.  CW-2 further stated that Milch and Stauber's arbitrary lowering of loss reserves occurred frequently and "happened across the board for commercial auto claims."  CW-2 further stated his opinion that all of Hallmark's commercial auto adjusters noticed that Milch and Stauber were engaged in this ongoing practice.

44.     CW-1 stated that, in addition to his widespread "adjustments" to loss reserve estimates prepared by claims professionals, Stauber and/or Milch also interfered with the claims management process and loss reserve estimation process in several other ways, including (i) by Stauber reducing adjusters' discretion in determining claim values from $75,000 to $10,000-$25,000; (ii) Stauber and Milch ordering adjusters to prepare mediation proposals with arbitrarily reduced claim values; (iii) causing claims to be projected out over 30 days, thereby spreading out the amount of time that it took to resolve claims and impact loss reserves; and (iv) attempting to "break up" claims into several payments in order to spread them out over several months.

**2.     Hallmark's fraudulent claims reserve process resulted in materially understated reserves.**

45.     CW-1 and CW-2 agree that Hallmark deviated from its stated procedures for calculating loss reserves in order to manipulate its reported financial results.  The Confidential Witnesses provided numerous specific examples of improper manipulation of Hallmark's loss reserves, including the following:

a)     In a serious injury/fatality case, the recommended adjuster payout was $500,000.  Due to the seriousness of the case, CW-1 recommended settling it for that amount.  Ignoring the loss reserve amount calculated by both the adjuster and CW-1, Stauber reduced the amount to $300,000, without providing any reason for doing so;

b)     As another example, CW-1 recalled a Louisiana case where the claims adjuster recommended a $750,000 payout, and Stauber reduced it to $600,000, again without any legitimate reason for deviating from the recommendation; and

c)     Similarly, CW-2 identified a claim for which he originally set a $250,000 loss reserve, but the loss reserve was subsequently and arbitrarily reduced to just $5,000.

46.     CW-2 stated that he has personally seen, in a conservative estimate, at least 100 commercial auto claims files where the loss reserves were drastically and arbitrarily reduced.  He also conservatively estimated that at least 50% or more of the commercial auto claims files had loss reserves that were drastically reduced.

47.     The baseless and arbitrary nature of Milch and Stauber's manipulations of the loss reserves is demonstrated by the subsequent settlement of these claims.  For example, in example c) directly above, on a claim for which CW-2 originally set a $250,000 loss reserve that Stauber baselessly reduced to $5,000, CW-2 later obtained Milch's approval to settle the case for the $250,000 originally set by CW-2.

48.     CW-2 further described that Milch and Stauber *knew* that Hallmark's loss reserves were improper because CW-2 had to seek Milch's and Stauber's authority to issue settlement checks in instances where the claim resolution was higher than the loss reserve in this and many other examples.  CW-2 said that as a result of the arbitrary loss reserve reductions, Hallmark was frequently making payouts to resolve pending commercial auto claims that were significantly higher than the loss reserve set for those claims.  CW-2 said that this occurred on at least 100 instances for commercial auto line claims that he was personally handling.  CW-2 said this experience occurred so frequently it was like "second nature," and was also experienced by other adjusters.  Based upon his contemporaneous discussions with other adjusters at the Company, CW-2 said that Hallmark's active and arbitrary manipulation of loss reserves was "clearly prevalent."

49.     CW-2 stated that Milch and Stauber were arbitrarily lowering and manipulating Hallmark's loss reserves to make Hallmark look more profitable than it actually was to investors. CW-2 stated that the $63.8 million dollar loss reserve adjustment announced in March 2020 was

directly caused by the fraudulent reserve lowering practice by Milch and Stauber carried out at the direction of Avand.

### 3. Hallmark attempted to "paper the files" by employing a new process for estimating loss reserves after firing accounting firm BDO.

50.     CW-2 stated that after BDO was terminated as Hallmark's auditor, Milch held a meeting with the entire Hallmark claims staff.  The meeting was held to discuss the process to manage claims and loss reserves.  CW-2 stated that the meetings were being held related to Sarbanes-Oxley (SOX) compliance.  The claims staff was told that they were "doing it wrong." The claims staff was told that they had to get verbal approval from Stauber before finalizing any claims, even after Stauber previously approved claims reports.  CW-2 stated that this was a very unusual process and stated that Milch and Stauber were using the meeting as a pretext to wrongly blame Hallmark's adjusters for paying claims without Stauber's approval and trying to blame adjusters for improper loss reserving practices.  CW-2 said that Milch and Stauber were wrongly attempting to falsely shift any improper loss reserving practices identified by BDO away from Milch and Stauber and onto Hallmark's adjusters.

### 4. Stauber's and Milch's abuse of the loss reserves estimation process reveals Hallmark's lack of internal accounting controls.

51.     CW-1 reiterated that under the actual procedures employed by Hallmark for loss reserve estimation, there were no "checks and balances" that prevented Stauber and Milch from baselessly overriding loss reserve estimates for the sole purpose of manipulating Hallmark's reported financial results.

52.     The inability of Hallmark's system of accounting internal controls to prevent manipulation of the reported amount of loss reserves constituted a "material weakness" in Hallmark's system of internal accounting controls.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

53.   During the Class Period, Defendants made a series of false and misleading statements to investors and omitted material facts in order to convey the false impression that Hallmark's financial condition was strong and that it's reported financial results were accurate.

