**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| COOPER SCHULZE, | § | Case No. 3:20-cv-1130-X |
| | § | |
| *Plaintiff*, | § | |
| v. | § | |
| HALLMARK FINANCIAL SERVICES, | § | |
| INC., NAVEEN ANAND, and JEFFREY | § | |
| R. PASSMORE | § | |
| | § | |
| *Defendants*. | § | |

**<u>DEFENDANTS' MOTION TO DISMISS</u>**
**<u>PLAINTIFF'S AMENDED COMPLAINT AND BRIEF IN SUPPORT</u>**

## TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

Background ........................................................................................................................... 3

I.      Hallmark's reserves for L&LAE and case reserves. ................................................ 4

II.     Hallmark's commercial automobile business. ......................................................... 6

III.    Hallmark's change in outside auditor. .................................................................... 8

IV.     Hallmark has not restated its financials or concluded a material weakness existed. .......... 8

Argument .............................................................................................................................. 11

I.      The Amended Complaint fails to plead with particularity that any of the challenged
        statements were false or misleading when made. .................................................... 11

        A. The Amended Complaint does not allege an actionable misrepresentation regarding
           the processes for estimating L&LAE. .......................................................... 11

        B. Plaintiff does not adequately allege that Hallmark misrepresented its opinions
           concerning the amount of its reserves for L&LAE. ........................................ 15

        C. The Amended Complaint does not adequately allege the falsity of statements regarding
           the loss development in the Specialty Commercial Segment. ............................. 18

        D. The Amended Complaint does not adequately allege falsity concerning any statement
           or opinion regarding Hallmark's claims department. ...................................... 19

        E. The Amended Complaint fails to allege falsity with respect to Hallmark's SOX
           certifications. ........................................................................................ 21

        F. Hallmark's statements concerning the termination of BDO are not actionable. .......... 22

II.     The Amended Complaint challenges forward-looking statements protected by the
        PSLRA's safe-harbor provision. ........................................................................... 23

III.    The Amended Complaint fails to plead scienter with respect to Hallmark. ................... 24

        A. The confidential witnesses' allegations are insufficient to attribute scienter to
           Hallmark. ............................................................................................. 26

        B. The Amended Complaint's additional scienter allegations are the type of boilerplate
           allegations regularly rejected by courts. ...................................................... 31

IV.     The Amended Complaint fails to adequately plead loss causation. ............................... 32

V.      The Court should dismiss the 10(b) claims against Anand. ........................................ 34

VI.     The Court should dismiss the 10(b) claims against Passmore. .................................... 35

VII.    The Amended Complaint's Section 20 claims also must be dismissed. .......................... 35

Conclusion ........................................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

*ABC Arbitrage Pls. Grp. v. Tchuruk*,
  291 F.3d 336 (5th Cir. 2002) .................................................................................9

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ...............................................................................31

*Applestein v. Medivation, Inc.*,
  861 F. Supp. 2d 1030 (N.D. Cal. 2012) ...............................................................30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................33

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................10, 17, 21

*Caprin v. Simon Transp. Services*,
  112 F. Supp. 2d 1251 (D. Utah 2000)...................................................................24

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015)...........................................11, 15, 17, 18, 24

*Coates v. Heartland Wireless Commc's, Inc.*,
  100 F. Supp. 2d 417 (N.D. Tex. 2000) .................................................................15

*Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*,
  945 F.2d 1226 (2d Cir. 1991)...........................................................................15, 21

*DSAM Global Value Fund v. Altris Software, Inc.*,
  288 F.3d 385 (9th Cir. 2002) ................................................................................25

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................2

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) .........................................................................33

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)...............................................................................................33

*Fryman v. Atlas Fin. Holdings, Inc.*,
  462 F. Supp. 3d 888 (N.D. Ill. 2020) ...............................................11, 15, 24, 32

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ................................................................................25

*Hall v. Rent-A-Ctr., Inc.*,
  Case No. 4:16CV978, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ...................................32

*In re Alamosa Holdings, Inc.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) ...........................................................................28, 29

*In re Am. Serv. Group, Inc.*,
  Case No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ..................................24

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ....................................................................................24

*In re CIT Grp., Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004).....................................................................................18

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10 CIV 972 RPP, 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ..............................11, 15

*In re Dell Inc., Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)....................................................................................34

*In re Deutsche Bank AG Sec. Litig.*,
  Case No. 09 CV 1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25, 2016).........................18

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  238 F. Supp. 3d 799 (S.D. Tex. 2017) ....................................................................................26

*In re EveryWare Glob., Inc. Sec. Litig.*,
  175 F. Supp. 3d 837 (S.D. Ohio 2016) ...................................................................................17

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .....................................................................................22

*In re Kindred Healthcare, Inc. Sec. Litig.*,
  299 F. Supp. 2d 724 (W.D. Ky. 2004)...........................................................11, 15, 21, 24, 30

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005).....................................................................................................32

*In re PetroChina Co. Ltd. Sec. Litig.*,
  120 F. Supp. 3d 340 (S.D.N.Y. 2015).....................................................................................22

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)...................................................................................35

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) .........................................................................9, 10, 11, 27, 30, 35

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
   237 F. Supp. 3d 492 (S.D. Tex. 2017) .....................................................................31

*Johnson v. Sequans Comm'ns S.A.*,
   No. 11-CV-6341, 2013 WL 214297 (S.D.N.Y. Jan. 17, 2013) ................................12

*Local 295/Local 851 IBT Employer Group v. Fifth Third Bancorp.*,
   731 F. Supp. 2d 689 (S.D. Ohio 2010) ...................................................................31

*Magruder v. Halliburton Co.*,
   359 F. Supp. 3d 452 (N.D. Tex. 2018) ...................................................................10

*Main v. Am. Airlines Inc.*,
   248 F. Supp. 3d 791 (N.D. Tex. 2017) .....................................................................3

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................................32

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ..................................................................................31

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013)....................................................................15

*Omnicare, Inc. v Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)..................................................................................16, 18, 21

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ...................................................................25, 29, 35

*Phillips v. Harvest Natural Res., Inc.*,
   No. H-13-801, 2016 WL 4523849 (S.D. Tex. Aug. 25, 2016)................................34

*R2 Invs. LDC v. Phillips*,
   401 F.3d 638 (5th Cir. 2005) ..................................................................................10

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) ..................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..........................................................................................10, 25

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
   273 F. Supp. 3d 650 (N.D. Tex. 2017) ...................................................................15

*Woolgar v. Kingstone Companies*,
   No. 19-CV-5500, 2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020).............11, 14, 15, 17, 24, 29

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir.2009) .................................................................30

**STATUTES**

15 U.S.C. § 78j(b) ..........................................................................................9

15 U.S.C. § 78u-4(b) ...........................................................................9, 10, 26

15 U.S.C. § 78u-5(c) ....................................................................................24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) .....................................................................................1, 9

Fed. R. Civ. P. 12(b)(6)...................................................................................1

**TABLE OF EXHIBITS**

| Exhibit | Document | App. No. |
|---|---|---|
| | Declaration of Charles Strecker | n/a |
| 1 | Hallmark Financial Services, Inc.'s 8-K announcing its financial results for the three months and nine months ended September 30, 2017, filed with the SEC on November 9, 2017 | 0001 – 0011 |
| 2 | Hallmark Financial Services, Inc.'s Form 10-K for the Fiscal Year Ended December 31, 2017, filed with the SEC on March 14, 2018 | 0012 – 0130 |
| 3 | Hallmark Financial Services, Inc.'s Form 8-K announcing its financial results for the three months and six months ended June 30, 2018, filed with the SEC on August 7, 2018 | 0131 – 0143 |
| 4 | Hallmark Financial Services, Inc.'s Form 10-Q for the Quarter Ended September 30, 2018, filed with the SEC on November 7, 2018 | 0144 – 0285 |
| 5 | Hallmark Financial Services, Inc.'s Form 8-K announcing its financial results for the three months and nine months ended September 30, 2018, filed with the SEC on November 8, 2018 | 0286 – 0296 |
| 6 | Hallmark Financial Services, Inc.'s Form 10-K for the Fiscal Year Ended December 31, 2018, filed with the SEC on March 14, 2019 | 0297 – 0562 |
| 7 | Hallmark Financial Services, Inc.'s Schedule 14A Proxy Statement for its Annual Meeting held May 30, 2019, filed with the SEC on April 26, 2019 | 0563 – 0581 |
| 8 | Hallmark Financial Services, Inc.'s Form 10-Q for the Quarter Ended March 31, 2019, filed with the SEC on May 8, 2019 | 0582 – 0718 |
| 9 | Hallmark Financial Services, Inc.'s Form 8-K announcing its financial results for the three and six months ended June 30, 2019, filed with the SEC on August 8, 2019 | 0719 – 0732 |
| 10 | Hallmark Financial Services, Inc.'s Form 10-Q for the Quarter Ended June 30, 2019, filed with the SEC August 9, 2019 | 0733 – 0880 |
| 11 | Hallmark Financial Services, Inc.'s Form 10-Q for the Quarter Ended September 30, 2019, filed with the SEC November 7, 2019 | 0881 – 1030 |

| Exhibit | Document | App. No. |
|---|---|---|
| 12 | Hallmark Financial Services, Inc.'s November 8, 2019 Transcript of Earnings Call for 2019 Q3 | 1031 – 1044 |
| 13 | *Hallmark Financial Announces Exit from Binding Primary Commercial Auto Business; Reports Loss Development for Prior Underwriting Years*, GlobeNewswire, March 2, 2020 (accessed December 12/03/2020) | 1045 – 1048 |
| 14 | Hallmark Financial Services, Inc.'s Form 8-K announcing its exit from its Binding Primary Auto Business, filed with the SEC on March 2, 2020 | 1049 – 1055 |
| 15 | Hallmark Financial Services, Inc.'s Form 8-K announcing that the Company does not expect to timely file its Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 11, 2020 | 1056 – 1059 |
| 16 | Hallmark Financial Services, Inc.'s Form 8-K announcing a change in the Company's independent registered public accounting firm, filed with the SEC on March 12, 2020 | 1060 – 1062 |
| 17 | Hallmark Financial Services, Inc.'s Form 8-K/A supplementing its Form 8-K originally filed on March 11, 2020, filed with the SEC on March 17, 2020 | 1063 – 1067 |
| 18 | Hallmark Financial Services, Inc.'s Form 10-K for the Fiscal Year Ended December 31, 2019, filed with the SEC on June 30, 2020 | 1068 – 1215 |
| 19 | Hallmark Financial Services, Inc.'s Form 8-K announcing departure of Directors or Certain Officers, election of Directors, appointment of certain Officers and compensatory arrangements of certain Officers, filed with the SEC on September 21, 2020 | 1216 – 1219 |
| 20 | *AM Best Places Credit Ratings of Hallmark Financial Services, Inc. and Its Subsidiaries Under Review With Negative Implications*, BusinessWire, March 2, 2020 (accessed 11/16/20) | 1220 – 1223 |

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), Defendants Hallmark Financial Services, Inc., ("Hallmark" or the "Company"), Naveen Anand, and Jeffrey R. Passmore file this Motion to Dismiss Plaintiff's Amended Complaint (the "Amended Complaint" or "AC") (Dkt. 37) and Brief in Support.

