**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| COOPER SCHULZE, Individually and On Behalf of All Others Similarly Situated, | Civil Action No. 3:20-cv-1130-X |
| Plaintiff, | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| HALLMARK FINANCIAL SERVICES, INC., NAVEEN ANAND, and JEFFREY R. PASSMORE, | |
| Defendants. | |

010936-11/1422630 V1

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ...................................................................................3

        A.      Hallmark's Business. ...............................................................................3

        B.      Hallmark's Loss and Loss Adjustment Expenses. ...................................4

                1.      Current period expenses...............................................................4

                2.      Loss reserves. ...............................................................................4

        C.      Hallmark's Covert Scheme to Understate Case Reserve Estimates. ........5

                1.      Defendants' misrepresented case reserves served to misstate net income. .8

                2.      Defendants' misrepresented case reserves served to misstate liabilities. ....9

        D.      Defendants' Materially False Statements..................................................9

                1.      Defendants falsely reported financial information. ...................10

                2.      Defendants made false statements regarding estimation of loss reserves. 10

                3.      Defendants made false Sarbanes-Oxley certifications. ............11

        E.      The Truth Emerges.................................................................................12

III.    RELEVANT LEGAL STANDARDS. ..............................................................13

IV.     ARGUMENT ....................................................................................................14

        A.      The Complaint Pleads Actionable Misstatements and Omissions With
                Particularity. ..........................................................................................14

                1.      The Complaint alleges actionable misrepresentations regarding Hallmark's
                        loss reserves and reported financial statements. .....................14

                2.      The Complaint alleges false statements regarding Hallmark's claims
                        department and Defendants' process for estimating loss reserves. ...........17

                3.      Defendants invoke fact disputes that are inappropriate for resolution on
                        this motion. .......................................................................20

                4.      The Complaint's allegations relating to Hallmark's SOX Certifications
                        and BDO's termination support actionable claims against Defendants. ...23

i

B.  Defendants' statements are not protected by the PSLRA's Safe-Harbor provision. ...............................................................................................24

C.  The Complaint pleads strong inferences of scienter against each Defendant. ......26

D.  The Complaint Adequately Pleads Loss Causation. ...........................................32

E.  The Court Should Not Dismiss the Section 10(b) Claims Against Defendants Anand and Passmore. .........................................................................................35

F.  The Court Should Not Dismiss the Section 20(a) Claims. ..................................35

V.  CONCLUSION AND CONDITIONAL REQUEST TO AMEND .................................35

## TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*ABC Arbitrage Pls. Grp. v. Tchuruk*,
  291 F.3d 336 (5th Cir. 2002) ...............................................................................14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...........................................................................................14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................... 13, 21

*Budde v. Global Power Equipment Group, Inc.*,
  2018 WL 4623108 (N.D. Tex. Sept. 26, 2018)....................................................31

*Callinan v. Lexicon Pharms., Inc.*,
  2020 WL 4740487 (S.D. Tex. Aug. 14, 2020) ........................................ 26, 27, 32

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016)...................................................................5

*Central Laborers' Pension Fund v. Integrated Elec. Services Inc.*,
  497 F.3d 546 (5th Cir. 2007) ...............................................................................30

*In re CitiGroup Inc. Bond Litig.*,
  723 F. Supp. 2d 568 (S.D.N.Y. 2010) ..................................................................15

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015)............................................................... 20, 32

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. May 10, 2012) ......................................................20

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ..................................................................................... 32, 33

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)..................................................................35

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ........................................................................34

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
  147 F. Supp. 3d 493 (E.D. La. 2015) ...................................................................15

*Fryman v. Atlas Fin Holdings, Inc.*,
  462 F.Supp.3d 888 (N.D. Ill. 2020) ................................................................. 20, 32

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................24

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003) ........................................................................... 27, 32

*Heck v. Orion Group Holdings, Inc.*,
  468 F. Supp. 3d 828 (S.D. Tex. 2020).......................................................................26

*In Magruder v. Halliburton*,
  No 3:05-cv-01156-M (ECF No. 100) (N.D. Tex. Mar. 12, 2019) ........................................34

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) .............................................................. 28, 29, 31

*In re Initial Public Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................20

*Jaroslawicz v. M&T Bank Corp.*,
  962 F.3d 701 (3d Cir. 2020) ............................................................................16

*In re KBR, Inc. Sec. Litig.*,
  2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) ....................................................14

*In re Kindred Healthcare, Inc. Sec. Litig.*,
  299 F. Supp. 2d 724 (W.D. Ky. 2004) ...............................................................20

*Kohut v. KBR, Inc.*,
  2015 WL 11995250 (S.D. Tex. Sept. 3, 2015) ...................................................31

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F.Supp.3d 476 (D. Del. 2019) ....................................................................15

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .....................................................................*passim*

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...........................................................................30

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. Sept. 15, 2000) ................................................32

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................ 15, 16, 17, 19

iii

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ...............................................................................31

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015) ...................................................................24

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ...............................................................................14

*Ret. Sys. of Miss. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ...............................................................................33

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................. 2, 25, 26

*Spitzberg v. Houston American Energy Corp.*,
    758 F.3d 676 ....................................................................................... 1, 16, 27, 33

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    273 F. Supp. 3d 650 (N.D. Tex. 2017).............................................................*passim*

*Woolgar v. Kingstone Cos., Inc.*,
    2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020)........................................... 18, 19, 32

## Federal Statutes

15 U.S. C. § 78m.....................................................................................................16

15 U.S. C. § 78u-4.............................................................................................*passim*

15 U.S. C. § 78u-4(b)(1).........................................................................................14

15 U.S.C. § 7201 *et seq*.....................................................................................*passim*

## Other Authorities

Fed. R. Civ. P. 8(a)(2) ..................................................................................... 32, 33

Fed. R. Civ. P. 9(b) .................................................................................................14

Fed. R. Civ. P. 15(a)(2) ...........................................................................................35

## I.   INTRODUCTION

Between March 5, 2019, and March 17, 2020 (the "Class Period"), Defendants Hallmark Financial Services, Inc. ("Hallmark"), Naveen Anand ("Anand"), and Jeffrey R. Passmore ("Passmore") (collectively, the "Defendants"[1]) falsified Hallmark's loss reserve liabilities on Hallmark's financial disclosures related to Hallmark's Binding Primary Commercial Auto insurance line of business.   When the truth was finally disclosed in March 2020 with abrupt revelations that Hallmark's previously-reported loss reserves were understated by $63.8 million and that Hallmark would exit its Binding Primary Commercial Auto line of business, Hallmark's stock price plummeted more than 44 percent.   Investors were harmed, and this lawsuit was filed to ensure Defendants are held accountable for their securities fraud.

Defendants Motion to Dismiss ("MTD") should be denied in its entirety for the following summary reasons.   *First*, under controlling Fifth Circuit standards, the Complaint (ECF No. 37) adequately alleges actionable misrepresentations regarding Hallmark's loss reserves and reported financial statements.   The Complaint specifically identifies a "gross disparity" between prediction and fact via Hallmark's forced disclosure of a $63.8 million discrepancy in loss reserves that was caused by Defendants' misconduct.   ¶¶ 7, 49.[2]   The Complaint also details Defendants' deliberate and systemic loss reserve accounting manipulation fraud during the Class Period.   ¶¶ 38-94.   These allegations more than suffice to plead materially false statements under *Spitzberg v. Houston American Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014.   *See infra* Section IV.A.1.

---

[1] Defendants Anand and Passmore are sometimes referred to herein as the "Executive Defendants."

[2] Unless otherwise indicated, references to "¶" are references to Plaintiff's Amended Class Action Complaint (ECF No. 37) (hereinafter referred to as the "Complaint").

*Second*, despite Defendants' improper attempt to conjure a counter-factual narrative by arguing that loss reserves were solely established by actuaries who were purportedly unconnected to the fraud in the claims department, the Complaint adequately alleges false statements regarding Hallmark's claims department and the process for estimating loss reserves. Defendants' scheme materially and falsely understated loss reserves reported in the relevant financial statements because the estimation of loss reserves by Hallmark's actuaries were mathematically based, in part, upon case reserves that were fraudulently manipulated in the claims department. *See infra* Sections IV.A.2-3.