54.   In reality, however, each of Defendants' statements were false and misleading in that loss reserve amounts were being manipulated in order to present to the investing public a false and much rosier picture about the profitability of Hallmark's Binding Primary Auto insurance division.  Defendants' statements alleged below were false and misleading because Defendants' unsound reserving practices remained hidden, and the true nature of Hallmark's loss reserves was never disclosed to the investing public until Hallmark's disclosure of a $63.8 million increase to its loss reserves in March 2020.

55.   The Class Period begins on March 5, 2019, when Hallmark Financial announced its fourth quarter and full year 2018 financial results in a press release, including reported net income of $10.3 million.  This press release was materially false and misleading when issued because the financial results reported therein were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

56.   On March 14, 2019, the Company filed its annual report for the period ended December 31, 2018 on Form 10-K with the SEC (the "2018 Form 10-K"), disclosing the same previously reported financial results as the May 5, 2019 press release.  The 2018 Form 10-K also disclosed a liability balance of $527 million in loss reserves.  The 2018 Form 10-K was signed by Defendants Anand and Passmore.

57.   The reported financial results contained in the 2018 Form 10-K were materially false and misleading when issued because the financial results reported therein were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

58.     The 2018 Form 10-K also made disclosures regarding the Company's estimation

of loss reserves.  The 2018 Form 10-K assured the market that Hallmark's loss reserves were

"adequate" and were calculated as objectively as possible "using individual case-basis valuations

and statistical analyses" and that the estimates were "continually reviewed and adjusted as

experience develops or new information becomes known":

> Losses and Loss Adjustment Expenses
>
> Losses and LAE represent the estimated ultimate net cost of all
> reported and unreported losses incurred through December 31, 2018
> and 2017.  The reserves for unpaid losses and LAE are estimated
> using individual case-basis valuations and statistical analyses.
> These estimates are subject to the effects of trends in loss severity
> and frequency.  Although considerable variability is inherent in such
> estimates, we believe that the reserves for unpaid losses and LAE
> are adequate.  The estimates are continually reviewed and adjusted
> as experience develops or new information becomes known.  Such
> adjustments are included in current operations.[9]

59.     Hallmark set out the procedures pursuant to which loss reserves would be

estimated.  Specifically, Defendants promised that loss reserves would be estimated "using case-

basis evaluations and statistical projections, which include inferences from both losses paid and

losses incurred."[10]   Hallmark further elaborated that these case-by-case evaluations would be

performed by claim supervisors and managers, and touted the experience and expertise of these

employees.[11]

60.     Although the case-by-case evaluations would be performed by the experienced

claims supervisors and managers, Hallmark explained that "[l]arge loss exposures are: i) reviewed

---

[9] 2018 Form 10-K, p. 15.

[10] *Id*. at 15.

[11] *Id*. at 14 ("As of December 31, 2018, we had a total of 92 claims managers, supervisors and
adjusters with an average experience of approximately 16 years.").

at least quarterly with senior management of the operating unit; and ii) monitored by Hallmark senior management."[12]

61.    The foregoing disclosures were materially false and misleading when made because, as described in Section IV(D)(1), Hallmark's actual procedures employed in calculating loss reserves were materially different than Hallmark described, including that the case evaluations performed by the experienced claims supervisors and managers were disregarded by senior management in favor of baseless adjustments designed only to manipulate the reported financial results of the Company in violation of GAAP and SEC regulations. *See*, Section VII, *infra*. These provisions were further materially false and misleading because Hallmark's increasing loss reserves were not simply a result of the continued "emergence of increase[d] frequency and severity trends" but were, as confirmed by CW-1 and CW-2, the result of Defendants' strategic manipulation and lowering of loss reserves in order to falsely inflate reported financial results. As described by CW-1 and CW-2, Stauber and Milch arbitrarily reduced claims losses and loss reserve amounts without reason and implemented procedures that ordered adjusters to report lower losses and reserves.

62.    Additionally, Defendants stated in the 2018 Form 10-K that Hallmark employed conservative reserving practices:

> **Maintaining a strong balance sheet**. We seek to maintain a strong balance sheet by employing conservative investment, reinsurance and reserving practices and to measure our performance based on long-term growth in book value per share.[13]

This disclosure was materially false and misleading because Defendants were not engaged in "conservative" reserving practices. Instead, as described in Section IV(D), *supra*, Defendants

---

[12] *Id*.

[13] *Id*. at 12.

were employing arbitrary and reckless practices to lower reported claims loss and loss reserves in order to meet Hallmark's desired level of net income and other reported financial results.

63.     Further, the 2018 Form 10-K falsely and misleadingly reported that its methodology for calculating loss reserves was a methodical, statistically driven process:

**Analysis of Losses and LAE**

Our consolidated financial statements include an estimated reserve for unpaid losses and LAE.  We estimate our reserve for unpaid losses and LAE by using case-basis evaluations and statistical projections, which include inferences from both losses paid and losses incurred.  We also use recent historical cost data and periodic reviews of underwriting standards and claims management practices to modify the statistical projections.[14]

64.     This disclosure was materially false and misleading in that Defendants were not employing data, statistics, or internal controls to set loss reserves but were ultimately using management's arbitrary and unilateral discretion to lower reported loss reserves in order to manipulate reported net income and other financial disclosures, as described in Section IV(D), *supra*.

65.     The Sarbanes-Oxley Act of 2002 ("SOX") requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.  Pursuant to SOX and the Exchange Act, a registrant's CEO and CFO are required to sign and certify, in each annual or quarterly report, that the report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and they have evaluated the effectiveness of the issuer's internal controls and have disclosed to the issuer's auditors and audit committee all

---

[14] *Id*. at 15.

significant deficiencies in the design or operation of internal controls.  *See* SOX, Section 302 (15 U.S.C. § 7241).