## INTRODUCTION

The Amended Complaint asserts the type of securities-fraud suit that federal courts regularly dismiss—one based on second-guessing of judgmental decisions by unnamed "confidential witnesses," in hindsight after Defendants increased certain loss estimates. Hallmark is a Dallas-based insurance company. Like other insurance companies, Hallmark estimates future payments it will need to make on known and unknown claims against its policies. Hallmark discloses its opinion about the estimate of these future payments through a line item on its balance sheet termed "reserves for unpaid losses and loss adjustment expenses" or "L&LAE." Hallmark's public filings contained extensive warnings about the "inherent uncertainty" of these estimates.

Hallmark discloses that it relies on statistical analysis and other methods performed by professional actuaries to estimate L&LAE. But the Amended Complaint does not include a single allegation about supposed fraud within Hallmark's actuarial department that is responsible for developing the estimates for L&LAE. Rather, the crux of the Amended Complaint is a handful of allegations from two unnamed "confidential witnesses" (the "CWs") who purport to be former employees of the department at Hallmark that handles individual claims, not L&LAE. The CWs allege disagreements concerning the claims department's reserves for those individual claims, but they make no allegations about any of Hallmark's professional actuaries or the statistical and actuarial analysis that leads to the estimate for L&LAE. Disregarding that individual case reserves are not determinative of L&LAE, the Amended Complaint takes allegations concerning the claims

department and impermissibly concludes that Hallmark's financial statements—and the estimates for L&LAE derived from statistical analysis and actuarial processes not subject of the CWs allegations—were "arbitrarily manipulated."

The Amended Complaint attempts to buttress these allegations through the kind of fraud-by-hindsight allegations that threaten to turn the securities laws into an impermissible "downside insurance policy" for investors. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347–48 (2005). This lawsuit followed shortly after Hallmark announced it planned to exit one of its lines of business—the commercial auto insurance business. For several years, Hallmark disclosed that the commercial auto business experienced difficulties due to various factors, including an increasingly difficult litigation environment. In March of 2020, Hallmark announced that it planned to exit the business and that, primarily due to greater than expected loss developed in the business for 2016 and 2017 underwriting years, it had increased its loss estimate. Hallmark did not restate its financials. Rather, it revised its previous reserve estimates based on new information and developing trends. Given the judgment-laden and uncertain nature of insurance reserves, which are subject to constant revision, numerous courts have dismissed securities fraud cases alleging fraud after increases to previously estimated reserves. *See infra* n. 44.

As in those cases, the Court should dismiss the Amended Complaint for multiple independent reasons. ***First***, Plaintiff fails to allege an actionable false statement or omission with the requisite particularity required by the PSLRA. The CWs, former employees of Hallmark's claims department, supply impermissibly vague and conclusory allegations that do not even purport to address the bulk of the alleged misrepresentations, which concern the L&LAE reserve developed by Hallmark's actuaries. Further, it is well established that the accounting judgment embodied by the core alleged misrepresentation—the reserve for L&LAE—constitutes an opinion,

and the Amended Complaint does not approach the high standard the Supreme Court has set for alleging the falsity of opinions.

*Second*, the Amended Complaint, like many others alleging fraud with respect to judgmental accounting estimates, fails to allege that each Defendant acted with a strong inference of scienter that is at least as compelling as any non-fraudulent inference, including gross negligence.[1]  The CW allegations, for example, demonstrate only that they disagreed with the decision making of upper-level management in the claims department and fail to support any inference, much less a strong one, that any individual acted with fraudulent intent.

*Third*, the Amended Complaint fails even to satisfy the plausibility standard for pleading that the alleged misrepresentation caused any loss.  Plaintiff attempts to plead loss causation by alleging supposed "corrective" disclosures, but Hallmark's stock price did not drop on the day of the primary alleged "corrective" disclosure.  The remaining two allegedly "corrective" disclosures occurred on days when the overall stock market suffered catastrophic losses due to the pandemic, including on so-called "Black Thursday" when the Dow Jones Industrial Average set a new record for the largest point drop in a single day.

*Finally*, the claims against the Defendants Naveen Anand and Jeff Passmore should be dismissed as woefully inadequate to support individual claims against each of them.  The Court should dismiss the entire Amended Complaint with prejudice.

## BACKGROUND

Defendant Hallmark is a property and casualty insurance company based in Dallas, Texas.[2]

---

[1]     Because Hallmark's reserves are "forward-looking statements" protected by the safe harbor of the PSLRA, they are inactionable for the additional reasons that they are accompanied by meaningful cautionary language and because Plaintiff does not adequately plead Defendants had actual knowledge of falsity.

[2]     Ex. 6, 2018 Form 10-K, at App. 0300.  When considering a motion to dismiss, a court may consider the contents of relevant public disclosures filed with the SEC.  *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 791 (N.D. Tex. 2017).

3

Hallmark has multiple lines of business, each offering different types of insurance ranging from commercial auto insurance to professional liability to aviation insurance.[3]  Defendant Anand has been the CEO of Hallmark since 2014.[4]  Defendant Passmore served in prior roles and became Senior VP and CFO of the Company in April 2019[5] until his resignation in September 2020.[6]

## I.  Hallmark's reserves for L&LAE and case reserves.

Like all insurance companies, Hallmark estimates the total predicted amount that it will be required to pay in the future to satisfy claims made on policies it has written; Hallmark then records that estimate as a reserve on its balance sheet.[7]  This estimate is referred to on Hallmark's balance sheet as "reserves for unpaid losses and loss adjustment expenses" or "L&LAE"[8] Reserves. L&LAE represent the total estimated unpaid cost to pay both reported and unreported claims, along with estimated expenses associated with resolving claims, such as attorney's fees.[9]

Reserves for L&LAE are estimated and tested by actuaries in Hallmark's actuarial department.[10]  In its public filings, Hallmark described the various methods it used to estimate and test reserves for L&LAE and the variables, judgment, and uncertainty involved in the process:

> There is no exclusive method for determining [the range of reserves for L&LAE], and judgment enters into the process.  The primary actuarial technique utilized is a loss development analysis in which ultimate losses are projected based upon historical development patterns.  The primary assumption underlying this loss development analysis is that the historical development patterns will be a reasonable predictor of the future development of losses for accident years which

---

[3]     *Id.*

[4]     Ex. 7, Apr. 26, 2019 Form DEF 14A, at App. 0574.

[5]     *Id.*

[6]     Ex. 19, Sept. 21, 2020 8-K, at App. 1218.

[7]     Ex. 6, Form 10-K, at App. 0334 ("Reserves for unpaid losses and LAE are established for claims that have already been incurred by the policyholder but which we have not yet paid.").

[8]     *Id.*

[9]     *Id.* ("Unpaid losses and LAE represent the estimated ultimate net cost of all reported and unreported losses incurred through each balance sheet date.").

[10]    *Id.*

are less mature. An alternate actuarial technique, known as the Bornhuetter-Ferguson method, combines an analysis of loss development patterns with an initial estimate of expected losses or loss ratios.[11]

. . .

We use a variety of statistical and actuarial techniques to analyze current claims costs, including frequency and severity data and prevailing economic, social and legal factors. Each such method has its own set of assumptions and outputs, and each has strengths and weaknesses in different areas. Since no single estimation method is superior to another method in all situations, the methods and assumptions used to project loss reserves will vary by coverage and product.[12]

Importantly, reserves for L&LAE are *not* simply the sum-total of estimates for all pending known claims, which are known as "case reserves."[13] Nor are reserves for L&LAE calculated by adding case reserves for known claims to the estimated value of future claims.[14] Instead, Hallmark's actuaries use a variety of statistical and other analytical methodologies to estimate the *total* expected future cost of resolving *all known and unknown claims* in the aggregate.[15] That estimate is recorded as the reserve for L&LAE on the balance sheet.[16]

Separate from the actuarial department, which estimates reserves for L&LAE, Hallmark also maintains a claims department, which investigates and addresses individual claims related to specific accidents, hires defense counsel, and coordinates the payment of claims.[17] The claims department estimates the amount required to resolve individual reported claims. As noted above, those estimated reserves are referred to as "case reserves."[18] The claims department is not staffed

---

[11]    *Id.*

[12]    *Id.*, at App. 0376.

[13]    *Id.* ("[U]ltimate losses are forecasted first, and that amount is reduced by the amount of cumulative paid claims and case reserves.")

[14]    *Id.*

[15]    *Id.*

[16]    *Id.*, at App. 0374, 0376.

[17]    *Id.*, at App. 0376.

[18]    *Id.*

with actuaries and is not responsible for estimating reserves for L&LAE.[19]  Whereas reserves for L&LAE are estimated by the actuarial department and account for long-term trends in the business and in the industry,[20] case reserves are estimated by Hallmark's claims department using then-known information about individual accidents.[21]  And while reserves for L&LAE are listed on the balance sheet, case reserves are not.