*Third*, the Complaint adequately pleads actionable claims against Defendants based on their misleading Sarbanes-Oxley certifications in financial statements that the information fairly presented Hallmark's financial condition. The Complaint identifies the false statements and explains why those statements are false, ¶¶ 53-94, in addition to Defendants' knowledge of the falsity of the "reserve project" in which loss reserves were deliberately manipulated to preserve Hallmark's reported profitability. *See infra* Section IV.A.4.

*Fourth*, Defendants' statements are not protected by the PSLRA Safe-Harbor provision that shelters forward-looking statements that are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially. The boilerplate qualifiers used by Defendants do not qualify for Safe-Harbor treatment because they do not constitute substantive, company-specific warnings based on a realistic description of the risks applicable to the particular circumstances as required by *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). The Safe-Harbor also does not apply when, as here, statements were made with actual knowledge that the statements were false or misleading. *See infra* Section IV.B.

*Fifth*, the Complaint pleads strong inferences of scienter against each Defendant. Those inferences include the importance of the Binding Primary Auto business segment as a core operation of the Company (¶¶ 95, 117); the sheer magnitude of the $63.8 million loss reserve increase (¶¶ 7, 95, 117); Hallmark's refusal to comply with BDO's request for audit information, BDO's firing, and Defendants' concealment of the nature of its disagreements with BDO (¶¶ 8-11, 50, 100-01, 117); the fact that Hallmark's actual, arbitrary accounting policies differed substantially from its stated policies of setting reserves objectively through individual case-basis valuations and statistical analyses (¶¶ 6, 30-52, 117); Hallmark's weak internal controls, combined with the Executive Defendants' knowledge of those weaknesses and their SOX certifications (¶¶ 3-6, 30-52, 117); and the Executive Defendants' contemporaneous knowledge of the falsity of their statements (¶¶ 30-52, 116). *See infra* Section IV.C.

*Sixth*, the Complaint adequately pleads loss causation by identifying the corrective disclosures and corresponding share price declines. *See infra* Section IV.D.

*Seventh*, the claims against the Executive Defendants are stated with sufficient particularity, *see infra* Section IV.E, and the Section 20(a) claims survive for the same reasons that compel sustaining the Section 10(b) claims, *see infra* Section IV.F.

## II.    STATEMENT OF FACTS

### A.    Hallmark's Business.

Hallmark is a diversified insurance group selling various types of property and casualty insurance policies. ¶ 26. An insurance policy is a contract between an "insured" and an insurance company, whereby the insured pays an up-front amount of cash ("premiums") in order to protect itself from specified adverse consequences that may impact the insured during a defined time period. The insurance company "pools" these risks and pays "claims" when specified adverse consequences impact any of its insureds. ¶ 27.

**B.      Hallmark's Loss and Loss Adjustment Expenses.**

Because Hallmark receives its revenues (the premiums) up-front and before it pays any claims under the insurance policies, Generally Accepted Accounting Standards ("GAAP") and Securities and Exchange ("SEC") regulations require Hallmark to estimate the amount of claims that it will pay related to the policies it issues in a given time period, and recognize these estimates as an expense in the same time period in which it recognizes the premiums as revenue in order to "match" the revenues with the related expenses.  These estimates of future claims expenses are known as "reserves" or "loss reserves."  ¶¶ 28, 110-114.  In addition to recognizing loss reserves as an expense in the same period in which it recognized the premiums as revenues, Hallmark's financial statements disseminated during the Class Period were required to carry the amount of these reserves as a liability on its balance sheet until the estimated expenses were actually paid.  ¶¶ 29, 109-14.

**1.      Current period expenses.**

Hallmark's 10-K explains that its largest single category of expenses (as for most insurers) is the "Losses and loss adjustment expenses," which represent the Company's estimate of the future claim expenses related to insurance policies sold in the current year.  ECF No. 41, Ex. 6, at App. 0363.  These estimates are calculated pursuant to a mathematical formula based on various factors, *including Hallmark's estimates of individual case reserves*.  Any understatement of case reserves will lower the Company's reported expenses, and thus increase its reported net income in the same amount.  ¶ 2; *see also* ¶¶ 27-29.

**2.      Loss reserves.**

As described above, the estimate of future claims expenses beyond those incurred in the current period were carried on Hallmark's reported balance sheets during the Class Period as a liability identified as "reserves for unpaid losses and loss adjustment expenses" or "L&LAE

Reserves." MTD at 4. Hallmark misleadingly implies that the L&LAE Reserves are set by actuarial calculations that are completely independent of its "case reserve" estimates. MTD at 5. However, as described by Hallmark in its SEC filings (and the Complaint's controlling allegations), the L&LAE Reserves "are estimated using *individual case-basis valuations* and statistical analysis." ¶ 31; *see also* ECF No. 41, Ex. 6, at App. 0334 (emphasis added). Specifically, the Company first estimates the "ultimate losses" and then subtracts the amounts of cumulative paid claims and "case reserves." *Id.* at 0376 ("ultimate losses are forecasted first, and that amount is reduced by the amount of cumulative paid claims and case reserves"); MTD at 5, n. 13. The amount of "case reserves" is determined by Hallmark's claims department. ¶¶ 30-33, 38-52. Accordingly, although the "ultimate losses" may be calculated by actuaries, any understatement of case reserves will also impact the Company's reported liabilities.

**C.      Hallmark's Covert Scheme to Understate Case Reserve Estimates.**

The Complaint details Hallmark's scheme to covertly, deliberately and systematically manipulate and understate case reserve estimates during the Class Period. Hallmark personnel, including Defendants Anand and Passmore, arbitrarily and deliberately reduced the amount of projected case reserves in order to artificially increase Hallmark's reported net income and net assets. ¶¶ 38-49. The Complaint alleges, through confidential witness statements[3] and other allegations, numerous instances of deliberate misconduct committed by Hallmark personnel, including Defendants.

---

[3] *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 458 (S.D. Tex. 2016) ("In cases under the PSLRA, plaintiffs may rely on confidential witnesses provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") (Citation omitted).

For example, Confidential Witness #1 ("CW-1") participated in quarterly claims review meetings with his director supervisor, Vice President of Claims Litigation Stefanie Milch ("Milch"), Chief Claims Officer Chuck Stauber ("Stauber"), and Defendant CEO Anand as part of an ongoing "reserve project" that was established to employ "unsound" loss reserve accounting practices that had "no checks and balances in place on financials."[4]  ¶¶ 38, 40, 41.  Pursuant to this "reserve project," instead of using procedures publicly disclosed and touted by Defendants whereby case-by-case evaluations would be performed by claim supervisors and managers and reviewed by senior management, Hallmark's *actual* claims management and loss reserve adjustment process was arbitrary and summarily disregarded the judgment of experienced claim supervisors and managers in order to manipulate Hallmark's reported financial results. Specifically, Milch would provide adjusters' claim reports to Stauber, who would arbitrarily reduce the claim amounts reported *without any rationale or basis* for changing claims adjusters' loss reserve recommendations.  ¶ 42.  Moreover, Stauber's rationale for reducing recommended claim amounts was never properly documented or placed in claim files, and only Stauber's final loss and reserve figures were documented.  *Id.*  There were no consistent, formal checks or balances on Stauber's arbitrary decisions, which usually reduced the amount of claim values and lowered loss reserves without valid reasons for doing so.  ¶ 43.

Stauber and Milch also interfered with Hallmark's claims management process and loss reserve estimation process by: (i) reducing adjusters' discretion in determining claim values from $75,000 to $10,000-$25,000; (ii) ordering adjusters to prepare mediation proposals with arbitrarily reduced claim values; (iii) causing claims to be projected out over 30 days, thereby spreading out

---

[4] CW-1 served as a Claims Program Manager in the Binding Primary Commercial Auto insurance business line at Hallmark from late 2017 to early 2020 and also had personal experience resolving and setting loss reserves at Hallmark and other publicly-traded companies.  ¶ 38.

the amount of time that it took to resolve claims and impact loss reserves (and perceived profitability); and (iv) attempting to "break up" claims into several payments in order to spread payments over several months to hide the impact on loss reserves (and profits). ¶ 44. CW-1 also described several instances[5] where Stauber arbitrarily reduced the amount of recommended insurance claim values covered under Hallmark's Binding Primary Commercial Auto policies without any justification or basis. ¶ 45. At all relevant times, Defendant Anand knew about the arbitrary lowering of loss reserves by Milch and Stauber during "reserve project" meetings. ¶ 116.