66.     The 2018 Form 10-K included a SOX certification signed by Defendant Anand, which was included as Exhibit 31(a) to the 2018 Form 10-K and provided as follows:

I, Naveen Anand, certify that:

1.  I have reviewed this annual report on Form 10-K of Hallmark Financial Services, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4.  The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures [as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)] and internal control over financial reporting [as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)] for the Registrant and have:

a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)  evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions

about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d)  disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5.  The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

   a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

   b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

67.    An identical Certification was signed by Defendant Passmore and attached as Exhibit 31(b) to the 2018 Form 10-K.

68.    The disclosures made in both Anand's and Passmore's Certifications were materially false and misleading because, among other items, Defendants Anand and Passmore were aware that: (i) the 2018 Form 10-K contained untrue statements of material facts; (ii) that the financial statements and other financial information in the 2018 Form 10-K did not fairly present the financial condition of the Company; (iii) Defendants did not design internal control over financial reporting that could provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements in accordance with GAAP because Hallmark's systems of accounting internal controls was materially flawed as

described in Section IV(D), *supra*.; and (iv) Defendants did not evaluate, or severely recklessly disregarded, the effectiveness of the Hallmark's disclosure controls and procedures.

69.     On May 8, 2019, Hallmark Financial issued a press release reporting its financial results for the first quarter of 2019, including reported net income of $15.0 million.

70.     The May 8, 2019 press release was materially false and misleading when issued because the financial results reported therein were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

71.     Also on May 8, 2019, Hallmark filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019, affirming the previously reported financial results.  The Form 10-Q was signed by Defendants Anand and Passmore.  Therein, the Company reported that its consolidated reserve for unpaid losses and  loss adjustment expenses was $530.23 million. However, these reported financial results were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

72.     Hallmark's May 8, 2019 Form 10-Q also disclosed the purported primary factors affecting each segment's prior accident year reserve development, providing in relevant part:

> **Specialty Commercial Segment.**  Our Commercial Auto business unit experienced net unfavorable development in the 2017 and prior accident years primarily in the primary commercial auto liability line of business, ***partially offset by favorable development in the primary commercial auto line of business in the 2018 accident year***. (emphasis added).

73.     This disclosure was materially misleading because the described factors affecting loss reserve developments failed to disclose Defendants' "reserve project" practice of fraudulently manipulating reported loss reserves, as described in Section IV(D), *supra*.

74.     Hallmark's May 8, 2019 Form 10-Q also attached as exhibits SOX Certifications signed by Defendants Anand and Passmore in substantially the same form as their SOX Certifications attached as exhibits to the 2018 Form 10-K.

75.     The disclosures made in both Anand's and Passmore's Certifications were materially false and misleading because, among other items, Defendants Anand and Passmore were aware that: (i) the Form 10-Q contained untrue statements of material facts; (ii) that the financial statements and other financial information in the Form 10-Q did not fairly present the financial condition of the Company; (iii) Defendants did not design internal control over financial reporting that could provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements in accordance with GAAP because Hallmark's systems of accounting internal controls was materially flawed as described in Section IV(D), *supra*.; and (iv) Defendants did not evaluate, or severely recklessly disregarded, the effectiveness of the Hallmark's disclosure controls and procedures.

76.     On August 7, 2019, Hallmark Financial reported its second quarter 2019 financial results in a press release entitled *Hallmark Financial Reports Second Quarter 2019 Results Highlighted by Significantly Higher Earnings and Book Value Per Share Growth*, including reported net income of $13.0 million for the quarter.

77.     The August 7, 2019 press release was materially false and misleading when issued because the financial results reported therein were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

78.     On August 9, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019, affirming the previously reported financial results.

The Form 10-Q was signed by Defendants Anand and Passmore.  Therein, the Company reported that its consolidated reserve for unpaid losses and loss adjustment expenses was $551.54 million.

79.     The financial disclosures contained in the August 9, 2019 Form 10-Q were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

80.     The August 9, 2019 Form 10-Q also disclosed the purported primary factors affecting each segment's prior accident year reserve development, the report stated, in relevant part:

> ***Specialty Commercial Segment.***  Our Commercial Auto business unit experienced net unfavorable development in the 2017 and prior accident years primarily in the primary commercial auto liability line of business, partially offset by net favorable development in the primary commercial auto line of business in the 2018 accident year. Our E&S Casualty business unit experienced net unfavorable development primarily in our E&S package insurance products in the 2017 and prior accident years, partially offset by net favorable development in the 2018 accident year.

81.     This disclosure was materially false and misleading and omitted material facts, because, as described in Section IV(D), Hallmark was not properly setting loss reserve amounts, instead utilizing arbitrary and fraudulent methods to artificially lower loss reserves and artificially inflate reported net income.

82.     Hallmark's August 9, 2019 Form 10-Q also attached as exhibits SOX Certifications signed by Defendants Anand and Passmore in substantially the same form as their SOX Certifications attached as exhibits to the 2018 Form 10-K.

83.     The disclosures made in both Anand's and Passmore's Certifications were materially false and misleading because, among other items, Defendants Anand and Passmore were aware that: (i) the Form 10-Q contained untrue statements of material facts; (ii) that the financial statements and other financial information in the Form 10-Q did not fairly present the

financial condition of the Company; (iii) Defendants did not design internal control over financial reporting that could provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements in accordance with GAAP because Hallmark's systems of accounting internal controls was materially flawed as described in Section IV(D), *supra*.; and (iv) Defendants did not evaluate, or severely recklessly disregarded, the effectiveness of the Hallmark's disclosure controls and procedures.