Both reserves for L&LAE and case reserves, however, are estimates.  Hallmark disclosed that these estimates were inherently uncertain subjective.  For example, the Company disclosed:

- "Estimating reserves is inherently uncertain"[22] and "[b]ecause setting reserves is inherently uncertain, there can be no assurance that the current reserves will prove adequate."[23]

- "Due to the inherent uncertainty in estimating unpaid losses and LAE, the actual ultimate amounts may differ from the recorded amounts."[24]

- "Due to the inherent uncertainty in reserve estimates, there can be no assurance that the actual losses ultimately experienced will fall within the actuarial range."[25]

- "Due to the significant uncertainties and related management judgments, there can be no assurance that future favorable or unfavorable loss development, which may be material, will not occur."[26]

## II.   Hallmark's commercial automobile business.

Long before the class period, Hallmark warned investors that one if its lines of business— the commercial auto business—had presented operational challenges.  In a November 9, 2017 press release, Anand stated, "Primary commercial auto is a challenging environment . . . This line

---

[19]     *Id.*, at App. 0320 (noting L&LAE are estimated by actuarial personnel).

[20]     *Id.*, at App. 0312 ("The amount of reserves represents our estimate of the ultimate cost of all unpaid losses and LAE incurred.  These estimates are subject to the effect of trends in claim severity and frequency.").

[21]     *Id.*, at App. 0311.

[22]     *Id.*, at App. 0320.

[23]     *Id.*

[24]     *Id.*, at App. 0334.

[25]     *Id.*

[26]     *Id.*, at App. 0376.

of business has become a target for litigation."[27]  In 2018, Hallmark reiterated that "[s]everity and litigation trends in commercial auto continue to be challenging."[28]  That year, the Company disclosed it was experiencing unfavorable results, that these unfavorable results were being driven primarily by the commercial auto line of business,[29] and that the Company was shifting its future focus away from commercial auto to other areas of the business.[30]

During class period, Hallmark continued to disclose to investors that the commercial auto line of business still presented problems.[31]  During the third quarter 2019 earnings call, Anand noted, "We've been mentioning increase in claims severity impacting our casualty lines, and particularly, commercial auto for the last 2 years" and that "[t]he company experienced . . . increased claim severity in our commercial auto line, above what was previously anticipated."[32]

On March 2, 2020, the Company announced it planned to exit this line of business.[33]  The Company described how the business had been scaled back recently, but that the Company continued to experience "greater than expected claim severity throughout all of commercial auto."[34]  The same day, the Company announced it would revise its reserve estimates upward for 2019 by $63.8 million and that this increase related primarily to the commercial auto business.[35]

---

[27]     Ex. 1, Nov. 9, 2017 Form 8-K, at App. 0004.

[28]     Ex. 3, Aug. 7, 2018 Form 8-K, at App. 0135.

[29]     Ex. 4, Q3 2018 Form 10-Q, at App. 0165.

[30]     Ex. 5, Nov. 8, 2018 Form 8-K, at App. 0291 ("The decline in net premiums written was driven by an intentional shift in the mix of business away from a commercial auto concentration in the portfolio towards targeted growth in the Specialty Commercial operating unit, a larger portion of which is ceded to reinsurers.").

[31]     Ex. 9, Aug. 8, 2019 Form 8-K, at App. 0724 ("commercial auto remains challenging from a severity perspective").

[32]     Ex. 12, Q3 2019 Earnings Call Transcript, at App. 1037.

[33]     Ex. 14, Mar. 2, 2020 Form 8-K, at App. 1053 ("Hallmark Financial Services, Inc. ("Hallmark . . ., a specialty property and casualty insurance company, announced last month to its brokers and agents that the Company had made the strategic decision to exit its Binding Primary Auto business.").

[34]     *Id.*

[35]     *Id.*

Hallmark did not restate or withdraw its previously issued financials. This reserve increase represented revisions to the Company's previous estimates.

### III.    Hallmark's change in outside auditor.

As the Company was preparing to issue its 2019 Form 10K, a disagreement arose between the Company and its outside auditor BDO LLP ("BDO") regarding reserves for L&LAE. BDO had served as Hallmark's independent auditor since 2017, issued unqualified opinions on Hallmark's 2017 and 2018 financial statements, and opined in both years that the Company maintained, in all material respects, effective internal control over financial reporting.[36] On March 5, 2020, Hallmark terminated BDO and disclosed the termination and its disagreement with BDO to investors on March 11, 2020.[37] The next day, Hallmark announced that it had retained a new independent auditor, Baker Tilly.[38] In accordance with SEC rules, BDO was given the opportunity to comment on Hallmark's description of the disagreement and stated "We agree with the statements made in [the March 11, 2020 Form 8-K]."[39] BDO also disclosed that their audit of the 2019 financial statements was incomplete at the time of their termination.[40]

### IV.    Hallmark has not restated its financials or concluded a material weakness existed.

Hallmark has not restated or withdrawn its financial statements, and there has been no material weakness finding as a result of any of the events described in the Amended Complaint. While the termination of BDO delayed the Company's 2019 Form 10-K filing, the filing was

---

[36]     Ex. 2, 2017 Form 10-K, at App. 0067, 0075; Ex. 6, 2018 Form 10-K, at App. 0344, 0353.

[37]     Ex. 15, Mar. 11, 2020 Form 8-K, at App. 1058.

[38]     Ex. 16, Mar. 12, 2020 Form 8-K, at App. 1062.

[39]     Ex. 17, Mar. 17, 2020 Form 8-K, at App. 1067.

[40]     *Id.* ("In addition, with respect to the matters of disagreement, BDO expanded significantly the scope of its audit on January 31, 2020, with respect to which a substantial portion of the requests had not been received and/or tested prior to our termination.").

completed on June 29, 2020,[41] and Hallmark is now timely filing its periodic reports.  The Company's current auditor issued an unqualified opinion on Hallmark financial statements for year-end 2019 and opined that the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019.[42]

## LEGAL STANDARDS

To state a securities-fraud claim under Section 10(b),[43] Plaintiff must satisfy the interlocking burdens imposed by Rule 9(b) and the PSLRA.  Plaintiff must plead: (1) a material false or misleading statement; (2) that each defendant acted with scienter concerning the fraud; (3) reliance; (4) damages; and (5) loss causation.  *See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532 (5th Cir. 2008).

Rule 9(b) requires that the complaint state "*with particularity* the circumstances constituting fraud."  Fed. R. Civ. P. 9(b) (emphasis added).  The PSLRA further enhances the "particularity" requirement for pleading securities fraud under Rule 9(b) in two ways.  ***First***, the PSLRA requires not only that plaintiffs specify each allegedly false or misleading statement or omission, but also that plaintiffs must specify "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief," the complaint must also "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B) (2012).  If a complaint does not "plead with particularity *sufficient* facts to support" an allegation that a statement was false when made, it must be dismissed.  *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002) (emphasis in original).  The Fifth Circuit has further cautioned that courts should not "strain to find inferences favorable to the

---

[41]     Ex. 18, 2019 Form 10-K, at App. 1068–1215.

[42]     *Id.*, at App. 1134.

[43]     Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b) (2012).

plaintiffs and [should] not accept conclusory allegations, unwarranted deductions, or legal conclusions." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (internal quotations omitted).  To plead an omission with particularity, a complaint "must plead with particularity the facts giving rise to a duty to disclose the material information." *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 460 (N.D. Tex. 2018); *see Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

*Second*, for each properly alleged misrepresentation, the PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference that the defendants acted with scienter.  *See* 15 U.S.C. § 78u-4(b)(1)–(2); *see also R2 Invs.*, 401 F.3d at 642, 645 (observing that only strong inferences of scienter, not based on conclusory allegations or unwarranted deductions, survive a motion to dismiss.  The Fifth Circuit defines scienter as an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs.*, 401 F.3d at 645 (internal quotation omitted).  Under the PSLRA, a plaintiff must state with particularity facts giving rise to a strong inference that *each* defendant acted with scienter for *each* alleged misrepresentation.  *See* 15 U.S.C. § 78u-4(b)(2); *see also Ind. Elec.*, 537 F.3d at 533.

The "strong inference" of scienter necessary to satisfy the PSLRA cannot be met merely with "facts from which an inference of scienter rationally *could* be drawn," nor will an inference of scienter that is "merely 'reasonable' or 'permissible'" suffice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007).  Rather, a § 10(b) claim can survive "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* at 324 (emphasis added).  Neither can the strong inference of scienter arise from generalized statements by a confidential witness

10

without knowledge of the facts alleged.  Courts "must discount allegations from confidential sources."  *Ind. Elec.*, 537 F.3d at 535.

**ARGUMENT**

**I.     The Amended Complaint fails to plead with particularity that any of the challenged statements were false or misleading when made.**

The Amended Complaint does not adequately allege a misleading statement or omission. Plaintiff's core allegation is that Hallmark understated its reserves for L&LAE.  But the allegations of the Amended Complaint are no different than those in the many dismissed complaints alleging that judgment-driven accounting estimates were misstated.[44]  The Amended Complaint does not plead with anything approaching the particularization required by the PSLRA that any of the following categories of challenged statements were false or misleading.

**A.     The Amended Complaint does not allege an actionable misrepresentation regarding the processes for estimating L&LAE.[45]**

The Amended Complaint first asserts conclusory allegations that Hallmark misrepresented its processes for estimating its ultimate reserves, or L&LAE.  It does so only by ignoring the Company's public disclosures concerning those processes.  Reserves for L&LAE are a liability listed on Hallmark's balance sheet and represent the estimated ultimate unpaid cost of resolving

---

[44]     *See Woolgar*, 2020 WL 4586792, at *17–18 (dismissing claims involving allegations that management ignored reserve estimates proposed by confidential witnesses); *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 891, 894 (N.D. Ill. 2020) (dismissing claims that insurance reserves were understated when the reserves were increased multiple times and the company's former auditor was terminated after the auditor took the position the reserves were understated); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 CIV 972 RPP, 2012 WL 1646888, at *28 (S.D.N.Y. May 10, 2012) (dismissing complaint for failure to allege actionable misrepresentation concerning insurance reserves given that "[r]eserves are opinions," and plaintiffs failed to allege "that defendants did not truly hold those opinions either knowingly or recklessly at the time they were made public"); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 76 (S.D.N.Y. 2015) (complaint failed to allege estimates of insurance reserves were misleading even where the insurer was alleged to have ignored potentially important information); *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 734 (W.D. Ky. 2004) (granting a motion to dismiss because "[r]eserves attributable to an individual case may change as the extent of liability becomes clearer" and because "[w]ith the discovery of a single fact, the reserve for a case could increase many times over, or be reduced to mere nuisance value.").