Confidential Witness #2 ("CW-2") corroborated CW-1's statements and confirmed that Hallmark's loss reserves were frequently, drastically, and arbitrarily reduced from recommended claims payouts. ¶ 42. CW-2 also identified additional instances of misconduct in setting case reserves.[6] ¶ 38. For example, if a recommended claims payout was $500,000, the loss reserves were often arbitrarily reduced by Milch and Stauber to as low as $5,000 to $10,000 without any rationale or explanation. ¶ 43. In another example, CW-2 personally set a $250,000 loss reserve for a claim, but that amount was arbitrarily reduced to just $5,000 without reason. ¶ 45. Milch subsequently authorized CW-2 to approve the $250,000 settlement amount originally set by CW-2, demonstrating the baseless and arbitrary nature of Milch and Stauber's ongoing practice of arbitrarily lowering loss reserves to desired amounts. ¶ 47.

---

[5] CW-1 describes a serious injury/fatality case that had a recommend settlement payout value $500,000 but was reduced by Stauber to $300,000 without reason. ¶ 45. CW-1 also recalled a Louisiana case with a recommended $750,000 settlement payout value that was also arbitrarily reduced by Stauber to $600,000. *Id.*

[6] CW-2 was a former Senior Liability Adjuster working in Hallmark's Binding Primary Commercial Auto insurance business line from mid-2015 to late 2020. CW-2 personally interacted with and reported directly to Milch, and was primarily responsible for evaluating Hallmark's liability exposure on claims and lawsuits in the Binding Primary Commercial Auto insurance business line. CW-2's duties involved determining payout amounts for case settlement resolution, determining the level of loss reserves, and completing loss reports. All information from CW-2 was documented and reported to Milch and Stauber for final approvals. ¶ 38.

This type of misconduct occurred frequently and "happened across the board for commercial auto claims." ¶ 43. CW-2 estimated that *at least 50%* of the commercial auto claims files had loss reserves that were drastically reduced in this manner and that that he had personally seen at least 100 such instances. ¶ 46. CW-2 recounted that Milch and Stauber *knew* that Hallmark's loss reserves were improper and inadequate to resolve outstanding insurance claim liabilities. ¶ 48. Hallmark frequently made payouts to resolve pending commercial auto claims that were *significantly* higher than the loss reserves set aside for those claims and that questionable under-reserving occurred so frequently that it became like "second nature." *Id.*

1.    **Defendants' misrepresented case reserves served to misstate net income.**

As the Complaint alleges, Defendants' scheme to manipulate the case reserves served to materially misstate Hallmark's reported net income by artificially minimizing the Company's reported expenses. Defendants concede that loan loss reserves and L&LAE were calculated by the actuarial department based upon various inputs, including case reserves. MTD at 4 (noting that reserve calculations are based upon "historical development pattern" of losses); 5 n.13 ("ultimate losses are forecast first, and that amount is reduced by the amount of cumulative paid claims and case reserves"). Because the amount of case reserves was a vital element of the calculation of loss reserves and ultimate loss, Defendants' scheme to understate case reserves also necessarily served to understate Hallmark's reported net income.

CW-2 confirmed that Milch and Stauber arbitrarily lowered and manipulated Hallmark's case reserves in order to manipulate Hallmark's reported net income. ¶ 49. Notably, CW-2 stated that *the $63.8 million loss reserve development announced in March 2, 2020 (see infra) was directly caused by fraudulent reserve lowering practices conducted by Milch and Stauber at the behest of Defendant Anand.* ¶¶ 49, 116. Milch confided to CW-2 that Stauber directed Milch to arbitrarily manipulate and lower loss reserves in relation to Hallmark's commercial auto claims.

8

¶ 116.  CW-2 also stated that Milch told CW-2 that Stauber told Milch that the lowering of loss reserves was a directive from Defendant Anand.  *Id.*  CW-2 further stated, in no uncertain terms, that Milch expressed concerns about committing securities fraud because of Milch, Anand, and Stauber's involvement in arbitrarily manipulating and lowering loss reserves.  *Id.*

### 2.    Defendants' misrepresented case reserves served to misstate liabilities.

Hallmark misleadingly contends that L&LAE is calculated by the actuarial department without regard to case reserves.  MTD at 4-5.  Although the "ultimate loss" calculation may be made by actuaries, L&LAE is calculated using various inputs, *including case reserves*.  *Id.* at 5, n. 13 ("Ultimate losses are forecast first, and that amount is reduced by the amount of cumulative paid claims and case reserves.").  Accordingly, the manipulation of case reserves will *necessarily* have a corresponding impact on the calculation of L&LAE.

Additionally, the projection of "ultimate losses" is made pursuant to a "loss development analysis" basing such estimates on a variety of factors, including "historical [loss] development patterns."  MTD at 4.  Because the Company's historical loss development patterns and its initial estimate of loss ratios in future periods will necessarily be impacted by incorrect case reserves, the mistakes in these inputs used by the actuarial department will lead to an incorrect "ultimate loss" and thus an incorrect L&LAE.

### D.    Defendants' Materially False Statements.

During the Class Period, Defendants made a series of false and misleading statements to investors in order to convey the false impression that Hallmark's financial condition was strong and that it's reported financial results were accurate.  However, these statements were false and misleading, as described below.  ¶¶ 53-54.

9

**1.    Defendants falsely reported financial information.**

The Class Period begins on March 5, 2019 with Hallmark's press release announcing its fourth quarter and full year 2018 financial results, including reported net income of $10.3 million. ¶ 55. On March 14, 2019, the Company filed its annual report for the period ended December 31, 2018 on Form 10-K with the SEC (the "2018 Form 10-K"), disclosing the same previously reported financial results as the May 5, 2019 press release. The 2018 Form 10-K also disclosed a liability balance of $527 million in loss reserves. On May 8, 2019, Hallmark issued a press release reporting its financial results for the first quarter of 2019, including reported net income of $15.0 million, and filed its quarterly report for the period ended March 31, 2019 with the SEC containing the same financial information. ¶¶ 69, 71. On August 7, 2019, Hallmark Financial issued a press release reporting its second quarter 2019 financial results, including reported net income of $13.0 million for the quarter. ¶ 77. This same financial information was included in the Company's 2Q2019 Form 10-Q filed with the SEC on August 9, 2019. ¶ 79. On November 7, 2019, Hallmark issued a press release announcing its reported financial results for 3Q2019, including reported net income of $5.3 million. ¶ 84. Also on that day, the Company filed its 3Q2019 Form 10-Q, which included the same financial information. ¶ 86. Each of these disclosures was materially false and misleading because the financial results reported therein materially understated reported expenses pursuant to the scheme described above (and thus overstated reported net income in the same amount). ¶¶ 55, 57, 70, 71, 77, 79, 85, 87.

**2.    Defendants made false statements regarding estimation of loss reserves.**

Throughout the Class Period, Defendants certified that Hallmark's loss reserve amount was adequate, appropriately calculated, effectively managed, and properly maintained to account for unpaid losses associated with Hallmark's insurance claim files, specifically as it related to Hallmark's Binding Primary Commercial Auto insurance business line. ¶ 3. Defendants made

10

various materially false qualitative statements regarding the Company's estimation of loss reserves, including that Hallmark's reported loss reserves were "adequate;" calculated as objectively as possible "using individual case-basis valuations and statistical analyses," and "continually reviewed and adjusted as experience develops or new information becomes known." ¶ 58. Defendants also promised that case reserves would be estimated by qualified and experienced employees (¶¶ 59-60), and that the Company employed "conservative" reserving practices. ¶ 62.[7] The 2018 Form 10-K also falsely disclosed that the methodology used in calculating reserves was a methodical, statistically-driven process. ¶ 63. As described below, these statements were materially false and misleading because they omitted to disclose the impact on loss reserve calculations of Defendants' illicit scheme to understate case reserves.

### 3.      Defendants made false Sarbanes-Oxley certifications.

Defendants Anand and Passmore signed Sarbanes-Oxley ("SOX") certifications attesting to the effectiveness of the Company's internal accounting controls. ¶¶ 65-68. But these sworn certifications were materially false and misleading because, *inter alia*, Defendants Anand and Passmore were aware that: (i) the 2018 Form 10-K contained untrue statements of material facts and did not fairly present the Company's financial results; (ii) Hallmark's system of accounting internal controls was materially flawed; and (iii) Defendants did not effectively evaluate or recklessly disregarded the effectiveness of the Hallmark's controls and procedures. ¶ 68.