84.   On November 7, 2019, Hallmark Financial announced its third quarter 2019 financial results in a press release entitled *Hallmark Financial Announces Third Quarter 2019 Earnings Results*, including reported net income of $5.3 million.

85.   The November 7, 2019 press release was materially false and misleading when issued because the financial results reported therein were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

86.   Also on November 7, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2019, affirming the previously reported financial results. The Form 10-Q was signed by Defendants Anand and Passmore. Therein, the Company reported that its consolidated reserve for unpaid losses and loss adjustment expenses was $565.29 million.

87.   The financial disclosures contained in the November 7, 2019 Form 10-Q were materially false and misleading and prepared in violation of GAAP, as described in Section VII, *infra*.

88.   The November 7, 2019 Form 10-Q also disclosed the purported primary factors affecting each segment's prior accident year reserve development, the report stated, in relevant part:

*Specialty Commercial Segment.* Our Commercial Auto business unit experienced net unfavorable development in the 2017 and prior accident years primarily in the primary commercial auto liability line of business, partially offset by net favorable development in the primary commercial auto line of business in the 2018 accident year. Our E&S Casualty business unit experienced net unfavorable development primarily in our E&S package insurance products in the 2017 and prior accident years, partially offset by net favorable development in the 2018 accident year.

89.     This disclosure was materially false and misleading and omitted material facts, because, as described in Section IV(D), Hallmark was not properly setting loss reserve amounts, instead utilizing arbitrary methods to artificially lower loss reserves and artificially inflate reported net income.

90.     Hallmark's November 7, 2019 Form 10-Q also attached as exhibits SOX Certifications signed by Defendants Anand and Passmore in substantially the same form as their SOX Certifications attached as exhibits to the 2018 Form 10-K.

91.     The disclosures made in both Anand's and Passmore's Certifications were materially false and misleading because, among other items, Defendants Anand and Passmore were aware that: (i) the Form 10-Q contained untrue statements of material facts; (ii) that the financial statements and other financial information in the Form 10-Q did not fairly present the financial condition of the Company; (iii) Defendants did not design internal control over financial reporting that could provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements in accordance with GAAP because Hallmark's systems of accounting internal controls was materially flawed as described in Section IV(D), *supra*.; and (iv) Defendants did not properly evaluate loss reserves, and/or were severely reckless in their accounting.

92.     During a November 8, 2019 conference call with investors regarding Hallmark's reported financial results for the quarter ended September 30, 2019, Defendant Anand falsely

reassured the market that Hallmark had adequate levels of loss reserves to address losses and close out cases from 2016 and 2017:

> [W]e're less than 50 claims open in terms of all those accident years at this point and adequate with the case reserve from our perspective. We have a little bit more over a couple of hundred claims open between '17 and '16 from an overall claim perspective. But the key point is, we feel case reserves, from a case reserve perspective, are probably at the highest level we've seen in our company in our history, and we feel they're adequately reserved. But as you get kind of closer to closing out the claims, you do get some volatility. And we thought it was prudent to add to our reserves on that basis based on some of the volatility we're seeing as we to continue the pace of closing out the claims that we have.

93.     This disclosure was false and misleading because it represented that Hallmark retained adequate loss reserves, despite Defendant Anand's knowledge of Hallmark's fraudulent and improper manipulation and understatement of loss reserves, as described in Section IV(D), *supra*, which would lead directly to Hallmark's subsequent disclosure of a $63.8 million loss reserve development in March 2020, demonstrating that loss reserves were improperly understated during the Class Period.

94.     As a result of Anand's false and misleading statements on the Earnings Call, Hallmark's stock price rose $1.11 to close at $17.91 a share, a gain of approximately 6.6%.

## VI.     THE TRUTH EMERGES

95.     On March 2, 2020, Hallmark announced that it would be forced to increase its loss reserves by a shocking $63.8 million to recognize losses stemming primarily from its underwriting years 2016 and 2017 Binding Primary Auto business. Perhaps due to these shocking losses, Hallmark further announced that it was exiting the Binding Primary Commercial Auto business. In a press release, the Company stated, in relevant part:

> Hallmark Financial Services, Inc. ("Hallmark Financial" or the "Company")

(NASDAQ: HALL), a specialty property and casualty insurance company, announced last month to its brokers and agents that the Company had made the strategic decision to exit its Binding Primary Auto business. Despite several years of implementing proactive rate actions and policy changes, the Company has continued to experience increasing claim severity from prior accident years. As a result, Hallmark Financial has made the decision that its in-force policies will be placed into run-off and non-renewed in accordance with applicable state requirements.

\* \* \*

The Company also announced that it will file its annual insurance statutory reports today, which will include pre-tax adverse prior year loss development of $63.8 million, net of reinsurance, for fiscal 2019, as provided in Schedule P, of which $56.1 million was recorded in the fourth quarter of 2019. These losses are primarily related to the Binding Primary Auto business for the 2016 and 2017 underwriting years, with a smaller remainder largely attributable to general liability. These amounts are unaudited and based on statutory requirements rather than generally accepted accounting principles.

\* \* \*

Despite achieving significant rate increases in this portfolio and improving the overall risk profile of the book, the performance of this business continued to be volatile. Over the past five years, the Binding Primary Auto business was responsible for over 100% of the Company's aggregate adverse reserve development.