[45]     The challenged statements concerning the process for estimating reserves L&LAE and handling claims are contained in AC ¶¶ 37, 58–64.

11

all reported and unreported claims.[46]

Hallmark's public disclosures make plain that these estimates are not the result of efforts of individuals in the claims department (such as the CWs) but instead result from the statistical and complex analysis of professional actuaries: "[V]arious *actuarial methods* are utilized to determine the reserves for losses and LAE recorded in our consolidated balance sheets."[47] Accordingly, it is the actuarial process that determines the ultimate loss, *i.e.*, the estimated reserves for L&LAE. Hallmark's public filings make clear that the "*ultimate losses are forecasted first*" through the actuarial methods performed by the actuarial department.[48] The allegations in the Amended Complaint that the *claims* department estimates the ultimate loss reserve is an unsupported conclusion that is flatly inconsistent with Hallmark's public disclosures.[49] While the existence of case reserves is mentioned in a footnote to Hallmark's financial statements, that footnote only describes how Hallmark calculates what is referred to in the industry as "IBNR," or the portion of the ultimate loss associated with claims that have been incurred but not reported to the Company. Hallmark calculates IBNR, first, by forecasting the ultimate loss through actuarial methods, and then, by "reduc[ing]" the ultimate loss "by the amount of cumulative paid claims and case reserves" managed by the claims department.[50] In other words, it is the ultimate loss (*i.e.*,

---

[46]     Ex. 6. 2018 Form 10-K, at App. 0334, 0374 ("Losses and LAE represent the estimated ultimate net cost of all reported and unreported losses incurred through December 31, 2018 and 2017.").

[47]     *Id.*, at App. 0376 (emphasis added).

[48]     *Id.* (emphasis added). Hallmark included in the Notes to its financial statements tables for each business segment showing the ultimate loss, which is forecasted first as described above, and a component of which is IBNR. *Id.*, at App. 097–98.

[49]     *Id.*, at App. 0376. For example, the Amended Complaint misconstrues Hallmark's disclosures by suggesting that "claim supervisors and managers" are involved in estimating reserves for L&LAE, AC ¶¶ 59-60, but this misreading is directly contrary to the public disclosures and cannot serve as a basis for securities fraud. *Johnson v. Sequans Comm'ns S.A.*, No. 11-CV-6341, 2013 WL 214297, at *13 (S.D.N.Y. Jan. 17, 2013) (refusing to "accept allegations that are contradicted by materials properly before the Court").

[50]     Ex. 6, 2018 Form 10-K, at App. 0376.

the reserve for L&LAE) estimated through the *actuarial* process that impacts the financial statements and Hallmark's net income, not the case reserves.

The Amended Complaint contains no allegations that Hallmark's *actuarial* estimation process was inconsistent with Hallmark's public disclosures about that process. In fact, the Amended Complaint does not discuss the actuarial process at all, beyond cherry picking a handful of public disclosures referencing the process. The two CWs concede they did not work in Hallmark's actuarial department and do not allege they interacted with any of the Company's actuaries or had any knowledge whatsoever of the actuarial process. Hallmark provided detailed disclosures about that process, which involves a "primary actuarial technique" that is "based upon historical development patters" and an "alternate actuarial technique, known as the Bornhuetter-Ferguson method," which "combines an analysis of loss development patterns with an initial estimate of expected losses or loss ratios" and "is most useful for recent accident years."[51]

Ignoring the breadth of the disclosures about the actuarial process, the Amended Complaint plucks out certain statements—including that L&LAE is estimated "using individual case-basis valuations and statistical analyses" using "inferences from both losses paid and losses incurred;" that estimates are "continually reviewed and adjusted as experience develops;" and that Hallmark's reserving practices are "conservative." AC ¶¶ 58–59, 63. The Amended Complaint claims these statements were misleading because "Hallmark's actual procedures employed in calculating loss reserves were materially different than Hallmark described, including that the case evaluations performed by the experienced claims supervisors and managers were disregarded by senior management in favor of baseless adjustments designed only to manipulate the reported financial results of the Company." AC ¶ 61; *see also id.* ¶¶ 63–64 (containing nearly identical allegations).

---

[51]       *Id.*, at App. 0334.

But these conclusory allegations of falsity concern the **claims** handling process, not the publicly-disclosed **actuarial** process for estimating L&LAE. While the Amended Complaint contains a number of conclusory allegations from the CWs regarding disagreements in the **claims** department related to reserves for individual accidents, it contains no allegations—much less particularized allegations—that could lead to an inference that the **actuarial** process for estimating Company-wide L&LAE was something different than what Hallmark disclosed.

The court in *Woolgar v. Kingstone Companies* rejected a claim based on confidential witness allegations—nearly identical to those in the Amended Complaint—that the disclosed process for estimating an insurance reserve was misleading because management ignored recommendations by claims personnel that certain reserves should be higher. No. 19-CV-5500, 2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020). There, the plaintiff alleged that the defendants "falsely stated . . . that the Company's loss reserve process used standard actuarial reserving methodologies, . . . that the loss reserves were closely monitored, and that the loss reserves were recomputed periodically using the most recent information on reported claims and a variety of statistical techniques" and that the company's underwriting practices were "conservative." *Id.* at *8 (internal quotations omitted). The court dismissed, noting that "none of the CWs are alleged to have specific experience with or knowledge of the [c]ompany's claims reserving practices or its loss reserve estimates." *Id.* at *11. The same is true here with respect to the reserve for L&LAE. The Court should dismiss Plaintiff's claims concerning any statements regarding the process for setting Hallmark's ultimate loss, or the L&LAE, for the failure to plead falsity with particularity.

14

### B.   Plaintiff does not adequately allege that Hallmark misrepresented its opinions concerning the amount of its reserves for L&LAE.[52]

The Amended Complaint next claims that the reserve for L&LAE itself was false or misleading.  But its allegations do not come close to the high bar for alleging falsity of an accounting estimate, such as the reserve for L&LAE.  Estimated loss reserves reflect "management's opinion—based on a variety of subjective determinations—as to the likelihood and magnitude of future loss[]." *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013); *see also Woolgar*, 2020 WL 4586792, at *14 ("loss reserves are statements of opinion").  Courts recognize that insurance reserves, in particular, are inherently uncertain statements of opinion.[53]

For this very reason, numerous courts have rejected securities fraud claims premised on allegedly inaccurate reserves.[54]  It is not enough to allege, as Plaintiff attempts here, that reserves must have been misleading because the reserves were later revised.  AC ¶ 93.  This is a clear example of a "fraud by hindsight" argument which courts have uniformly rejected.[55]  Instead,

---

[52]     The challenged statements concerning Hallmark's opinions regarding the amount of its reserves for L&LAE and its belief that the reserve for L&LAE was "adequate" are contained in AC ¶¶ 38, 55–58, 69–71, 76–78, 84–86. The Amended Complaint also includes challenged disclosures of Hallmark's net income, at AC ¶¶ 43, 53, 55, 69, 76, 84, but Plaintiff's allegations that those disclosures were misleading are derivative of the claim that the reserve for L&LAE were misleading.  *See id.* ¶¶ 5, 34, 54, 62, 64, 81, 89, 114.

[53]      *In re CRM Holdings*, 2012 WL 1646888, at *28 ("Insurance reserves are, by their nature, extremely conjectural."); *Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1231 (2d Cir. 1991) ("[R]egardless of the actuarial method used" calculation of insurance loss reserves "is based in large part upon informed guesswork.").

[54]     *See Woolgar*, 2020 WL 4586792, at *16; *Atlas Financial*, 462 F. Supp.  at 891, 894; *City of Westland Police*, 129 F. Supp. 3d at 76; *In re CRM Holdings*, 2012 WL 1646888, at *28; *In re Kindred Healthcare*, 299 F. Supp. 2d at 734.

[55]     *See City of Westland Police*, 129 F. Supp. 3d at 73 (holding the fact that company's reserves "ultimately proved insufficient" could not on its own form basis for actionable misrepresentation because "[t]he securities laws do not permit allegations of fraud by hindsight") (internal quotations and citations omitted); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 672 (N.D. Tex. 2017) (holding "predictions that do not come true or even that are negligent are insufficient to support a strong inference of securities fraud" because the Fifth Circuit does not "recognize allegations of fraud by hindsight"); *Coates v. Heartland Wireless Commc'n, Inc.*, 100 F. Supp. 2d 417, 429 (N.D. Tex. 2000) (holding plaintiffs failed to plead facts to show the need for a company's write-

statements of opinion, such as reserves for L&LAE, are actionable only in two limited exceptions: (1) when "the speaker did not hold the belief [he] professed," or (2) if "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Omnicare, Inc. v Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86, 194 (2015). The Amended Complaint does not come close to alleging either.

*First*, the Amended Complaint fails to allege with particularity facts supporting the inference that Defendants did not actually believe Hallmark's estimates for L&LAE. The Amended Complaint contains zero allegations concerning Hallmark's actuaries who are actually responsible for developing the estimate for L&LAE; the statistical or other actuarial methods that Hallmark's actuaries employed to develop the estimate; the range that Hallmark's actuaries developed for purposes of testing the estimate; or any meetings, communications, or discussions between Defendants and the actuaries responsible for developing the estimate. In short, the Amended Complaint contains not a single grievance with the disclosed basis for the estimate for L&LAE. Accordingly, there are no allegations—much less particularized ones—that even question whether Defendants' held the belief espoused in those estimates.