---

[7] *See also* ¶¶ 72, 80, 88 (assuring market on May 8, 2019 Form 10-Q that unfavorable loss reserve developments would be offset by favorable developments in the 2018 accident year); ¶ 92 (CEO Anand and CFO Passmore assuring analysts and investors on a November 8, 2019 earnings call that there were adequate levels of loss reserves to address outstanding claim losses and to close-out problematic insurances cases from 2016 and 2017).

### E.    The Truth Emerges.

On March 2, 2020, the truth of Hallmark's unsound claims management and loss reserve practices began to emerge after Hallmark announced that it would be required to increase its loss reserves by $63.8 million related to its supposedly well-managed Binding Primary Commercial Auto insurance policies that it had sold during 2016 and 2017.  ¶¶ 7, 95.  Hallmark also announced its intention to exit the Binding Primary Commercial Auto insurance business, which had appeared to be profitable prior to taking this massive $63.8 million charge against earnings.  ¶ 95.  On this news, Hallmark's share price fell $2.10, or more than 14%, to close at $12.23 per share on March 3, 2020, on unusually heavy trading volume.  ¶ 96.

The Binding Primary Commercial Auto insurance business had appeared to be profitable because of Defendants' undisclosed improper manipulation of Hallmark's loss reserves.  ¶ 8. Because Hallmark lacked sufficient internal accounting and reporting controls,[8] Hallmark was able to perpetrate this fraud until its independent auditor, BDO, finally became suspicious and required additional documentation and evidence regarding the appropriateness of the loss reserves in connection with its audit of Hallmark's 2019 financial statements.  ¶¶ 8-9, 100, 101, 103.  Rather than provide incriminating evidence to its auditor, Hallmark instead fired BDO.  *Id.*  In response to this shocking disclosure, Hallmark's share price fell from a close of $8.10 per share on March 11, 2020, to close trading at $5.71 per share on March 12, 2020, which represents a loss of $2.39 per share (29.5%) on unusually heavy trading volume.  ¶¶ 9, 102.

On March 17, 2020, following the close of the market, Hallmark filed with the SEC an amendment of its March 11, 2017, Current Report, in which it attached as Exhibit 16.1 a letter

---

[8] *See* ¶¶ 109-114 (discussing Hallmark's non-compliance with GAAP); *see also* ¶¶ 105, 106 (discussing Hallmark's non-compliance with NASDAQ's financial reporting requirements and NASDAQ's threat of delisting Hallmark).

from BDO dated March 13, 2020. ¶¶ 10, 100, 101, 103. In this letter, BDO disclosed that its termination resulted from Defendants' refusal to comply with auditing procedures established by BDO: "BDO expanded significantly the scope of its audit on January 31, 2020, with respect to which a substantial portion of the requests had not been received and/or tested prior to our termination." ¶ 103. Thus, instead of allowing BDO to perform an audit of Hallmark's loss reserve calculations and methodology, Defendants decided to terminate BDO's work, knowing that certain negative market reaction would inevitably follow (and in fact did follow) from the dismissal of an auditor in the midst of an accounting scandal. ¶ 11; *see id.* ¶ 103. On the news of Hallmark's refusal to comply with BDO's audit procedures, Hallmark's share price fell from a close of $3.20 per share on March 17, 2020, to close at $3.12 per share on March 18, 2020, representing a decline of $0.08 per share or a decline of 2.5%. ¶¶ 12, 104.

In total, between March 2, 2020 (when the truth regarding Hallmark's false loss reserves began to be revealed) through March 17, 2020 (when BDO disclosed it was fired because Hallmark refused to comply with its audit procedures), Hallmark's share price plummeted more than 78%. ¶ 13. Thus, as a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Hallmark's securities, Plaintiff and other Class members suffered significant losses and damages. ¶ 14; *see also* ¶¶ 96-99, 102, 104 (discussing stock price drops and corresponding negative analyst coverage); ¶¶ 121-123 (discussing negative impact of stock price due to Hallmark's corrective disclosures); ¶¶ 124-132 (discussing materialization of risks due to Hallmark's false and/or misleading statements).

### III.    RELEVANT LEGAL STANDARDS.

A complaint must not be dismissed unless it fails to plead "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the facts pled allow a court "to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When evaluating a motion to dismiss, a court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). The inquiry is a limited one: "The issue is not whether the plaintiff ultimately will prevail . . . ." *In re KBR, Inc. Sec. Litig.*, 2018 WL 4208681, at *2 (S.D. Tex. Aug. 31, 2018).

While the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b) require plaintiffs to allege misstatements with particularity, it "was not enacted to raise the pleading burdens under Rule 9(b) and section 78u-4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value[,] . . . must be routinely dismissed on [a motion to dismiss]." *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002). These requirements are satisfied, as here, where a complaint identifies with specificity "the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they are fraudulent." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citation omitted).

## IV.    ARGUMENT

### A.    The Complaint Pleads Actionable Misstatements and Omissions With Particularity.

The Complaint adequately alleges false and misleading statements under the PSLRA, and those allegations are distinguishable from the non-binding loss reserve accounting cases that Defendants cite.

#### 1.    The Complaint alleges actionable misrepresentations regarding Hallmark's loss reserves and reported financial statements.

The Complaint alleges numerous false and misleading statements made by Defendants during the Class Period regarding Hallmark's reported financial results resulting from their flawed calculation of "case reserves." Defendants disregard these well-pled allegations and incorrectly

14

assert that Hallmark's faulty estimation of case reserves is irrelevant to Hallmark's reported financial results because "reserves for unpaid losses and loss adjustment expenses" or "L&LAE" estimates are calculated by the actuarial department without regard to the amount of "case reserves." MTD at 15-18. But as described in Sections II.B-C, *supra*, although Hallmark's calculation of loss expenses and loss reserves may be made by actuaries, *such calculations are based upon a formula that relies upon the accuracy of the "case reserves" as one of its inputs*. Thus, any inaccuracies in case reserves will also necessarily render L&LAE to be inaccurate. *Id.* Accordingly, the Complaint's allegations sufficiently identify material misstatements regarding Defendants' reported financial information.

Defendants seek to immunize these false statements by trying to characterize them as "fraud by hindsight" and inactionable "opinions" under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). But *Omnicare* does not support Defendants here for two reasons. *First*, *Omnicare* could not apply to loan loss reserve calculations, which are not opinions, but are verifiable numbers subject to objective GAAP standards governing how they must be evaluated. *See* ¶¶ 109-14; *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 578 (S.D.N.Y. 2010) (defining loss reserves pursuant to GAAP).

*Second*, the Court's analysis in *Omnicare* was premised on the strict liability provisions of Section 11 and not the Section 10(b) claims asserted in this action. *Omnicare*, 575 U.S. at 181 ("We granted certiorari . . . to consider *how § 11* pertains to statements of opinion.") (emphasis added). For this reason, many (but not all courts) have found that *Omnicare* does not apply to Section 10. *See, e.g.*, *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 527-28 (E.D. La. 2015) (noting the differences between Sections 10(b) and 11 and refusing to apply *Omnicare* protections to opinions in a Section 10(b) claim); *Lord Abbett*

15

*Affiliated Fund, Inc. v. Navient Corp.*, 363 F.Supp.3d 476, 496 (D. Del. 2019) (declining to hold that *Omnicare* applies to Exchange Act claims); *see also Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 718 n. 16 (3d Cir. 2020) ("We have not considered whether *Omnicare* applies to claims brought under the Exchange Act[.]").

Under the controlling Fifth Circuit standard applicable in a Section 10(b) case, "[a]n opinion or prediction is actionable if there is a *gross disparity* between prediction and fact." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) (emphasis added); *Lormand*, 565 F.3d at 264 n.13. The Complaint specifically identifies such a "gross disparity" via Hallmark's forced disclosure of a $63.8 million discrepancy in loss reserves that was caused by Defendants' misconduct. ¶¶ 7, 49. The Complaint also alleges numerous instances of undisclosed, material and unwarranted reductions of specific case reserves (*see, e.g.*, ¶¶ 45, 47) and that such reductions occurred in "at least 100 instances." ¶ 48. These allegations more than suffice to plead a material false statement under the relevant and controlling Fifth Circuit standard.