96. As a result of this shocking news, the Company's share price fell from a close of $14.33 on March 2, 2020 to close at $12.23 per share on March 3, 2020, a decline of $2.10 (14.7%), on unusually heavy trading volume.

97. Ratings company A.M. Best reacted on March 2, 2020 by issuing a press release entitled *AM Best Places Credit Ratings of Hallmark Financial Services, Inc. and Its Subsidiaries Under Review With Negative Implications*, which stated, in pertinent part:

AM Best has placed under review with negative implications the Long-Term Issuer Credit Rating (Long-Term ICR) of "bbb-" and the Long-Term Issue Credit Ratings (Long-Term IR) of Hallmark Financial Services, Inc. (Hallmark Financial) [NASDAQ: HALL].

> Concurrently, AM Best has placed under review with negative implications the Financial Strength Rating (FSR) of A- (Excellent) and the Long-Term ICRs of "a-" of the members of Hallmark Insurance Group (Hallmark Group).
>
> \*   \*   \*
>
> These Credit Ratings (ratings) have been placed under review with negative implications following the announcement by Hallmark Financial that its 2019 statutory results will include pre-tax adverse prior year loss development of $63.8 million, net of reinsurance.

98.    Securities analyst Boenning & Scattergood reported in its March 5, 2020, equity research report that "the risk of further reserve development remain[ed] high in the near term." The report further stated that "Hallmark's share price has declined more than 20% since the announcement [of exiting the Binding Primary Auto business line] and is now trading under 70% of book value."

99.    On March 6, 2020, Hallmark was downgraded by Zacks Investment Research from a "hold" rating to a "strong sell" rating.  When the market opened on the following Monday, Hallmark shares dropped from a close of $9.29 per share on March 6, 2020 to close trading on March 9, 2020 at $7.39, a loss of $1.90 per share (20.5%).

100.    On March 11, 2020, after the market closed, Hallmark Financial disclosed that  it had dismissed its independent auditor due to a disagreement regarding estimates for reserves  for unpaid losses, among other things.  In a Form 8-K filed with the SEC after the market closed,  the Company stated, in relevant part:

> On March 5, 2020, Hallmark Financial Services, Inc. (the "Company") dismissed BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm, effective immediately.  BDO's audit reports on the Company's consolidated financial statements as of and for the years ended December 31, 2017 and 2018, did not contain any adverse opinion or disclaimer of opinion, and were not qualified or modified as to uncertainty, audit scope or accounting principles.  The decision to change accountants

was approved by the Audit Committee of the Company's board of directors (the "Audit Committee").

During the two fiscal years ended December 31, 2018, and the subsequent interim periods through the filing of the Company's Form 10-Q for the quarter ended September 30, 2019, there were no disagreements (as defined in Item 3.04 of Regulation S-K) between the Company and BDO. *Subsequently, a disagreement arose regarding certain matters related to (a) the Company's processes for estimating reserves for unpaid losses and loss adjustment expenses, (b) the resulting potential impact on the Company's assessment of the associated internal controls over financial reporting, and (c) the resulting potential impact on recorded amounts of those reserves, all as of the quarter ended September 30, 2019, and the year ended December 31, 2019.* The Audit Committee has discussed the subject matter of the disagreement with BDO and has authorized BDO to respond fully to the inquiries of any successor independent registered public accounting firm concerning the subject matter of such disagreement. (Emphasis added).

101.    Thus, the Company admitted that it dismissed its independent auditor over a "disagreement" pertaining to Hallmark's loss reserve calculations and internal controls. However, Defendants failed to comply with the requirement of Item 304(a)(1) of Regulation S-K (17 C.F.R. § 229.304(a)(1)) that Hallmark "describe" (rather than just "identify") the nature of the Company's disagreement with BDO. Hallmark's failure to comply with this requirement allowed it to conceal the specific nature of BDO's perceived need to obtain additional audit evidence and whatever disagreements that BDO may have had with respect to Hallmark's loss reserve procedures or calculations or Hallmark's systems of internal accounting control.

102.    As a result of the March 11, 2020 Form 8-K filing, the Company's share price fell from a closing price of $8.10 on March 11, 2020 to close at $5.71 per share on March 12, 2020, a decline of $2.39 per share (29.5%), on unusually heavy trading volume.

103.    On March 17, 2020, Hallmark filed with the SEC a letter from BDO. Therein, BDO stated that it had attempted to expand the scope of its audit but that Hallmark would not

respond to requests regarding "the matters of disagreement" related to Hallmark's process for estimating and reporting loss reserves:

> We have been furnished with a copy of the response to Item 4.01 of Form 8-K for the event that occurred on March 11, 2020, to be filed by our former client, Hallmark Financial Services, Inc. (the "Company"). We agree with the statements made in response to that Item insofar as they relate to our Firm. In addition, with respect to the matters of disagreement, BDO expanded significantly the scope of its audit on January 31, 2020, with respect to which a substantial portion of the requests had not been received and/or tested prior to our termination.

104.    On this news, the Company's share price fell $0.08 per share, or 2.5%, to close at $3.12 per share on March 18, 2020.

105.    On March 20, 2020, Hallmark filed a Current Report on Form 8-K with the SEC. This Current Report was signed by Defendant Passmore and disclosed that the Company had received a notice from the NASDAQ threatening to delist the Company's shares due to its failure to timely file its 2019 Form 10-K:

> **Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing**
>
> On March 18, 2020, Hallmark Financial Services, Inc. (the "Company") received notice from Nasdaq that, as a result of the Company's failure to timely file its Form 10-K for the year ended December 31, 2019 (the "Filing"), the Company is not in compliance with Nasdaq's Listing Rule 5250(c)(1). Under Nasdaq rules, the Company has 60 calendar days to submit a plan to regain compliance. If such plan is accepted, Nasdaq may grant an extension of up to 180 calendar days from the due date of the Filing, or until September 14, 2020, to regain compliance.