*Second*, the Amended Complaint does not approach the standard set forth in *Omnicare* for pleading that an opinion is misleading as the result of an omission. *Omnicare*, 575 U.S. at 194. The only allegations that Plaintiff uses to support the suggestion that the reserves for L&LAE were misleading by omission are supplied by the CWs. But the CWs do not claim to have any knowledge of the actuarial department or the methods it used to develop or test the estimate for L&LAE. Accordingly, there is no alleged omission that could render the opinion embodied by

---

down was so apparent that the fact that it was not taken shows fraud because "[t]he securities laws do not entitle plaintiffs to bring claims based on fraud by hindsight").

that estimate misleading.[56]

     In *Woolgar*, the plaintiff claimed that the defendants misstated reserves and this "under reporting of its loss reserves ultimately came to light . . . when Defendants were forced to take a reserve charge." 2020 WL 4586792, at *3 (internal quotations omitted). A confidential witness, "CW6," alleged that it was "CW6's job to calculate what the reserves should be, but CW6's recommendations were ignored by upper management at least 50% of the time on the larger accounts." *Id.* at *5. CW6 further alleged that "a lot of [the company's] files were under reserved, particularly the larger accounts," and "when CW6 requested reserve increases, those requests were declined." *Id.* The court held this was insufficient to allege falsity, stating: "***That management allegedly did not accept some of CW6's reserve recommendations . . . does not demonstrate that [the company] engaged in risky reserving practices, had insufficient reserves, [or] intentionally understated its reserves***." *Id.* at *18 (internal quotations omitted and emphasis added).

     Even in contexts where confidential witnesses claim some knowledge of the processes for setting the challenged estimate (unlike here) courts have been reluctant to conclude the plaintiff satisfied the high bar for falsity of a judgment-laden accounting estimate. For example, in *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837 (S.D. Ohio 2016),[57] company leadership allegedly ignored a confidential witness's revenue estimates and recorded higher amounts. *Id.* at 852–53. The court dismissed the claims because "an opinion statement is not necessarily misleading when an issuer knows, but fails to disclose, a fact cutting against the opinion even if the opinion is later proven incorrect." *Id.* at 853.[58]

---

[56]    The Amended Complaint fails to offer any cogent theory regarding why Defendants were under a duty to disclose the CW allegations regarding case reserves in conjunction with disclosing reserves for L&LAE. *See Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

[57]    *Aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017).

[58]    *See also City of Westland Police*, 129 F. Supp. 3d at 76 (estimates of insurance reserves were not misleading where the insurer ignored a potentially important source of information because there were no well-pled allegations

Here, it is even more apparent that the Amended Complaint's conclusory allegations about disagreements within the **claims department** do not satisfy the standard for pleading falsity of the estimate for L&LAE developed by Hallmark's **actuarial department**.[59]  The gap[60] between the Amended Complaint's allegations and the high bar set by *Omnicare* prevents any determination that Plaintiff has adequately pled falsity of the opinions concerning the L&LAE estimates.

### C.   The Amended Complaint does not adequately allege the falsity of statements regarding the loss development in the Specialty Commercial Segment.[61]

The Amended Complaint also attempts to allege that Hallmark's disclosures concerning the development of its estimated losses in the Specialty Commercial Segment were misleading. These allegations concern the very kind of opinions embodied in Hallmark's overall estimate for L&LAE; the Amended Complaint fails to plead their falsity for the same reasons discussed above.

Hallmark disclosed that, due to the inherent uncertainty of L&LAE reserve estimates, the Company's reserves may be revised in the future.[62]  Increases to the L&LAE reserves after the

---

showing how review of this information would have led to a different amount of reserves); *In re Deutsche Bank AG Sec. Litig.*, Case No. 09 CV 1714 (DAB), 2016 WL 4083429, *25 (S.D.N.Y. July 25, 2016) (rejecting a claim that defendants made a material omission by failing to disclose that senior bank officials disagreed with a more junior employee's opinions about risks related to the mortgage market).

[59]    Plaintiff also alleges that Defendants' statements regarding the reserves were misleading because they violated GAAP, but the Amended Complaint does not explain how the reserves for L&LAE failed to comply with GAAP other than by pointing to the allegations of the CWs.  Courts refuse to consider alleged violations of GAAP when the alleged violation is merely duplicative of the claim that a defendant made false or misleading statements. *See City of Westland Police*, 129 F. Supp. 3d at 76; *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 688 (S.D.N.Y. 2004).

[60]    That gap is even wider when considering a key admonition in *Omnicare*: "[W]hether an omission makes an expression of opinion misleading always depends on context" because "an investor reads each" opinion "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." 575 U.S. at 190.  Here, Hallmark disclosed repeatedly that its reserves for estimated L&LAE were "inherently uncertain," that "there can be no assurance that the current reserves will prove adequate," and that due to reliance on "management judgments, there can be no assurance that future favorable or unfavorable loss development, which may be material, will not occur." Ex. 6, 2018 Form 10-K, at App. 0320, 0376.

[61]    The challenged statements concerning the loss development in the Specialty Commercial Segment are contained in AC ¶¶ 72–73, 79–81, 87–89, and 92–93.

[62]    Ex. 6, 2018 Form 10-K, at App. 0376 ("Due to the significant uncertainties and related management judgments, there can be no assurance that future favorable or unfavorable loss development, which may be material, will not occur.").

original estimate are known as "unfavorable development," while decreases are referred to as "favorable development."[63]  Each quarter, Hallmark disclosed the favorable and unfavorable development experienced in each of its business segments, including the Specialty Commercial Auto segment which contained the commercial auto business.[64]  The Company also disclosed which business lines and accident years were primarily responsible for overall favorable or unfavorable development in a particular segment.[65]  The Company discussed these changes on earnings calls and the Amended Complaint points to one such call when Anand noted that L&LAE reserves had increased.  AC ¶ 92.

Plaintiff claims these disclosures regarding which business units experienced favorable or unfavorable development for which accident years were misleading because Defendants failed to also disclose the "practice of fraudulently manipulating reported loss reserves" alleged by the CWs.  AC ¶ 73; *see also id.* ¶ 81, 89, 93.  In other words, Plaintiff does not claim that Hallmark's stated reasons for the movements in each business segment's L&LAE reserves were misleading for any other reason other than the supposedly undisclosed "manipulation" of case reserves by personnel in the claims department.  This claim is, therefore, duplicative of the claim that the estimates for L&LAE themselves were misstated and should be dismissed for the same reasons.

### D. The Amended Complaint does not adequately allege falsity concerning any statement or opinion regarding Hallmark's claims department.[66]

The Amended Complaint contains only sparse references to Hallmark's claims department or the case reserves set by the claims department.  These sparse references fall far short of the type

---

[63]       *Id.*

[64]       Ex. 6, 2018 Form 10-K, at App. 0336; Ex. 8, Q1 2019 Form 10-Q, at App. 0600; Ex. 10, Q2 2019 Form 10-Q, at App. 0753; Ex. 11, Q3 2019 Form 10-Q, at App. 0900.

[65]       Ex. 6, 2018 Form 10-K, at App. 0336; Ex. 8, Q1 2019 Form 10-Q, at App. 0660; Ex. 10, Q2 2019 Form 10-Q, at App. 0753; Ex. 11, Q3 2019 Form 10-Q, at App. 0900.

[66]       The challenged statements concerning the claims department are contained in AC ¶¶ 31, 41, 59–61, 92.

of particularized allegations that could support an inference of falsity.

The Amended Complaint first references Hallmark's disclosure that "[l]arge loss exposures are: i) reviewed at least quarterly with senior management of the operating unit; and ii) monitored by Hallmark senior management."  AC ¶ 60.  The only reason the Amended Complaint gives for the supposed falsity of these statements is the allegation that supervisors "disregarded" the judgments of lower level claims personnel.  *Id.* ¶ 61.  But the notion that senior managers might not agree with lower-level personnel is entirely consistent with how Hallmark described its practices—claim supervisors and managers would "periodically and systematically" review the claims "as a method of quality and loss control."[67]   There is no particularized allegation that Hallmark's statements concerning senior management's review of large losses were misleading.

The Amended Complaint also quotes Anand's commentary concerning case reserves in response to a question from an analyst on an earnings call.  Anand stated:

> [W]e're less than 50 claims open in terms of all those accident years at this point and adequate with the case reserve from our perspective.  We have a little bit more over a couple of hundred claims open between '17 and '16 from an overall claim perspective.  But the key point is, we feel case reserves, from a case reserve perspective, are probably at the highest level we've seen in our company in our history, and we feel they're adequately reserved.  But as you get kind of closer to closing out the claims, you do get some volatility.  And we thought it was prudent to add to our reserves on that basis based on some of the volatility we're seeing as we to continue the pace of closing out the claims that we have.[68]

There is nothing in the Amended Complaint challenging the facts concerning case reserves in these comments: Anand provided information about the number of open claims for particular accident years and stated case reserves were at the highest level they had ever been.  Instead, the Amended Complaint focuses on Anand's opinion concerning the adequacy of the case reserves for certain

---

[67]     Ex. 6, 2018 Form 10-K, at App. 0311.  *See also* AC ¶ 31, 41 (claiming Hallmark "touted the experience" of the claims department and "case by case" evaluations, but failing to explain how these statements were false).

[68]     AC ¶ 92; Ex. 12, Q3 Earnings Call Transcript, at App. 1040.

accident years.  The adequacy of case reserves is a statement of opinion subject to the pleading requirements of *Omnicare*.[69]  The Amended Complaint falls short of that two-prong standard.