But even if the *Omnicare* standard applied, Hallmark's loss reserve calculations are actionable because the Complaint pleads (i) material facts contrary to the facts that a defendant speaker says to support an opinion (objective falsity), and (ii) that those facts are known by the defendant speaker but omitted in an opinion statement to the plaintiff investor (subjective falsity). *Omnicare*, 575 U.S. at 185-86. As described above, the Complaint sufficiently alleges both the objective falsity of the case reserve calculations and why the Defendants knew that such calculations were false. This is not "fraud by hindsight." Rather, there existed an ongoing, systemic loss reserve accounting manipulation fraud within Hallmark that was being perpetuated by Defendants deliberately and knowingly prior to and after any financial disclosures were filed during the Class Period. Defendants had a hidden "reserve project" that was arbitrary, deceptive,

16

and concealed from investors. Further, Defendants could not have held the belief that loss reserves were "adequate" given that CW-2 stated that Milch and Stauber *knew* that loss reserving practices were improper, and that Milch confided in CW-2 that she was directed by Stauber and Anand to arbitrarily manipulate loss reserves to desired amounts. Thus, even if Defendants' statements were "opinions," these statements remain actionable under *Omnicare*.[9]

### 2.    The Complaint alleges false statements regarding Hallmark's claims department and Defendants' process for estimating loss reserves.

Defendants incorrectly contend that Plaintiff fails to adequately allege false statements concerning Hallmark's process for estimating loan loss reserves. MTD at 11. The Complaint identifies numerous false statements regarding this process, including statements that Hallmark's reported loss reserves were "adequate," calculated as objectively as possible "using individual case-basis valuations and statistical analyses," and "continually reviewed and adjusted as experience develops or new information becomes known." ¶ 58. Defendants also promised that case reserves would be estimated by qualified and experienced employees (¶¶ 59-60), that the Company employed "conservative" reserving practices (¶ 62), and that calculating reserves was a methodical, statistically-driven process (¶ 63).

The Complaint alleges that these statements were materially false and misleading because of Defendants' scheme to manipulate Hallmark's case reserves (which were an integral part of the loan loss reserve calculations). *See* Section II.C *supra*. Because Defendants' scheme materially and falsely understated case reserves and because Hallmark's estimation of "ultimate losses" and loss reserves were mathematically based, in part, upon case reserves, Hallmark's ultimate losses,

---

[9] Defendants similarly argue that the Complaint's allegations related to Hallmark's Specialty Commercial Segment (*see, e.g.,* ¶¶ 72-73) fail because disclosures related to that segment are purported "opinion" statements. MTD at 18-19. For the same reasons just discussed, the identified statements are not inactionable opinions and the relating allegations should be sustained.

17

loss reserves and L&LAE were each incorrect and not "adequate" as described by Defendants. Likewise, Defendants' disclosures that loss reserves were calculated as objectively as possible "using individual case-basis valuations and statistical analyses," that the methodology used in calculating reserves was a methodical, statistically-driven process," and that such formulas were "continually reviewed and adjusted as experience develops or new information becomes known" were materially false and misleading because they omitted to disclose the material information that: (i) the individual case-basis valuations materially understated future liability; (ii) the statistical analysis was inaccurate because it was based upon false case reserve calculations; and (iii) the statistical analysis failed to consider information that had become known to Defendants regarding the false case reserve calculations. Similarly, the disclosure that that case reserves would be estimated by qualified and experienced employees was materially false and misleading because it failed to disclose that many of these employees were involved or aware of the scheme to misstate case reserves. Likewise, the disclosure that the Company employed "conservative" reserving practices was also materially false for all of the reasons described above.

Thus, the Complaint adequately alleges falsity relating to statements regarding Hallmark's calculation of loss reserves and L&LAE. Defendants' authorities do not compel a different result. Defendants heavily rely on *Woolgar v. Kingstone Cos., Inc.*, 2020 WL 4586792 (S.D.N.Y. Aug. 10, 2020) (MTD at 14-15), where the court dismissed the plaintiff's complaint because the complaint failed to allege that confidential witnesses had specific experience with or knowledge of the company's reserving practices. *Id.,* at *11-12. By contrast, the Complaint here establishes the basis for CW-1 and CW-2's knowledge of the improper case reserve scheme by virtue of their job titles, dates of employment, and specific duties at Hallmark (¶ 38) and their recounting of *personal experiences* with Defendants' improper practices (¶ 40-52). CW-1 and CW-2 are

18

properly alleged to have had intimate knowledge of the manipulation of case reserves.[10]  These allegations provide a plausible inference that there existed a closely-connected relationship between the loss reserve estimates formulated in the claims department and any subsequent estimates formulated by actuaries.  Defendants' argument that neither confidential witness is alleged to have knowledge of the actuarial department is a red herring because, as Defendants admit, the inaccurate case reserves were a basis for the calculations made by the actuaries.  Accordingly, none of the concerns identified in *Woolgar* apply here.

Defendants argue that any statements related to Hallmark's claims department, including Defendant Anand's reassurances to the market that claims were being managed effectively, are non-actionable "opinions" under *Omnicare*.  MTD at 20-21.  However, as discussed above, these statements are actionable given that, under the Fifth Circuit standard, there was a gross disparity between Defendants' supposed "opinions" and the reality of Hallmark's then-current loss reserve status.  These statements are also actionable under *Omnicare*.  Thus, Defendants' argument fails for the same reasons discussed in Section IV.A.1.  Further, and contrary to Defendants' contention, the Complaint does not exclusively rely on the allegation that claims department supervisors disregarded the loss reserve judgments of lower-level claims personnel.  MTD at 19-20.  Rather, the Complaint is replete with particularized allegations showcasing the falsity of Defendants' misleading statements regarding Hallmark having an effective claims department that could competently manage loss reserves.  CW-1's and CW-2's allegations are not recitations of mere

---

[10] CW-1 and CW-2 have personal knowledge of, among other things: (i) their experiences working in Hallmark's claims department, (ii) calculating loss reserves, (iii) managing insurance claims files (specifically those that related to Hallmark's Binding Primary Commercial Auto insurance business line), (iv) interactions with claims adjusters managing losses for outstanding claims, (v) paying out settlement amounts for outstanding claims liabilities, (vi) personally interacting with Milch and Stauber, and (vii) personally attending "reserve project" meetings with Defendant Anand.  *See generally* ¶¶ 38-52, 115-16.

"disagreements" within the claims department (as Defendants claim) but illustrate an ongoing, deliberate loss reserve manipulation scheme within the Hallmark business enterprise directed by Defendant Anand.

Defendants' remaining authorities are similarly unavailing. *See Fryman v. Atlas Fin Holdings, Inc.*, 462 F.Supp.3d 888, 899 (N.D. Ill. 2020) (terminated auditor was investigating a *subsidiary* of the defendant company, not the defendant company itself); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 74, 80 (S.D.N.Y. 2015) (no facts alleged that company knew that it had misrepresented the adequacy of its reserves); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *28 (S.D.N.Y. May 10, 2012) (allegations that individual defendants manipulated reserves of a subsidiary and not the defendant); *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 734 (W.D. Ky. 2004) (company continually increased reserves in response to claims and disclosed all known information, contradicting plaintiffs' claims of concealment).

### 3. Defendants invoke fact disputes that are inappropriate for resolution on this motion.

Defendants raise factual issues concerning Hallmark's purported methodology for calculating loss reserves that are inappropriate for consideration in a motion to dismiss. MTD at 11-14. Defendants' attempt to replace the Complaint's allegations with different allegations of their own choosing should be disregarded. *See, e.g., See In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 332-33 (S.D.N.Y. 2003) (rejecting defendants' attempt to "rewrite[] the Complaint[] in a way that they believe favors dismissal" and stating that defendants "must take the Complaint[] as . . . written."). Any determinations of how claims adjusters and actuaries

20

interacted and worked together to calculate final, reported loss reserves should not be resolved at the pleading stage.[11]

In any event, there is good reason to be skeptical of Defendants' attempt to silo "loss reserves" from "case reserves." The public SEC filings cited by Defendants do not support their claim that all decisions and inputs regarding L&LAE come exclusively from the "actuarial department." *See* MTD at 4, n.10. Although the Court may consider these SEC filings for the limited purpose of what disclosures were made, it may not consider them for the truth of their contents. Regardless, the cited SEC filings do not mention a stand-alone "actuarial department." *See* ECF No. 41, Ex. 6, at App. 0334 (discussing reserves for unpaid losses and LAE and not mentioning a separate "actuarial department"). Further, Hallmark's own presentations to investors directly contradict Defendants' current factual argument that the "actuarial department" exclusively decided L&LAE calculations and inputs. *See* Declaration of Lucas E. Gilmore in Support of Lead Plaintiff's Opposition to the Motion to Dismiss ("Gilmore Decl."), Ex. D at 5 ("In-house Claims Management. Claims is a core competency of the organization and enables the company to implement its philosophy of driving claims to a quick closure *while providing real-time feedback to . . . actuarial teams*") (emphasis added); *see also id.* at 11-12 (discussing how *claims management* will drive improvement of company operating results); Gilmore Decl., Ex. C at 5 and 9 (discussing how actuarial teams embedded into and supporting Hallmark's different teams, including the claims team that sets case reserves, will improve outcomes).