106.    On May 18, 2020, Hallmark filed a Current Report on Form 8-K with the SEC. This Current Report was signed by Defendant Passmore and disclosed that the Company had received a notice from the NASDAQ threatening to delist the Company's shares, this time due to

its failure to timely file its quarterly report on Form 10-Q for the quarter ended March 31, 2020, as well as its continuing failure to file its 2019 Form 10-K:

> **Item 3.01  Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing**
>
> On May 13, 2020, Hallmark Financial Services, Inc. (the "Company") received notice from Nasdaq that, as a result of the Company's failure to timely file its Form 10-Q for the quarter ended March 31, 2020 and because it remains delinquent in filing its Form 10-K for the year ended December 31, 2019, the Company is not in compliance with Nasdaq's Listing Rule 5250(c)(1).  As a result, the Company has until May 28, 2020 to submit an update to its original plan to regain compliance with the filing requirements.  If such updated plan is accepted, Nasdaq may grant an extension until up to September 14, 2020 to regain compliance

107.    On July 17, 2020, Hallmark filed a Current Report on Form 8-K with the SEC.  This Current Report was signed by Defendant Passmore and disclosed that the Company had entered into a reinsurance agreement in which it paid a significant sum of money to a reinsurer in order to prevent the necessity of any further adjustments to the Company's loss reserves from the Auto Insurance policies.

108.    On September 21, 2020, the Company filed a report with the SEC on Form 8-K disclosing that Defendant Passmore had resigned as Chief Financial Officer of the Company, effective September 30, 2020.

## VII.    HALLMARK'S FINANCIAL STATEMENTS VIOLATED GAAP BY MATERIALLY MISREPRESENTING HALLMARK'S REPORTED LOSS RESERVES

109.    These improper accounting practices and manipulations were in direct violation of GAAP and SEC rules, as described below, and resulted in materially overstated financial results for the year ended December 31, 2019, and each quarter ended March 31, 2019, June 30, 2019 and September 30, 2019.

110.     Generally Accepted Accounting Principles ("GAAP") are the set of conventions, rules and procedures that constitute the professional standards of the accounting profession. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading or inaccurate. The Accounting Standards Codification ("ASC"), along with SEC regulations, represents authoritative guidance regarding GAAP.  During the Class Period, Hallmark Financial represented that its financial statements were presented in conformity with GAAP.

111.     GAAP provides rules for how and when to set loss reserves.  ASC 944 requires that public insurance companies estimate losses for unpaid claims and that losses should be included in a reserve.[15]  ASC 944-40-25-1 and 944-40-25-2 address the recognition of insurance claim costs and provide that both of the following shall be accrued when insured events occur:

      a.     A liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been

reported to the insurer); and

      b.     A liability for claim adjustment expense; that is a liability for all costs expected to be incurred in connection with the settlement of

unpaid claims.

112.     The estimated liability for unpaid claims includes the amount of money that will be required for future payments on both of the following:

      a.     Claims that been reported to the insurer;

---

[15] *Financial Services – Insurance*, Accounting Standards Codification Mo. 944, Financial Accounting Standards Board (2018).

b.      Claims related to insured events that have occurred but have not been reported to the insurer as of the date the liability is estimated.

113.    ASC 944-40-30-1 addresses a company's estimation of loss and loss adjustment expense reserves and states:

> The liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, and any other factors that would modify past experience.

114.    Thus, Hallmark Financial was required to recognize the estimated future amount of settling all claims covered by the insurance policies it sold as a loss reserve, and thus an expense in the current period.  But Defendants' financial statements disseminated and/or filed with the SEC during the Class Period violated GAAP by materially misrepresenting Hallmark's reported loss reserves as detailed in Section IV(D), *supra* (thus also overstating net income and net assets).

## VIII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

115.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Executive Defendants, by virtue of their receipt of information reflecting the true facts regarding Hallmark Financial, their control over, and/or receipt and/or modification of Hallmark's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hallmark, participated in the fraudulent scheme alleged herein.

116.    Defendants' contemporaneous knowledge of the falsity of their statements identified in Section V herein further demonstrates their scienter in making these false statements. Defendants' contemporaneous knowledge of the falsity of the reported loss reserve amounts is demonstrated by the following:

a)    CW-2's representations that Defendant Anand knew about and directed Milch and Stauber's ongoing manipulation and arbitrary lowering of loss reserves;

b)    CW-2's representations that Defendant Avand and Stauber had a close prior relationship and had frequent meetings together and that they also held company town hall meetings together to discuss Hallmark's business practices with employees;

c)    CW-2's recounting of a phone conversation with Milch in July 2020 during which Milch confided that Stauber directed Milch to arbitrarily manipulate and lower loss reserves in relation to Hallmark's commercial auto claims and Milch further told CW-2 that Stauber told her that the lowering of loss reserves was a directive from Defendant CEO Naveen Anand.  Milch referred to the instant lawsuit and told CW-2 that she was worried about committing securities fraud and said that she was thinking about leaving Hallmark to work for another insurance company, Gallagher Basset Insurance.  Milch indicated to CW-2 that she wanted CW-2 to come with her;

d)    CW-1 similarly represents that Defendant Anand knew about these "reserve project" meetings and that Anand and Stauber frequently met to discuss loss reserves.