**First**, there is no allegation that Anand did not actually hold the belief he expressed. *Omnicare*, 575 U.S. at 185–86.  Anand's alleged participation in meetings or a "reserve project," AC ¶ 40, says nothing about what Anand heard or discussed.  Similarly, vague and conclusory allegations that Anand directed "reserve lowering," *Id.* ¶ 49, even if taken as true, give no indication that Anand believed that the case reserves were not adequate.  Insurance companies such as Hallmark must adjust case reserves all the time to account for new facts and changing trends.[70]  **Second**, there is no particularized allegation that Anand knew but failed to disclose "information whose omission ma[de] [his opinion concerning the adequacy of case reserves for certain accident years] misleading to a reasonable investor."  *Omnicare*, 575 U.S. at 185–86.  While the Amended Complaint contains various statements from the two unnamed CWs regarding their disagreements with case-reserve decisions by management of the claims department, it stops short of alleging that Anand had any awareness of these disagreements.[71]

E.     **The Amended Complaint fails to allege falsity with respect to Hallmark's SOX certifications.[72]**

The Amended Complaint contains only the barest of allegations as to why the internal controls certifications, which are required by the Sarbanes-Oxley Act ("SOX"), and which Anand

---

[69]     *See Delta*, 945 F.2d at 1231 ("[C]ase reserve decisions involving reported claims entail uncertainty as to the amount of final loss."); *In re Kindred Healthcare*, 299 F. Supp. 2d at 734 ("Reserves attributable to an individual case may change as the extent of liability becomes clearer.  With the discovery of a single fact, the reserve for a case could increase many times over, or be reduced to mere nuisance value.").

[70]     *See In re Kindred Healthcare*, 299 F. Supp. 2d at 734.

[71]     Likewise, the Amended Complaint does not assert with particularity that Anand had a duty to disclose these disagreements.  *See Basic*, 485 U.S. at 239 n.17.

[72]     The challenged statements concerning SOX certifications are contained in AC ¶¶ 22, 66, 68, 74, 75, 82, 83, 90, and 91.

and Passmore signed, are false.  Courts have held that it is not enough to couple allegations of a purported control deficiency with a recitation of defendants' SOX certifications in order to plead falsity.  *See In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016) (dismissing claims that SOX certifications were false and misleading).  In order to adequately allege that SOX certifications were false or misleading, Plaintiff must plead with particularity—not just a control deficiency—but that the actions described in the certification were not actually undertaken.  *Id*; *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (finding it dispositive that "Plaintiff does not allege any particularized facts which would suggest that the actions articulated in the SOX Certifications were not undertaken").  Here, neither of the CWs claims to have been involved in the design or evaluation of internal controls and neither claims to have knowledge of the design or evaluation of internal controls by Anand or Passmore. Plaintiff offers no particularized allegations describing what Anand and Passmore either did or did not do in their design and review of internal controls.  The Amended Complaint does not sufficiently allege any false statement related to internal controls.[73]

### F.  Hallmark's statements concerning the termination of BDO are not actionable.[74]

Although it is not listed as one of the alleged "False and Misleading Statements," the Amended Complaint includes a strained allegation that Hallmark's March 11, 2020 Form 8-K failed to comply with SEC regulations.  AC ¶¶ 100–03.  In that filing, Hallmark disclosed a

---

[73]     Moreover, the Amended Complaint does not adequately describe any failure or deficiency in internal controls.  The confidential witnesses allege summarily that "there were no 'checks and balances' and no consistent, formal process with compliance personnel involved during Stauber's decisions to reduce a claim's predicted value." AC ¶ 43; *see also id.* ¶¶ 45, 50.   But the allegation that Stauber disagreed with and revised certain reserve estimates only shows that Stauber was doing his job as head of the claims department.  The Amended Complaint does not explain why the head of a claims department cannot review and revise case reserves.  Nor does it describe any specific control or procedure that was circumvented or disregarded.

[74]     The statements concerning BDO's termination are contained in AC ¶¶ 100–03.

disagreement with its auditor, BDO LLP ("BDO").  Regulation S-K, Item 304(a)(1) requires that

a company describe the disagreement, and Hallmark did so, stating:

> [A] disagreement arose regarding certain matters related to (a) the Company's
> processes for estimating reserves for unpaid losses and loss adjustment expenses,
> (b) the resulting potential impact on the Company's assessment of the associated
> internal controls over financial reporting, and (c) the resulting potential impact on
> recorded amounts of those reserves, all as of the quarter ended September 30, 2019,
> and the year ended December 31, 2019.  *Id.* ¶ 100.

Plaintiff claims that this description does not "describe" the disagreement, but merely "identifies"

the disagreement.  *Id.* ¶ 101.  There is no support in Item 304 for this wordplay.

The Amended Complaint falsely implies that BDO, in its response, "stated it had attempted

to expand the scope of its audit but that Hallmark would not respond."  *Id.* ¶ 103.  This grossly

mischaracterizes what BDO said, which was disclosed publicly:

> We agree with the statements made in response to that Item insofar as they relate
> to our Firm.  In addition, with respect to the matters of disagreement, BDO
> expanded significantly the scope of its audit on January 31, 2020, with respect to
> which a substantial portion of the requests had not been received and/or tested prior
> to our termination.  AC ¶ 103.

In other words, BDO did not take issue with the description of the disagreement provided by the

Company.  BDO noted that it had expanded the scope of its audit and, at the time BDO was

terminated, it still had further work to do to complete the audit.  The Amended Complaint's

misleading reading of the 8-K and BDO's response are insufficient to allege a false statement.

## II.    The Amended Complaint challenges forward-looking statements protected by the PSLRA's safe-harbor provision.

Under the PSRLA's "safe harbor" provision, "forward-looking statements" are not

actionable if (1) they are identified as forward-looking statements and accompanied by meaningful

cautionary language, or (2) the plaintiff fails to plead and prove the individual making the

statement or the executive officer approving the statement had actual knowledge of its falsity.  15

U.S.C. § 78u-5(c)(1) (2012).[75]   Because the types of  reserves challenged in the Amended Complaint (and opinions about their adequacy) are estimates of amounts that may or may not be paid in the future, they are forward-looking statements protected by the PSLRA.  *See*, *e.g.*, *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004) ("The amount [a company] keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience based on past claims history as well as current filings . . . .  It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA.").[76]   Here, the Amended Complaint's challenged statements related to reserves are inactionable for the dual reasons that they are accompanied by meaningful cautionary language, *see supra* Background § I, and because Plaintiff has not pled that the individuals making the challenged statements had actual knowledge of their falsity.

## III.    The Amended Complaint fails to plead scienter with respect to Hallmark.

Because insurance company reserves, such as reserves for L&LAE and case reserves, are highly-judgmental estimates that must be regularly adjusted and revised, courts have regularly held that allegations concerning such reserves do not support the "strong inference" of scienter a plaintiff is required to plead under the PSLRA.[77]

---

[75]    "If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 777 (S.D. Tex. 2012).

[76]    *See also Caprin v. Simon Transp. Services*, 112 F. Supp. 2d 1251, 1256 (D. Utah 2000) (where plaintiffs' core allegation was that defendants "understated accident reserves during the class period and thereby fraudulently overstated its earnings," holding that because "plaintiffs have not sufficiently alleged that the defendants had actual knowledge that the statements in the forward-looking statement were false or misleading . . . the defendants are protected by the Safe Harbor Doctrine."); *In re Am. Serv. Group, Inc.*, Case No. 3:06-0323, 2009 WL 1348163, at *37 (M.D. Tenn. Mar. 31, 2009) (holding section 78u–5 safe harbor applied to company's statements about future exposure and reserves because such statements "are forward looking statements and are protected by the PSLRA").

[77]    *See Woolgar*, 2020 WL 4586792 at *24–25 (plaintiff failed to plead scienter based on confidential witness allegations that proposed reserve adjustments were ignored); *Atlas Financial*, 462 F. Supp. 3d at 905 (plaintiffs failed to plead scienter based on allegations that reserves were revised on multiple occasions and where the company's outside auditor claimed reserves were misstated); *City of Westland Police*, 129 F. Supp. 3d at 80 (dismissing securities

In determining whether the Amended Complaint supports such a "strong inference" of scienter, the Court must consider and weigh any non-fraudulent inferences against the fraudulent ones that Plaintiff attempts to draw. *Tellabs*, 551 U.S. at 310. The allegations may survive dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged," including gross negligence. *Id.* Thus, even allegations of "gross negligence" in the development of a company's accounting estimates or its internal controls are insufficient to plead a strong inference of scienter.[78] Likewise, a revision to an accounting estimate—even a $63.8 million one as is alleged here—does not suffice to demonstrate falsity, much less the fraudulent mental state to create a strong inference of scienter.[79] Indeed, even where a company restates previously issued financials (which did not occur here), a large restatement does not support scienter. For example, in *Owens v. Jastrow*, the Fifth Circuit affirmed dismissal where the defendant overvalued its mortgaged-backed securities portfolio by 100% and bank regulators forced a ***$1.62 billion restatement*** of the entire portfolio. 789 F.3d 529, 541–45 (5th Cir. 2015) (refusing to infer scienter even though "the magnitude was undoubtedly large").

To survive dismissal, the Amended Complaint must support a strong inference of scienter that is at least as cogent and compelling as the non-fraudulent inferences *with respect to each individual Defendant*. But the Fifth Circuit does not permit Plaintiff's use of "group pleading," *i.e.*, referring to the defendants collectively as "Defendants," "Executive Defendants," or

---

fraud claims that insurance reserves were misstated because, *inter alia*, the plaintiff failed to offer any non-conclusory allegations of scienter regarding the reserves in question).

[78]    *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 253–54 (5th Cir. 2003) (even "gross mismanagement" of accounting compliance leading to large financial restatement failed to demonstrate strong inference of scienter); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002) ("[n]egligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud").

[79]    *See supra* Argument § I(B).

"Hallmark," *see, e.g.*, AC ¶¶ 115-17, or attempting to attribute scienter through such collective references. Such allegations "cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 364 (5th Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)).

The Amended Complaint's scienter allegations, including those supplied by the CWs and Plaintiff's additional generic allegations, cannot withstand the scrutiny that the law demands.

### A.     The confidential witnesses' allegations are insufficient to attribute scienter to Hallmark.

The primary way that Plaintiff attempts to allege scienter is through the CWs, but these allegations do not suggest anything more than internal disagreements regarding ***case reserves***, and do not pertain to the bulk of the challenged misrepresentations.[80] Courts in the Fifth Circuit have held that a plaintiff must meet the scienter pleading burden for *each* misrepresentation.[81] The CW allegations contain no particularized allegations concerning the actuarial personnel responsible for developing the estimate for L&LAE; the actuarial processes or techniques; communications between the Defendants and the actuaries; or any of Hallmark's internal controls. Accordingly, the CW allegations cannot give rise to any inference of scienter, much less a strong one, concerning the challenged statements regarding the processes for estimating L&LAE, *see supra* Argument § I(A); the opinions embodied in the estimates of L&LAE or Hallmark's net income, *see supra* Argument § I(B); the opinions about the development of L&LAE in the Specialty Commercial

---

[80]     *See supra* Argument § I(A).