---

[11] *Twombly*, 550 U.S. at 556 ("Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [illegality]. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'") (citation omitted).

21

Further, the SEC filings make clear that "case reserves" established by the claims department are a major—if not a key input—to the estimates tested by actuaries. Specifically, the "Reserves for unpaid losses and LAE" section of Hallmark's March 14, 2019, Form 10-K (*see* ECF No. 41, Ex. 6, at App. 0334) states that the "primary actuarial technique utilized is a loss development analysis in which ultimate losses are projected *based upon historical development patterns.* The primary assumption underlying this loss development analysis is that the *historical development patterns will be a reasonable predictor of the future development of losses* for accident years which are less mature . . . . Because *claim expenses represent the single largest category of our expenses*, inaccuracies in the assumptions used to estimate the amount of such benefits can result in our failing to… fund our operations." *Id.* (emphasis added). Historical development patterns and trends in loss frequency and severity (inputs that Hallmark's actuaries rely upon) are directly related to the case reserves set by the claims department. *See, e.g.,* Gilmore Decl., Ex. A at 6-7 and Ex. C at 12 (discussing claims department role in managing prior year loss developments, claims frequency and claims severity); *see also* Gilmore Decl., Ex. D at 11-12 (discussing how historical loss reserve developments in 2016 and 2017 are managed by the claims department); ECF No. 41, Ex. 6, at App. 0334 ("Our carried reserve for unpaid losses and LAE as of December 31, 2018 is comprised of $242.3 million in *case reserves* and $284.9 million in incurred but not reported reserves") (emphasis added).

GAAP provides rules for how and when to set loss reserves. In particular, ASC 944 requires that public insurance companies estimate losses for unpaid claims and that losses should be included in a reserve. ¶111. Thus, case reserve estimates of the claims department were intimately intertwined with and acted as the basis for any final, reported L&LAE estimates calculated by the actuaries. Any under-reserving of loss reserves within the claims department has

the natural consequence of directly affecting any estimates calculated by the actuaries, and thereby ultimately affected any loss reserves reported on Hallmark's balance sheet.

> **4.    The Complaint's allegations relating to Hallmark's SOX Certifications and BDO's termination support actionable claims against Defendants.**

Defendants argue that the Complaint's allegations relating to Defendants' noncompliance with internal accounting controls requirements under the Sarbanes-Oxley Act ("SOX") do not allege any falsity in relation to Defendants' public statements. MTD at 21-22. Not true, as the Complaint both identifies the false statements and exhaustively explains why those statements are false. ¶¶ 53-94. The Complaint alleges that Defendant Anand *knew* and *participated* in the "reserve project" (a/k/a the deliberate loss reserve manipulation scheme to preserve Hallmark's profitability). *See, e.g.* ¶ 40. Because this "reserve project" circumvented Hallmark's internal controls, the Complaint sufficiently alleges that Anand knew of this deficiency in Hallmark's internal controls, thus rendering his certification regarding Hallmark's internal controls demonstrably false. Additionally, Defendants ignore other material false statements in the SOX certifications confirming that the financial statements and other financial information in the 2018 Form 10-K "fairly present," in all material respects, the financial condition of Hallmark. ¶ 66. Defendants' knowledge of and participation in the reserve project is compelling evidence of their knowledge of the falsity of Hallmark's reported financial statements. Thus, the Complaint is rife with examples demonstrating "['] the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.'" *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 684 (N.D. Tex. 2017) (internal citation omitted). These allegations adequately plead a material false statement.[12]

---

[12] These allegations also establish an inference of scienter against Defendants Anand and Passmore, as discussed further below in Section IV.C. *See also* ¶ 117 (Anand and Passmore's

23

Similarly, and contrary to Defendants' argument (MTD at 22-23), the Complaint's allegations regarding BDO's audit termination are actionable. Defendant Anand and Passmore certified in their SOX certifications that Hallmark's internal accounting controls and procedures were sufficient when they clearly knew of the opposite, as demonstrated by BDO's disagreement with Hallmark over loss reserve accounting practices and BDO's subsequent forced termination. *See* ¶¶ 10, 11, 39, 50, 66, 100, 101, 103, 117.

Defendants cite *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359 (S.D.N.Y. 2015), and *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013), but these cases are inapposite. The plaintiffs in *PetroChina* failed to identify how the defendant's statements about internal management and operations violated any specific requirement of the China Securities Regulatory Commission. 120 F. Supp. 3d at 360-61. The plaintiffs in *Gentiva* failed to allege facts suggesting that the individual defendants did not undertake actions articulated in the SOX certifications. 932 F. Supp. 2d at 370-71. In stark contrast to these cases, the allegations here robustly identify the false SOX certifications and why they were false when made by the Executive Defendants.

**B.      Defendants' statements are not protected by the PSLRA's Safe-Harbor provision.**

Defendants argue that their statements relating to loss reserves are forward-looking statements protected by the PSLRA. MTD at 23-24. Not so. *See* ¶¶ 133-34. Under the PSLRA's Safe Harbor clause, a forward-looking statement is not actionable if "the statement is 'identified as . . . forward-looking . . . and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" or if 'the plaintiff fails to

---

knowledge of internal control weaknesses coupled with their contradictory representations in their SOX certifications provide strong circumstantial evidence of Defendants' scienter).

[plead] that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading." *Lormand*, 565 F.3d at 243 (citing 15 U.S.C. § 78u-5(c)(1)(A-B)).  Neither of these exceptions apply here.

*First*, Hallmark did not pair meaningful cautionary statements with Hallmark's disclosures. As a threshold issue, Defendants' argument fails to even identify the purported cautionary statements and instead refers generally to "Background § 1."  MTD at 24.  We are left to guess at what statements that Defendants have in mind.  To the extent that Defendants intended to invoke Hallmark's language highlighting "uncertainty," "variables," "judgment," "estimates," "no assurances," "inherently uncertain" and the like (*see* MTD at 4-6), such boilerplate qualifiers are insufficient to constitute meaningful cautionary statements.  The Fifth Circuit has held that "[t]he requirement for 'meaningful' cautions calls for 'substantive' *company-specific warnings based on a realistic description of the risks applicable to the particular circumstances*, not merely a boilerplate litany of generally applicable risk factors."  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (citing H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess. 31, 44 (1995)) (emphasis added); *see also Lormand*, 565 F.3d at 244-45 ("formulaic" and "generic disclaimers" cannot protect forward-looking statements, because "Congress clearly intended that boilerplate cautionary language not constitute 'meaningful cautionary' language for the purpose of the safe harbor analysis").  Defendants' generic use of terms such "uncertainty," "variables," "judgment," "estimates," "no assurances," and "inherently uncertain" fail to provide the substantive, company-specific warnings based on a realistic description of the risks applicable to the particular circumstances as *Southland* requires.  Indeed, *Lormand* expressly rejected similar cautionary-disclaimer language.  *See* 565 F.3d at 245 ("These forward-looking statements involve

25

numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results.").

*Second*, the Complaint sufficiently alleges that Defendants Anand and Passmore made supposed forward-looking statements "with actual knowledge" that those statements were false or misleading. *Southland*, 365 F.3d at 371-72. CW-1 and CW-2 recounted, among other things, that Defendant Anand was personally involved in the "reserve project" and directed Milch and Stauber to arbitrarily manipulate and lower loss reserves for profit. Thus, the safe harbor also does not apply because of Defendants' actual knowledge that their statements were false.