117.    Lead Plaintiff has also alleged strong circumstantial evidence of Defendants' scienter, including that: (i) Hallmark's actual accounting policies differed from its stated policies; (ii) Hallmark's refusal to comply with BDO's request for information necessary to perform an audit of Hallmark's 2019 financial statements, and BDO's firing when it persisted in its requests;

(iii) Hallmark's weak internal controls, combined with the Executive Defendants' knowledge of the weaknesses and SOX certifications; (iv) Defendants' concealment of a description of the nature of its disagreements with BDO regarding Hallmark's loss reserve calculations, despite its legal requirement under Item 304(a)(1) of Regulation S-K that it do so; and (v) the importance of the Binding Primary Auto business segment as a core operation of the Company.

## IX.   LOSS CAUSATION

118.   At the time of Lead Plaintiff's purchases, the price of Hallmark stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.  Defendants' false and misleading statements and omissions had the intended effect and caused the Hallmark Financial stock to trade at artificially inflated prices during the Relevant Period, during which Lead Plaintiff purchased such stocks.  The Hallmark Financial stock could not have been issued, or would have been sold at dramatically lower prices, had investors been aware of Defendants' fraudulent scheme.

119.   Because Lead Plaintiff was unaware that Defendants' representations identified above were false and misleading (and that Defendants omitted and failed to disclose that its financial results were achieved through a fraudulent scheme), they paid an artificially inflated and unreasonable price for their purchases of Hallmark Financial stock.

120.   Loss causation is demonstrated by Lead Plaintiff under each of the alternative theories of: (i) corrective disclosures; and (ii) materialization of the risk.

## A.   Corrective Disclosures.

121.   Loss causation is demonstrated when the truth behind Defendants' various false statements and material omissions was gradually revealed to the market in a series of corrective disclosures, causing Lead Plaintiff to suffer significant losses when the following non-exhaustive examples of partial corrective disclosures caused the price of the Hallmark Financial stock to

decline sharply in market price as the prior artificial inflation came out of the Hallmark Financial stock:

      a)      **Disclosures Regarding Massive Charges to 2019 Earnings to Correct Inadequate Loss Reserves**.  In response to the March 2, 2020 disclosure that the Company would be forced to recognize a $63.8 million charge to increase its previously reported loss reserves, the Hallmark stock that had previously been purchased by Lead Plaintiff fell from a close of $14.33 on March 2, 2020 to close at $12.23 per share on March 3, 2020, a decline of $2.10 (14.7%), on unusually heavy trading volume (¶¶ 94-95);

      b)      **Disclosure Regarding Hallmark Firing its Auditor**.  In response to Hallmark's March 2011 disclosure that it had fired its auditor deep into its audit of the Company's 2019 financial statements (and just days before the 2019 financial statements were required to be filed with the SEC), the Company's share price fell from a closing price of $8.10 on March 11, 2020 to close at $5.71 per share on March 12, 2020, a decline of $2.39 per share (29.5%), on unusually heavy trading volume (¶¶ 99-101); and

      c)      **Disclosure that Hallmark Refused to Cooperate With Audit Procedures Prior to Firing BDO**.  In response to BDO's March 17, 2020 disclosure that Hallmark had refused to cooperate with its audit prior to firing BDO, the Company's share price fell $0.08 per share, or 2.5%, to close at $3.12 per share on March 18, 2020. (¶¶ 102-103).

122.    The timing and magnitude of the declines in Hallmark's share price negate any inference that Lead Plaintiff's losses were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

123.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.  Had Defendants disclosed

complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Hallmark's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.  It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Hallmark securities and that the corrective disclosure of the Defendants' misrepresentations and omissions would cause the price of Hallmark securities to decline.

**B.     Materialization of Risks.**

124.    As detailed herein, Defendants engaged in a scheme to deceive Lead Plaintiff and the market and a course of conduct that artificially inflated the price of the Hallmark Financial stock and operated as a fraud or deceit on Lead Plaintiff by failing to disclose and misrepresenting the adverse facts detailed herein.

125.    Hallmark's reported financial results and future business prospects were based upon its illicit (and undisclosed) manipulation of its reported financial results and undisclosed material weaknesses in its systems of accounting internal control.

126.    Throughout the period during which Lead Plaintiff purchased his Hallmark stock, the prices of these securities were artificially inflated as a result of Defendants' materially false and misleading statements and omissions as alleged herein.

127.    Defendants' false statements served to conceal the risks that the loss reserve scheme would be publicly exposed, as well as the risks related to Defendants' and Hallmark Financial Finance's preparation and dissemination of false financial statements.

128.    It was foreseeable that public exposure of the scheme would lead to negative financial and legal consequences to Defendants, including: (i) ratings agency and analyst downgrades; (ii) dismissal of its auditor BDO; (iii) resignation of key employees; (iv) the inability

to complete and timely file required financial statements; and (v) the threat of delisting by NASDAQ.  The materialization of any one or more of these factors would lead to a significant decline in the price of Hallmark stock.

129.    The value of Lead Plaintiff's investments in Hallmark stock was negatively impacted when the concealed risks materialized in at least the following respects:

  a)    <u>Ratings agency downgrades</u>: ¶¶ 96-98;

  b)    <u>Auditor resignation or firing</u>: ¶¶ 99-103;

  c)    <u>Employee resignations or firings</u>: ¶ 107;

  d)    <u>Inability to complete and timely file required financial statements</u>: ¶¶ 104-105; and

  e)    <u>Threats of delisting by NASDAQ</u>: ¶¶ 104-105.