[81]     *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 868 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Services, Inc.*, 925 F.3d 727 (5th Cir. 2019) (plaintiffs failed to plead "specific misrepresentations or misleading omissions by either [d]efendant with the required 'who, what, when, where, and how' of ***each*** misrepresentation or omission" (emphasis added)).

Segment, *see supra* Argument § I(C); or the SOX Certifications, *see supra* Argument § I(E).
Likewise, the CWs provide no information concerning the communications between Hallmark and
BDO, and their allegations cannot give rise to any inference (of scienter or otherwise) concerning
Hallmark's description of BDO's termination.  *See supra* Argument § I(F).

The only challenged statements to which the CW's allegations even loosely relate are the
disclosures concerning case reserves (a metric not included as a line item on Hallmark's financial
statements and barely discussed in the Amended Complaint) and the claims department.[82]  Even
with respect to the sparse challenged statements concerning the claims department and the case
reserves, the CW's allegations are insufficient to allege that any Defendant acted with scienter.
The Fifth Circuit has held that "allegations [that] derive from confidential sources further detract[]
from their weight in the scienter analysis," and "courts *must* discount allegations from confidential
sources."  *Ind. Elec.*, 537 F.3d at 535 (emphasis added).  Accordingly, the CWs' vague and
unparticularized allegations concerning the claims department do not provide any inference of
scienter as to any individual:

- Hallmark's practices were "unsound" and "provided no 'checks and balances on financials'"; and "The process in the claims department "disregarded the judgment of experienced claim supervisors and managers previously touted by the Company would be summarily disregarded in order to manipulate Hallmark's reported financial results"; AC ¶ 41

- There were "no 'checks and balances' and no consistent, formal process with compliance personnel involved during Stauber's decisions"; *Id.* ¶ 43

- "Hallmark deviated from its stated procedures for calculating loss reserves in order to manipulate its reported financial results"; *Id.* ¶ 45

- "Milch and Stauber were arbitrarily lowering and manipulating Hallmark's loss

---

[82]     CW-1's allegations that "Stauber's decisions to reduce a claim's predicted value (and thus lowering reserves and increasing reported net income," (AC ¶ 43), is not only conclusory but also contrary to Hallmark's public disclosures.  As Hallmark's public filings reflect, L&LAE is the metric that is reported on the balance sheet and impacts net income; that metric is established through an actuarial process and not by the claims department.  Ex. 6, 2018 Form 10-K, at App. 0374, 0376.

reserves to make Hallmark look more profitable."[83] *Id.* ¶ 49

Conclusory allegations by CWs such as these do not support an inference of scienter because they do not contain the "'who, what, when, where, and how' required under Rule 9(b) . . . and under the PSLRA." *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 842 (N.D. Tex. 2005).

The CWs' other allegations fare no better.  Several of the CW allegations are statements that merely reflect an actively-managed claims department.  These include allegations that meetings were held to discuss claims and reserves, AC ¶ 40, that management required approval before the payment of claims and that the claims staff was required to get "verbal approval from Stauber before finalizing any claims," *id.* ¶¶ 38, 50, that the discretion of lower-level members of the claims department was changed or reduced, *id.* ¶ 44, that the claims department prepared mediation proposals with "reduced claims values," *id*, that management "spread[] out the amount of time that it took to resolve claims" and spread out claim payments, *id.*, and that the department paid out claims in amounts greater than the reserve set for those claims, *id.* ¶ 48.  None of these allegations come close to an inference, much less a strong one, of fraudulent intent by any individual.  Indeed, the very examples of changes to individual case reserves supplied by the CWs indicate that, contrary to the vague and conclusory allegations of "arbitrary" reductions, the claims department was treating individual claims individually: upper management set individual reserves for individual cases at $300,000, $600,000, and $5,000, respectively.  AC ¶ 45.

Further, CW-2's allegations of "across the board" reserve reductions and "systemic decrease[s]" that "were appearing to be done 'arbitrarily,'" *id.* ¶ 43, his opinion that that "this ongoing practice" did not "sit well" with him, *id.* ¶ 43, and his claim of reductions in reserves on

---

[83]     This allegation is not only conclusory but it also misunderstands what is plain from Hallmark's public filings: the actuary group determines the overall L&LAE, which is on the balance sheet and impacts net income, not members of the claims department.  Ex. 6, 2018 Form 10-K, at App. 0374, 0376.

100 claims or 50% of commercial auto claims, *id.* ¶ 46, are wholly inadequate to support scienter. These allegations merely "demonstrate a disagreement between the CWs and [Hallmark's] 'upper management' as to what the loss reserves should be, which is not uncommon in the context of reserves." *Woolgar*, 2020 WL 4586792, at *18, 24–25 ("CW6's frequently rejected loss reserve recommendations and refused reserve increase requests" "at least 50% of the time" were insufficient to plead a strong inference of scienter).

The insufficiency of the CWs' allegations is even more plain when considering the requirement to analyze scienter "defendant by defendant, adding any allegations unique to that defendant, to comprehensively determine if plaintiffs have alleged facts that give rise to a strong inference of scienter as to any defendant." *Owens*, 789 F.3d at 537–38. The CWs make no allegations concerning Defendant Passmore. With respect to Defendant Anand, the CWs make three allegations, none of which is sufficient.

**First**, the CWs provide vague claims of nondescript meetings that Anand attended, AC ¶ 40, but these allegations cannot create a strong inference that Anand had any fraudulent intent. *Woolgar*, 2020 WL 4586792, at *25 ("although CW2 references 'monthly reports' and 'meetings,' the Complaint does not plausibly allege what information was actually included in those reports or discussed at those meetings"). **Second**, CW-2 asserts that "the $63.8 million dollar loss reserve adjustment announced in March 2020 was directly caused by the fraudulent reserve lowering practice by Milch and Stauber carried out at the direction of A[n]and." AC ¶ 49. This allegation is similarly woefully vague and lacking in particularization, especially given that CW-2 never claims to have spoken to Anand.[84]   More fundamentally, the unsupported suggestion that Anand

---

[84]      *See In re Alamosa Holdings*, 382 F. Supp. 2d at 850 ("Plaintiffs have surmised that Defendants knew of critical problems [but] failed to plead any factual particulars to support such a leap in logic . . . Conclusory allegations disguised as facts will not suffice to survive a motion to dismiss.").

manipulated the ultimate loss reserve through personnel in the claims department cannot be squared with Hallmark's public disclosures that its ultimate loss reserve (the estimated L&LAE, which was the subject of the $63.8 million revision) was developed by the actuaries, and not the claims department.[85]  **Third**, CW-2 provides a quadruple-hearsay description of a phone call in which Anand did not participate, and where no one claimed Anand was aware of any wrongdoing: allegedly, (1) CW-2 said (2) that Milch said (3) that Stauber said (4) that Anand directed "lowering of loss reserves."  AC ¶ 116(c).  Setting aside the hearsay inherent in this allegation,[86] the mere "lowering of loss reserves" is not fraudulent and is a regular occurrence at an insurance company. *See In re Kindred Healthcare*, 299 F. Supp. 2d at 734 ("With the discovery of a single fact, the reserve for a case could increase many times over, or be reduced to mere nuisance value.").[87]

The CW allegations do not support any fraudulent inference, much less one that is at least as compelling as the many non-fraudulent interpretations they support, including that Hallmark's claims department was tightly managed or that management of the claims department espoused a different view of individual case reserves than the CWs.  *See Ind. Elec.*, 537 F.3d at 531 (an allegation "cannot contribute to a strong inference of scienter [if] it is susceptible to many interpretations, including innocent ones.").

---

[85]     Ex. 6, 2018 Form 10-K, at App. 0376.

[86]     The Court has discretion to disregard the CWs' hearsay-based allegations.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91, 997 n.4 (9th Cir.2009) (confidential witness statements based on hearsay "may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration."); *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) ("[T]he fact that Plaintiffs rely on hearsay statements passed onto CW–2 further underscores the unreliability of the confidential witness statements in this case.").

[87]     CW-2 also alleges that Milch told CW-2 that Milch "was worried about committing securities fraud and that she was thinking about leaving Hallmark" but this hearsay-based conclusory allegation is more cogently interpreted as reflecting unsurprising jitters by an employee of a Company that has been sued for securities fraud just two months before this conversation allegedly took place.

**B.      The Amended Complaint's additional scienter allegations are the type of boilerplate allegations regularly rejected by courts.**

While the main thrust of Plaintiff's scienter allegations come from the two unnamed CWs, the Amended Complaint adds a laundry-list of generic allegations, many of which could be attributed to nearly any public company, and all of which courts regularly reject as insufficient.

*First*, Plaintiff points to Anand's and Passmore's positions and responsibilities as officers of Hallmark, including that they signed standard SOX certifications attached to the Company's regular public filings. AC ¶ 22. But "[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). Further, an officer's "signature on a SOX certification, without more, does not support a strong scienter inference." *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 509 (S.D. Tex. 2017).[88]

*Second*, Plaintiff alleges that Anand and Stauber had a "close prior relationship" and met frequently to discuss reserves. AC ¶ 116(b). But the Amended Complaint does not explain how either allegation, if true, means that Anand was aware of any fraudulent conduct.