## C.    The Complaint pleads strong inferences of scienter against each Defendant.

The PSLRA "requires plaintiffs to 'state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind,'" that is, "with an intent to deceive, manipulate, or defraud or severe recklessness." *Callinan v. Lexicon Pharms., Inc.*, 2020 WL 4740487, at \*33 (S.D. Tex. Aug. 14, 2020) (citations omitted). "Severe recklessness" is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.,* at \*33 (citations omitted). The inference need only be "at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)); *Heck v. Orion Group Holdings, Inc.*, 468 F. Supp. 3d 828, 852-53 (S.D. Tex. 2020) (same). "The inference of scienter *need not be irrefutable, nor even the most compelling of all competing inferences*, but must be strong in light of other inferences." *Town of Davie*, 273 F.Supp.3d 650 at 664 (citation omitted) (emphasis added). "[W]here there are competing

26

inferences that establish or negate the scienter requirement, '*a tie favors the plaintiff*' on a motion to dismiss[.]" *Spitzberg*, 758 F.3d at 686 (emphasis added).

"The critical issue in a motion to dismiss for failure to allege scienter 'is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Callinan*, 2020 WL 4740487, at *33 (internal citations omitted) (emphasis in original).  Circumstantial evidence "can support a strong inference of scienter" and a plaintiff is not required "to present *direct* evidence of scienter in order to withstand dismissal of his securities claims."  *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003) (emphasis in original).  This "strong" inference need not be "of the smoking-gun genre, or even the most plausible of competing inference."  *Lormand,* 565 F.3d at 251.

Defendants' absence of scienter arguments (MTD at 24) fail.  As alleged, Defendants deceptively touted Hallmark's allegedly methodical and sophisticated claims management process as an effective way to mitigate against anticipated increases in loss reserves due to claims liability exposure.  Defendants consistently and falsely represented that Hallmark's claims management process would close claims faster and reduce exposure to increasing loss reserve costs, thereby improving Hallmark's financial position.  ¶ 37.  The Complaint establishes strong inferences that these misrepresentations were made with scienter.  These strong inferences include:  (i) the importance of the Binding Primary Auto business segment as a core operation of the Company (and which was responsible for over 100% of the Company's aggregate adverse reserve development (¶¶ 95, 117)); (ii) the magnitude of the loss reserve increase—$63.8 million—and Hallmark's subsequent decision to exit Binding Primary Auto business (¶¶ 7, 95, 117); (iii) Hallmark's refusal to comply with BDO's request for information necessary to perform an audit

of Hallmark's 2019 financial statements, BDO's firing when it persisted in its requests, and Defendants' concealment of the nature of its disagreements with BDO regarding Hallmark's loss reserve calculations, despite its legal requirement of full disclosure under Item 304(a)(1) of Regulation S-K (¶¶ 8-11, 50, 100-01, 117); (iv) the fact that Hallmark's actual, arbitrary accounting policies differed substantially from its stated policies of setting reserves objectively through individual case-basis valuations and statistical analyses (¶¶ 6, 30-52, 117); (v) Hallmark's weak internal controls, combined with the Executive Defendants' knowledge of those weaknesses and their SOX certifications (¶¶ 3-6, 30-52, 117); and (vi) the Executive Defendants' contemporaneous knowledge of the falsity of their statements (¶¶ 30-52, 116).[13]  Further, allegations of GAAP violations coupled with evidence of corresponding fraudulent intent can be sufficient to further raise an inference of scienter. *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 n.3 (5th Cir. 2008).

The Complaint establishes strong inferences of scienter against Defendants Anand and Passmore individually because of their improper SOX certifications.  The Fifth Circuit and this Court have held that "[s]igned SOX certifications support scienter only 'if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Town of Davie*, 273 F. Supp. 3d at 684 (citing *Central Laborers'*

---

[13] For instance, Defendant Anand knew about and directed Milch and Stauber's ongoing manipulation and arbitrary lowering of loss reserves; Defendant Anand and Stauber had a close prior relationship and had frequent meetings together and that they also held company town hall meetings together to discuss Hallmark's business practices with employees; Stauber directed Milch to arbitrarily manipulate and lower loss reserves in relation to Hallmark's commercial auto claims; Stauber told Milch that the lowering of loss reserves was a directive from Anand; Milch was worried about committing securities fraud and said that she was thinking about leaving Hallmark; and Anand knew about the "reserve project" meetings and frequently met with Stauber to discuss loss reserves.

*Pension Fund v. Integrated Elec. Services Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)) (internal citations omitted); *accord Indiana Elec. Workers*, 537 F.3d at 545. The Complaint alleges particular facts demonstrating that both Defendant Anand and Passmore knew that their SOX certifications and Hallmark's financial statements contained material misstatements and omissions. This is not a case where unsuspecting corporate-suite executives blindly signed-off on required disclosure documents with ignorance. To the contrary, Defendant Anand *directed* the fraud. He *knew* and *participated* in the "reserve project" (a/k/a the deliberate loss reserve manipulation scheme to preserve Hallmark's profitability), as recounted by CW-1 and CW-2. Moreover, Defendants Anand and Passmore were responsible for falsely reassuring the market on earnings calls during which they gave no indication that (i) loss reserves were understated by $63.8 million (they said reserves were "adequate") and (ii) that Hallmark would exit its supposedly well-managed Binding Primary Commercial Auto insurance business. These Defendants lulled the market into thinking that Hallmark's loss reserve practices and claims management processes were under control. The Complaint is rife with examples demonstrating "[']the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.'" *Town of Davie*, 273 F.Supp.3d at 684.

Similarly, the Complaint's allegations regarding BDO's audit termination supports a finding of scienter for similar reasons. Defendant Anand and Passmore certified in their SOX certifications that Hallmark's internal accounting controls and procedures were sufficient when they clearly knew/were aware of the opposite, as demonstrated by BDO's disagreement with Hallmark over loss reserve accounting practices and BDO's subsequent forced termination. *See* ¶¶ 10, 11, 39, 50, 66, 100-01, 103, 117. Anand and Passmore had "reason to know" or "should have suspected" that Hallmark's "financial statements contained material misstatements or

29

omissions" relating to Hallmark's loss reserves because of the presence of "glaring accounting irregularities or other red flags" identified by BDO's audit. *Town of Davie*, 273 F. Supp. 3d at 684. Yet, Anand and Passmore, as knowledgeable CEO and CFO, respectively, still signed their SOX certifications, thereby misleading investors and leading to a "strong scienter inference." *Id.*

The Complaint plausibly illustrates to a reasonable person that Anand and Passmore's actions intended to deceive investors and manipulate Hallmark's publicly-filed financial statements.[14]   Anand and Passmore were severely reckless because their act of certifying statements that they knew/were aware not to be true represented an extreme departure from the standards of ordinary care (culminating in a surprise $63.8 million loss reserve adjustment that would shock the market), and presented an obvious danger of misleading the market and harming investors (which it did, ¶ 13).

Defendants incorrectly seek to deflect the impact of CW-1's and CW-2's compelling evidence of Defendants' scienter by arguing that these confidential witnesses have no direct knowledge of the actions of the actuaries. MTD at 26. But this distinction is not relevant because the Complaint plainly establishes CW-1's and CW-2's knowledge of the scheme to manipulate case reserves, and Defendants' acknowledge that the loss reserve calculations are based, at least in part, on the amount of case reserves. *See* Section II.C, *supra.*

Defendants attempt to minimize the impact of the confidential witness's evidence by asking the Court to assume the unreliability of the witnesses, but the Fifth Circuit recognizes that "[c]onfidential source statements are a permissible basis on which to make an inference of scienter." *Central Laborers' Pension Fund v. Integrated Elec. Services Inc.*, 497 F.3d 546, 552

---

[14] "A corporation is liable for statements by employees who have apparent authority to make them." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008).

(5th Cir. 2007); *accord Kohut v. KBR, Inc.*, 2015 WL 11995250, at \*12 (S.D. Tex. Sept. 3, 2015).[15] In this case, the confidential witness allegations are remarkably specific and particularized and far from "boilerplate" as Defendants contend (MTD at 31-32). The confidential witnesses described with particularity that individual case reserves were, as a matter of course, arbitrarily determined by Stauber (with Anand's knowledge), and examples of wrongful and arbitrary interventions by Milch and Stauber in specific cases are provided. ¶¶ 40-49. CW-1 and CW-2's collective allegations are consistent with the totality/circumstances of other allegations in the Complaint and, therefore, lead to a strong, cogent, and compelling inferences of scienter against the Executive Defendants and Hallmark. *See Indiana Elec. Workers*, 537 F.3d at 533 (the court evaluates the "state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)[']") (citation omitted).