130.    The declines in the price of the Hallmark Financial stock and resulting losses are directly attributable to the materialization of risks that were previously misrepresented or concealed by the Defendants.

131.    Had Lead Plaintiff known of the material adverse information not disclosed by the Defendants or been aware of the truth behind their material misstatements, they would not have purchased the Hallmark Financial stock at artificially inflated prices.

132.    As a result of their purchases of the Hallmark Financial stock, Lead Plaintiff suffered economic loss and damages, as contemplated by the federal securities laws.

## X.    NO SAFE HARBOR

133.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally

accepted accounting principles.  Moreover, none of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Hallmark's business, operations, prospects, current and historical financial accounting practices, financial condition, and internal controls, among other topics.

134.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Hallmark's business, operations, prospects, financial accounting practices, financial condition, and internal controls, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Hallmark were insufficient to insulate Defendants from liability for their materially false and misleading statements.

### XI.    THE PRESUMPTION OF RELIANCE

135.    At all relevant times, the market for Hallmark's common stock was efficient for the following reasons, among others:

a)    Hallmark's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)    As a regulated issuer, Hallmark filed periodic reports with the SEC and the NASDAQ;

c)    Hallmark regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide ranging

public disclosures, such as communications with the financial press and other similar reporting services; and

        d)      Hallmark was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

136.    As a result of the foregoing, the market for Hallmark's common stock reasonably promptly digested current information regarding Hallmark from all publicly available sources and reflected such information in the price of Hallmark's common stock.  All purchasers of Hallmark common stock during the Class Period suffered similar injury through their purchase of Hallmark common stock at artificially inflated prices, and a presumption of reliance applies.

137.    A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XII.    CLASS ALLEGATIONS

138.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Hallmark between March 5, 2019 through March 17, 2020, inclusive (the "Class").  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Executive Defendant; (iii) any person who was an officer or director of Hallmark; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Hallmark; (viii) all Hallmark plans that are covered

by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

139.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Hallmark shares were actively traded on the NASDAQ.   As of August 10, 2020, there were approximately 18.12 million shares of Hallmark common stock outstanding.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the Class.   Class members who purchased Hallmark common stock may be identified from records maintained by Hallmark or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

140.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

141.    Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

142.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.   Among the questions of fact and law common to the Class are whether:

       a)    The federal securities laws were violated by Defendants' acts as alleged herein;

       b)    Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c)     Defendants acted with scienter; and

d)     Class members suffered compensable damages

143.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

### XIII.    CLAIMS BROUGHT PURSUANT TO SECTIONS 10(B) AND 20(A) OF THE EXCHANGE ACT

### COUNT I

#### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)

144.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

145.    This Count is asserted on behalf of all members of the Class against Defendants Hallmark, Anand, and Passmore for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

146.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

147.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material

facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Hallmark common stock during the Class Period.

148.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Hallmark common stock, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the adequacy of Hallmark's loss reserves and loss adjustments, Hallmark's business, operations, and prospects, the effectiveness of Hallmark's internal controls over accounting and financial reporting practices, and Hallmark's financial condition; (ii) artificially inflate and maintain the market price of Hallmark's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Hallmark common stock at artificially inflated prices and suffer losses when the true facts became known.

149.    Defendant Hallmark is liable for all materially false and misleading statements made during the Class Period, as alleged above.  Defendants Anand and Passmore, as top executive officers of the Company during their respective tenures, are liable as direct participants in the

wrongs complained of herein.  Defendants Anand and Passmore are liable for the false and misleading statements they personally made and/or signed, as alleged above.

150.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Hallmark stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

151.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Hallmark common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the Class would not have purchased Hallmark common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

152.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Hallmark common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### (Against Defendants Anand and Passmore)

153.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

154.    This Count is asserted on behalf of all members of the Class against Defendants Anand and Passmore, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

155.    During their tenures as officers and/or directors of Hallmark, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶ 22-24.  By reason of their positions of control and authority as officers and/or directors of Hallmark, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Hallmark during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

156.    In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶ 22-24, Defendants Anand and Passmore had direct involvement in the day-to-day operations of the Company.  Defendants Anand and Passmore signed certain of the Company's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by Hallmark during the Class Period.  As a result of the foregoing, Defendants Anand and Passmore, as a group and individually, were controlling persons of Hallmark within the meaning of Section 20(a) of the Exchange Act.

157.    As set forth above, Hallmark violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

158.    By virtue of their positions as controlling persons of Hallmark and as a result of their own aforementioned conduct, Defendants Anand and Passmore are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead

Plaintiff and the other members of the Class who purchased or otherwise acquired Hallmark common stock.  As detailed above, during the respective times these Defendants served as officers and/or directors of Hallmark, each of these Defendants was culpable for the material misstatements and omissions made by Hallmark.

159.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Hallmark common stock.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XV.    DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury.

DATED: September 30, 2020                   Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By ____*/s/ Reed R. Kathrein*_____
        REED R. KATHREIN

Reed R. Kathrein (admitted *Pro Hac Vice*)
Lucas E. Gilmore (admitted *Pro Hac Vice*)

HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Lead Plaintiff Rajeev Yalamanchili*

Marc R. Stanley (TX Bar No. 19046500)
STANLEY LAW GROUP
6116 N. Central Expressway, Suite 1500
Dallas, TX  75206
Telephone: (214) 443-4301
Facsimile:  (214) 443-0358
marcstanley@mac.com

*Liaison Counsel for Lead Plaintiff*
*Rajeev Yalamanchili*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered in the CM/ECF system, as denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Reed R. Kathrein*
REED R. KATHREIN