*Third*, Plaintiff claims there is "circumstantial evidence" of scienter. For circumstantial evidence to support a strong inference of scienter, a plaintiff must "allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 409 (5th Cir. 2001). The Amended Complaint points to the disclosures concerning BDO's dismissal and Hallmark's disagreement with BDO, AC ¶ 117, but courts have held that disagreements with an auditor in the course of the auditor's dismissal are not adequate to plead scienter when those disagreements are voluntarily disclosed to investors, as was the case

---

[88]      *See also Local 295/Local 851 IBT Employer Group v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 725 (S.D. Ohio 2010) ("[F]or a Sarbanes–Oxley certification to establish scienter, the complaint must allege facts demonstrating that the defendant knew or should have known that the report contained false statements.").

here. *See Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 899 (N.D. Ill. 2020) (holding a disagreement with a terminated auditor did not create a strong inference of scienter even when the auditor informed the company it believed its insurance reserves were materially misstated). The Amended Complaint also asserts that "the importance of the Binding Primary Auto business segment as a core operation of the Company" is circumstantial evidence of scienter. AC ¶ 117. Courts in the Fifth Circuit, however, have held that simply alleging a segment of a company's business is a "core operation," without more, is insufficient to show a strong inference of scienter.[89]

## IV.   The Amended Complaint fails to adequately plead loss causation.

The Amended Complaint fails to plausibly plead loss causation by reference to three supposedly "corrective" disclosures. The first disclosure—the announcement that the Company would exit the commercial auto business—was issued at 9:00 AM Eastern on March 2, 2020.[90] But Hallmark's stock price *increased* that day.[91] The Amended Complaint attempts to link the price drop occurring the following day to the March 2 announcement. Courts have rejected such attempts to look to a price drop on the second day following a corrective disclosure because "[a]n efficient market is said to digest or impound news into the stock price in a matter of minutes; therefore, an alleged corrective disclosure released to the market at the start of Day 1, coupled with

---

[89]    *See Hall v. Rent-A-Ctr., Inc.*, Case No. 4:16CV978, 2017 WL 6398742, at *32 (E.D. Tex. Oct. 19, 2017), *report and recommendation adopted*, 4:16CV978, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017). As further alleged "circumstantial evidence of scienter, the Amended Complaint also points to (1) purported differences in Hallmark's disclosed policies compared to its actual policies and (2) vague allegations of internal control deficiencies. AC ¶ 117. These conclusory allegations are addressed above in Sections I.A and I.E.

[90]    Ex. 13, "Hallmark Financial Announces Exit from Binding Primary Commercial Auto Business; Reports Loss Development for Prior Underwriting Years," at App. 1046–48.

[91]    Courts may take judicial notice of stock prices for purposes of evaluating a motion to dismiss. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (holding court taking judicial notice of stock prices was proper); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264 n.3 (3d Cir. 2005) ("We can take judicial notice of [a company's] stock prices even on a motion to dismiss because these facts are not subject to reasonable dispute and are capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned.") (citations and quotations omitted).

an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not show price impact as to the alleged corrective disclosure." *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269 (N.D. Tex. 2015).[92]

In addition, all three alleged corrective disclosures occurred in March of 2020 when stock markets were in free-fall due to the pandemic. The March 12, 2020 alleged price drop occurred on what has become known in the financial press as "Black Thursday" when the Dow suffered its biggest point drop in history.[93] The March 18, 2020 alleged price drop of only 2.5% coincided with a 6% (1,300 point) drop in the Dow that same day.[94] Allegations that the drops during this period were caused by Hallmark's allegedly corrective disclosures and not the global pandemic crisis are nothing more than "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" and should not survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Moreover, none of allegedly corrective disclosures revealed the falsity of any prior statement. *See Magruder v. Halliburton*, No. 3:05-cv-01156-M, at 12 (ECF No. 100) (N.D. Tex. Mar. 12, 2019) (dismissing claims because loss causation was not adequately pled where plaintiff "d[id] not specifically identify any corrective disclosure that revealed a previously concealed truth"). The March 2 disclosure stated that the Company would be exiting the commercial auto

---

[92]    While this opinion assessed price impact at the class certification stage, an allegation that is insufficient to show price impact is necessarily insufficient to show loss causation. "Price impact" refers to "whether the alleged misrepresentations affected the market price in the first place." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 814 (2011). Loss causation requires this determination, plus an additional step: showing "that a misrepresentation that affected the integrity of the market price also caused a subsequent economic loss." *Id.* at 812.

[93]    Sean Burch, *Black Thursday: Dow Suffers Biggest Point Drop Ever, as Disney and Apple Fall Hard*, Yahoo, Mar. 12, 2020, https://www.yahoo.com/entertainment/black-thursday-dow-suffers-biggest-201047970.html.

[94]    Fred Imbert & Yun Li, *Dow drops 1,300 points, S&P 500 loses 5% as coronavirus market sell-off reaches new low*, CNBC, Mar. 17, 2020, https://www.cnbc.com/2020/03/17/stock-futures-fall-slightly-after-market-rebounds-on-hopes-for-1-trillion-stimulus.html.

business and increasing its reserves.  As noted above, increasing reserves is not an indication prior reserves were misstated.  Likewise, the March 11 disclosure noting that Hallmark terminated BDO did not correct any prior statements and the March 17 disclosure confirmed that BDO agreed with Hallmark's previous disclosure.  *See supra* § I(D).  Accordingly, the Amended Complaint fails to plead loss causation.[95]

## V.    The Court should dismiss the 10(b) claims against Anand.

For all the reasons discussed above, the 10(b) claims against Anand cannot survive dismissal.  As Hallmark's CEO, Anand undoubtedly relied on the actuarial processes, which were disclosed in the Company's filings, through which Hallmark developed its estimates for ultimate losses, or L&LAE.  Nothing in the Amended Complaint supplies any reason for Anand to have disbelieved Hallmark's disclosures about its actuarial processes or the estimates for L&LAE.  The sparse CW allegations mentioning Anand have no bearing on the actuarial processes or estimates.  And, as detailed above, the CW allegations fail even to supply particularized allegations of falsity—and certainly no strong inference of scienter—with respect to Anand's opinion in 2019 that case reserves for accident years in 2017 and prior were "adequate."  The CWs do not reference particular accident years, and the Amended Complaint ignores that BDO signed unqualified audit opinions concerning Hallmark's internal controls and financial statements for 2017 and 2018 and Baker Tilly did the same for 2019.[96]  Because the Amended Complaint fails entirely to plead falsity

---

[95]     Plaintiff also asserts a "materialization of risks" theory of loss causation, claiming there was a risk that "manipulation" of financials and undisclosed material weaknesses would become known and this risk "materialized." AC ¶¶ 124–32.  This theory is duplicative of Plaintiff's corrective disclosure theory.  It insufficient for the same reasons, plus three additional reasons.  First, there are no plausible allegations that a risk of "public exposure" of "manipulation" (or even an increase in reserves) was known.  Second, courts have held that the "materialization of risk" theory of loss causation does not apply to allegations of false statements of opinion.  *See In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008) (citing cases).  Finally, the events listed in AC ¶ 129 wherein Plaintiff claims this risk "materialized" either are not appropriately alleged to corresponded to a stock price decline, (AC ¶¶ 96–98, 107, 104–105; *see also* Ex. 20, "*AM Best Report*," at App. 1221–23), did not reveal any new information (AC ¶¶ 96–99), or are duplicative of the alleged corrective disclosures (AC ¶¶ 98-103).

[96]     *See Phillips v. Harvest Natural Res., Inc.*, No. H-13-801, 2016 WL 4523849, at *3 (S.D. Tex. Aug. 25, 2016).

or scienter with respect to any statements by Anand, and for the discussed above, the Court should dismiss with prejudice the 10(b) claims against Anand.

## VI.     The Court should dismiss the 10(b) claims against Passmore.

Plaintiff should not seriously dispute that it is appropriate for the Court to dismiss the claims against Hallmark's former CFO, Passmore.   There are no particularized allegations regarding Passmore whatsoever, much less those that could support an inference of falsity.[97]   The CW allegations do not even mention Passmore.  AC ¶¶ 38–51.  It is impermissible to assert a claim for securities fraud against an individual without even attempting to satisfy the black-letter standards within the Fifth Circuit requiring that scienter must be pleaded defendant-by-defendant.[98]   The section of the Amended Complaint with supposed additional allegations of scienter is void of any individual mention of Passmore.  AC ¶¶ 115-17.  The claims against Passmore are wholly deficient for this reason and all the reasons set forth above, and the Court should dismiss the 10b-5 claims against Passmore with prejudice.

## VII.    The Amended Complaint's Section 20 claims also must be dismissed.

Since the Section 10(b) claims must be dismissed, so too must the Section 20(a) claims because Section 20(a) claims are derivative of 10(b) claims.  *See, e.g., Ind. Elec.*, 537 F.3d at 545.

CONCLUSION

Accordingly, the Court should dismiss the Amended Complaint with prejudice.

---

("That a major accounting firm approved the filings shows the errors were not so obvious that their publication demonstrates an intent to defraud investors"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010) ("The independent auditor's approval of REMEC's annual goodwill impairment testing undercuts any claim by Plaintiffs that Ragland knew or should have known the assumptions were false.").

[97]     In the "Parties and Relevant Non-Parties" section, the Amended Complaint states "Passmore made materially false and misleading statements on the Company's earnings calls held on August 8, 2019 and November 8, 2019." Passmore's participation on these calls is never mentioned again and his supposedly false statements are never identified, much less plead with the particularity required by the PSLRA.

[98]     *See Owens*, 789 F.3d at 543–44 (requiring particularized scienter pleadings as to each defendant and dismissing claims against former CFO despite $1.3 billion write-down).

Respectfully submitted,

BAKER BOTTS L.L.P.

By:  */s/ Jessica B. Pulliam*
     Jessica B. Pulliam
     Texas Bar No. 24037309
     Charles Strecker
     Texas Bar No. 24066157
     2001 Ross Avenue, Suite 900
     Dallas, Texas 75201-2980
     United States of America
     Tel.: (214) 953-6500
     Fax: (214) 953-6503
     jessica.pulliam@bakerbotts.com
     charles.stecker@bakerbotts.com

     Danny David
     Texas Bar No. 24028267
     910 Louisiana Street
     Houston, Texas 77002
     United States of America
     Tel.: (713) 229-4055
     Fax: (713) 229-2855
     danny.david@bakerbotts.com

     *Counsel for Defendants Hallmark Financial*
     *Services, Inc., Naveen Anand, and Jeffrey R.*
     *Passmore*

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2020, I electronically filed this document using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

     */s/ Jessica B. Pulliam*
     Jessica B. Pulliam