Defendants' cases are inapposite. In *Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) (MTD at 25), the magnitude of the changes to reported financials, while large, had only a "small" contribution to the inference of scienter "because the valuation involved subjective [GAAP] accounting concepts that can yield a wide range of reasonable results." *Id.* Here, by contrast, Defendants were not merely utilizing approved, subjective GAAP accounting concepts but were *arbitrarily* manipulating loss reserves, which caused the large magnitude of the loss reserve adjustment ($63.8 million). There is a difference between "subjective" and arbitrary processes;

---

[15] Defendants wrongly suggest that hearsay statements from confidential witnesses are improper and should be disregarded. *See* MTD at 30. As this Court has recognized, "CWs are often reporting hearsay, but that 'does not automatically disqualify [their] statement from consideration in the scienter calculus.' . . . This is because 'the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence.'" *Budde v. Global Power Equipment Group, Inc.*, 2018 WL 4623108, at \*4 (N.D. Tex. Sept. 26, 2018) (internal citations omitted).

common sense dictates that arbitrary processes never yield "reasonable results." *See also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. Sept. 15, 2000) (the greater the magnitude of a GAAP violation, the more likely it is that such a violation was made consciously or recklessly). Defendants' reliance on the facts of *Goldstein*, 340 F.3d at 254 (MTD at 25 n.78), is similarly misguided because, unlike the plaintiff in *Goldstein*, Plaintiff here does not allege "gross mismanagement" in accounting compliance but, instead, a deliberate manipulation of loss reserves and an ongoing attempt to conceal that manipulation by the Executive Defendants.[16]

**D.     The Complaint Adequately Pleads Loss Causation.**

"Loss causation" refers to a "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). In order to plead loss causation, the Complaint "must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *Callinan*, 2020 WL 4740487, at *40-41. Loss causation can be demonstrated circumstantially by identifying corrective disclosures. *Id.* at 41. "Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss[.]" *Lormand*, 565 F.3d at 258. "For a complaint to adequately plead this requirement, it need only set forth 'a short and plain statement of the claim showing that the pleader

---

[16] Defendants' remaining out-of-circuit cases do not help them. *See Woolgar*, 2020 WL 4586792 (confidential witnesses were not in positions in which they had particular knowledge about the defendant's commercial liability lines, had no direct contact with the individual defendants, and did not allege that individual defendants received information demonstrating that their public statements were false); *Fryman*, 462 F. Supp. 3d at 899 (terminated auditor was investigating a *subsidiary* of the defendant company, not the defendant company itself); *City of Westland*, 129 F. Supp. 3d at 80 (no facts alleged that company knew that it had misrepresented the adequacy of its reserves).

is entitled to relief' and provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014). The ordinary pleading rules under Fed. R. Civ. P. 8(a)(2) apply to allegations of loss causation, and "are not meant to impose a great burden upon a plaintiff." *See Dura*, 544 U.S. at 346; *see also Spitzberg*, 758 F.3d at 687-88 (there is no heightened pleading standard or a "particularity" requirement with respect to loss causation, and "the PSLRA does not obligate a plaintiff to deny affirmatively that other factors affects the stock price in order to defeat a motion to dismiss.").

The Complaint sets forth "a short and plain statement" of corrective disclosures that illustrate loss causation. ¶¶ 118-123. Further, the Complaint alleges how Hallmark's share price fell as a result of (i) disclosure of the $63.8 million loss reserve charge; (ii) disclosure of BDO's termination; and (iii) disclosure of Hallmark's disagreement with BDO. ¶ 121. The relationship between these corrective disclosures and the corresponding share price declines adequately pleads a facially plausible causal relationship.

Defendants' arguments about other factors purportedly causing a drop in Hallmark's stock price (MTD at 32-33) are not appropriate at this stage because they ask the Court to engage in an intensive fact-inquiry that goes beyond the pleadings stage. *See Lormand*, 565 F.3d at 267 (declining to resolve whether other market forces and events caused the plaintiff's economic losses at the pleading stage: "The plaintiff is only required to plead a plausible cause of action; we are not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PLSRA."). In any event, the broader market decline on March 12, 2020 cited by Defendants does not explain the downward steps taken by Hallmark's share price over the

33

course of several days in response to specific announcements made by Hallmark *beginning on March 2 before* the broader market swoon occurred.  Defendants also ignore that Hallmark's share price declines on March 3 and March 12 in response to specific Hallmark corrective disclosures were far greater than declines in the Dow Jones Industrial Average on those days (March 3: Hallmark down 14.7%, Dow down 2.94%; March 12: Hallmark down 29.5%, Dow down 9.99%).[17]  This is precisely why courts decline to make loss causation findings at the pleading stage; the Court can make loss causation findings at the appropriate time based on expert evidence.

Further, and contrary to Defendants' argument (MTD at 33-34), Plaintiff has tied the share price declines to specific corrective disclosures revealing the falsity of prior statements.  The March 2, 2020 disclosure that the Company would be forced to recognize a $63.8 million charge to increase previously reported loss reserves exposed Defendants' prior lies about Hallmark's process for estimating reserves.  ¶ 121.  Likewise, the March 11 disclosure that Hallmark had fired auditor BDO amplified investor questions about the scope of the scandal and its effects on Company financials.  *Id.*

Defendants' authorities are unhelpful.  *In Magruder v. Halliburton*, No 3:05-cv-01156-M (ECF No. 100) (N.D. Tex. Mar. 12, 2019), the court held that alleged disclosures regarding the duration of a bankruptcy stay said nothing about purportedly concealed truths, quite unlike the corrective disclosures here that strike to the very heart of Defendants' representations about loss reserve practices.  And *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251 (N.D. Tex. 2015), is unhelpful because the defendant was able to rebut the fraud on the market presumption using evidentiary presentations, including expert testimony, that were considered in association

---

[17] *See* Dow Jones Industrial Average 1896-2021 Data, Trading Economics, https://tradingeconomics.com/united-states/stock-market (last visited Jan. 6, 2021).

with class certification—an inquiry that is inappropriate at the pleading stage. *Lormand*, 565 F.3d at 267.

### E.       The Court Should Not Dismiss the Section 10(b) Claims Against Defendants Anand and Passmore.

As discussed primarily in Sections IV.A and IV.C above, the Complaint sufficiently alleges claims against both Defendants Anand and Passmore. And Passmore's resignation as Hallmark's CFO on September 30, 2020 is further evidence of scienter. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) (the "timing and circumstances of individual defendants' resignations" can contribute to an inference of scienter). Thus, the Court should not dismiss the Section 10(b) claims alleged against Anand and Passmore.

### F.       The Court Should Not Dismiss the Section 20(a) Claims.

Defendants' sole argument regarding the Complaint's Section 20(a) claims is that it rises and falls with the Section 10(b) claims. Because the Complaint adequately states Section 10(b) claims, the Section 20(a) claims should not be dismissed.

## V.       CONCLUSION AND CONDITIONAL REQUEST TO AMEND

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety. If Defendants' motion is granted in whole or in part, Lead Plaintiff respectfully requests leave to amend pursuant to Fed. R. Civ. P. 15(a)(2).

Dated: January 6, 2021                          Respectfully submitted,

                                                **HAGENS BERMAN SOBOL SHAPIRO LLP**

                                                By _____*/s/ Lucas E. Gilmore*_____
                                                LUCAS E. GILMORE (CA Bar No. 250893)

                                                Reed R. Kathrein (admitted *Pro Hac Vice*)
                                                Lucas E. Gilmore (admitted *Pro Hac Vice*)
                                                715 Hearst Avenue, Suite 202
                                                Berkeley, CA 94710
                                                Telephone: (510) 725-3000

Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman (admitted *Pro Hac Vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Counsel for Lead Plaintiff*
*Rajeev Yalamanchili*

Marc R. Stanley (TX Bar No. 19046500)
Martin Woodward (TX Bar No. 00797693)
**STANLEY LAW GROUP**
6116 N. Central Expressway, Suite 1500
Dallas, TX  75206
Telephone: (214) 443-4301
Facsimile:  (214) 443-0358
marcstanley@mac.com
mwoodward@stanleylawgroup.com

*Liaison Counsel for Lead Plaintiff*
*Rajeev Yalamanchili*

36

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List.

*/s/ Lucas E Gilmore*
LUCAS E. GILMORE
